ROBERT C. SCHUBERT (S.B.N. 62684)
WILLEM F. JONCKHEER (S.B.N. 178748)
DUSTIN L. SCHUBERT (S.B.N. 254876)
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
rschubert@schubertlawfirm.com
wjonckheer@schubertlawfirm.com
dschubert@schubertlawfirm.com

JEFFREY M. NORTON (admitted *pro hac vice*)
**NEWMAN FERRARA LLP**
1250 Broadway, 27th Floor
New York, NY 10001
Telephone: (212) 619-5400
Facsimile: (212) 619-3090
jnorton@nfllp.com

*Co-Lead Counsel for Lead Plaintiff Frank Fish*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re SOLARCITY CORPORATION SECURITIES LITIGATION<br>-------------------------------------------------<br>This Document Relates To: All Actions | **Master File No. 5:16-cv-04686-LHK**<br>**Consolidated Class Action**<br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br>Jury Trial Demanded<br>**Hon. Lucy H. Koh** |

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. SUMMARY OF ALLEGATIONS .......... 1

III. JURISDICTION AND VENUE .......... 4

IV. PARTIES .......... 4

A. Plaintiff .......... 4

B. Defendants .......... 5

V. SUBSTANTIVE ALLEGATIONS .......... 8

A. Background of SolarCity's Business .......... 8

B. SolarCity's Key Financial and Operating Metrics .......... 11

C. Defendants Mask Failing Demand With Dubious Sales Practices and Manipulation of Contract Status and Cancellations .......... 14

D. Company Drops and Alters Key Metrics in an Attempt to Further Conceal Impact of Cancellations .......... 16

E. Fraud Corroborated by Confidential Witnesses .......... 18

*Confidential Witness No. 1* .......... 18

*Confidential Witness No. 2* .......... 20

*Confidential Witness No. 3* .......... 21

*Confidential Witness No. 4* .......... 22

*Confidential Witness No. 5* .......... 23

VI. FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD .......... 24

A. First Quarter 2015 .......... 24

B. Second Quarter 2015 .......... 29

C. Third Quarter 2015 .......... 33

D. Fourth Quarter and Year End 2015 .......... 40

E. First Quarter 2016.......... 42

VII. LOSS CAUSATION .......... 43

VIII. ADDITIONAL SCIENTER ALLEGATIONS .......... 47

IX. POST-CLASS PERIOD EVENTS.......... 52

X. PRESUMPTION OF RELIANCE .......... 54

XI. NO SAFE HARBOR.......... 55

XII. CLASS ACTION ALLEGATIONS.......... 55

XIII. CAUSES OF ACTION.......... 57

COUNT I Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants).......... 57

COUNT II Violations of Section 20(a) of the Exchange Act (Against the Individual Defendants) .......... 59

XIV. PRAYER FOR RELIEF .......... 60

## I. INTRODUCTION

1. Lead Plaintiff Frank Fish ("Plaintiff") alleges the following based upon personal knowledge with respect to himself and, for all other matters, the investigation of Lead Counsel which included, *inter alia*: (i) SolarCity Corporation's ("SolarCity" or the "Company") filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and other public statements; (iii) securities analyst reports and media reports about the Company; and (iv) interviews with former SolarCity employees who were employed by SolarCity before or during the Class Period, defined below. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2. This is a class action for violations of the federal securities laws. Plaintiff brings this action on behalf of all persons who purchased or otherwise acquired the publicly-traded securities of SolarCity between May 6, 2015 and May 9, 2016 (the "Class Period"), and who were damaged thereby (the "Class").

3. Plaintiff asserts claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10(b)-5 promulgated thereunder. The defendants are SolarCity, its co-founder and Chief Executive Officer ("CEO"), Lyndon R. Rive, its former Chief Financial Officer ("CFO"), Brad W. Buss, its current CFO and former Chief Operating Officer ("COO"), Tanguy Serra, and its former Chief Revenue Officer ("CRO"), Hayes Barnard (the "Individual Defendants") (collectively "Defendants").

## II. SUMMARY OF ALLEGATIONS

4. SolarCity sells solar energy systems for residential and commercial use. The Company generally absorbs the upfront capital costs needed to install the solar energy system at the customer's property, and then bills the customer pursuant to long-term contracts lasting 20 years. The contracts, known as SolarLeases and SolarPPAs, can be cancelled by the customer prior to construction at no charge. The Company monetizes its receivables from the contracts to generate capital for financing the installations.

5. In the fiscal years leading up to the Class Period, the Company reported substantial losses as it pursued an aggressive growth strategy. In SEC filings and earnings releases before and during the Class Period, the Company touted its data-driven model based on certain "key operating metrics" that it used to "evaluate our business, measure our performance, identify trends affecting our business, formulate financial projections and make strategic decisions."

6. As alleged below, these metrics were based heavily upon the number of solar customers and contracts. For each reporting period, the metrics generally measured: (a) the number of SolarCity's cumulative customers; (b) the number of SolarCity's cumulative energy contracts; (c) the total megawatts ("MW") deployed; and (d) the dollar amount of nominal contracted payments ("NCP"), defined as the estimate of the sum of the cash payments that the Company's customers are obligated to pay under the Company's agreements, including contracts in the Company's backlog. The Company did not, however, disclose the large numbers of contracts that were either unsustainable, likely to be cancelled, or that should have been cancelled and removed from the Company's backlog.

7. During the Class Period, the Company began to experience declining demand for its solar systems due to adverse conditions in the solar market. As alleged herein, the Company acted recklessly and/or intentionally by concealing the effects of declining demand by amassing dubious contracts through overly-aggressive sales practices and delaying the removal of customer contracts from the Company's internal reporting system that should have been cancelled for inactivity and/or infeasibility.

8. SolarCity's aggressive sales practices became notorious and were the subject of customer complaints, class action litigation, and government investigations. As alleged herein, in late 2014, members of Congress from eight states requested that the Federal Trade Commission and the Consumer Financial Services Bureau conduct investigations into high pressure and fraudulent sales tactics employed by solar companies, including SolarCity.

9. With regard to masking and/or delaying cancellations from the Company's internal systems, certain confidential witnesses confirm that this was accomplished through manipulation of the Company's "SolarWorks" contract database by various means, which had the effect of preserving such contracts when the contracts should have been canceled, and should not have been relied upon as an indicator of growth or demand.

10. Efforts to suppress the Company's staggering rate of contract cancellations were pervasive. According to confidential witnesses, residential cancellation rates were surging as high as 40% to 50% during the Class Period. As noted above, this problem was exacerbated by the Company's top-down aggressive sales culture, which produced low-quality contracts that were often cancelled by customers who declined to proceed, or could not be fulfilled. As a result of the Company's efforts to achieve large and growing numbers of unsustainable contracts while simultaneously employing measures to suppress large numbers of anticipated contract cancellations, the Company's reported cumulative customers, cumulative energy contracts, MW booked and NCP metrics were materially inflated during the Class Period. This allowed the Company to conceal both diminishing demand and the impact of contracts that should have been removed from the backlog. As press coverage and analyst reports throughout the Class Period demonstrate, investors believed Defendants.

11. Despite the Company's smoke and mirrors attempts to falsely represent growth and conceal falling demand, the practices were unsustainable, forcing the Company to begin shedding contracts. This was gradually revealed to investors as the Company announced declining results for the third and fourth quarters of fiscal year 2015, and dismal results for the first quarter of 2016 as the Class Period ended.

12. Significantly, as the true state of affairs was revealed in these disclosures, the Company obfuscated further by *ceasing to report* its traditional "key operating metrics" altogether. By the end of the Class Period, the stock had dropped to approximately $17 per share off a Class Period high of over $60 per share.

13. Throughout the Class Period, Defendants acted with scienter and made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## III. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, SolarCity's principal executive offices are located within this Judicial District.

17. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV. PARTIES

### A. Plaintiff

18. As set forth in his Certification attached hereto, Plaintiff Frank Fish purchased SolarCity common stock during the Class Period and was damaged thereby.

**B. Defendants**

19. Defendant SolarCity was, at all relevant times, a Delaware corporation with its principal executive offices located at 3055 Clearview Way, San Mateo, California 94402. SolarCity's common stock traded on the NASDAQ Stock Market ("NASDAQ") under the symbol "SCTY." At relevant times, SolarCity was in the business of selling solar power to residential, commercial and government customers. In June 2016, it was announced that SolarCity would be acquired by Tesla, Inc. ("Tesla"), and the transaction closed in November 2016.

20. Defendant Lyndon R. Rive ("Rive") was the CEO of SolarCity. He is a founder of the Company and served as CEO and as a director since 2006. Prior to co-founding SolarCity, from October 1999 to July 2006, Rive co-founded and served as vice president and a member of the board of directors of Everdream Corporation, a provider of distributed computer management software and service. Prior to that position, Rive founded LRS, a distributor of health products in South Africa. According to the Company's 2016 Proxy Statement, Rive was selected to serve on the board of directors "due to his perspective and experience as one of our founders and as our Chief Executive Officer, as well as his extensive background in the solar industry."

21. Defendant Brad W. Buss ("Buss") was the CFO of SolarCity from prior to the beginning of the Class period until February 10, 2016, when he resigned. Buss remained an employee of SolarCity through March 31, 2016, and thereafter served as an advisor to the Company for the remainder of the Class Period. According to the Company's 2015 Proxy Statement, prior to joining SolarCity, Buss served as CFO and Executive Vice President, Finance and Administration of Cypress Semiconductor Corp., a semiconductor design and manufacturing company, from August 2005 until June 2014. Buss also served as Vice President of Finance at Altera Corp., a semiconductor design and manufacturing company, from March 2000 to March 2001 and from October 2001 to August 2005. Finally, Buss has served as a member of the board of directors of Tesla since November 2009.

22. Defendant Hayes (Hayden) D. Barnard ("Barnard") was the CRO of SolarCity from August 2013 to June 9, 2016, when he abruptly retired. He remained as an employee of the

Company through August 15, 2016. While at SolarCity, as discussed *infra*, Defendant Barnard was a major driver of the Company's aggressive expansion and emphasis on sales numbers, and reported to one or more of the other Individual Defendants. Before joining SolarCity, Barnard was the Founder, Chairman, and CEO of Paramount Equity Mortgage, a consumer finance company specializing in mortgage, insurance, and residential solar. Prior to Paramount Equity Mortgage, Barnard served as an account manager of Oracle Corporation from 1995 to 2003. As SolarCity's CRO, Defendant Barnard was placed in charge of the Company's sales and marketing organizations, according to the Company's August 13, 2013 Form 8-K filed with the SEC which announced SolarCity's approximately $120 million acquisition of a Paramount Equity Mortgage subsidiary. Thus, in his CRO duties, Defendant Barnard was charged with, *inter alia*, assembling, reviewing, and approving the Company's "key operating metrics" relating to SolarCity's sales and, accordingly, knew firsthand about the actual state of SolarCity's declining customer demand and aggressive sales practices. Defendant Barnard furnished and disseminated this false and misleading sales information with actual knowledge that it was for the purpose of communicating the results to investors in earnings releases, SEC filings, and conference calls. Consequently, Defendant Barnard participated in the issuance of and caused to be disseminated false and misleading statements and/or failed to disclose material facts during the Class Period about SolarCity's growth, falling demand, and inflated performance metrics. This conduct was done in furtherance of Defendants' fraudulent scheme and course of conduct.

23. Defendant Tanguy Serra ("Serra") became the President of SolarCity in November 2015 and also served as CFO of SolarCity starting in February 2016. Serra joined SolarCity in May 2013 as Executive Vice President of Operations, and became the COO in February 2014. According to the Company's 2016 Proxy Statement, prior to joining SolarCity, Serra served as chief executive officer and president of Vivint Solar, Inc., a solar energy solutions company, from April 2011 to April 2013, where he oversaw both finance and operations and was responsible for raising the company's tax equity funds. From April 2004 to September 2011, Serra served as vice president at TPG Capital, L.P., a private equity investment firm, where he

managed a number of the firm's investments. Prior to TPG Capital, Serra held financial analyst positions with Morgan Stanley Capital Partners and Merrill Lynch.

24. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of SolarCity, were privy to confidential and proprietary information concerning SolarCity, its operations, finances, financial condition, development and performance, and present and future business prospects.

25. Because of the Individual Defendants' positions, they had access to the adverse undisclosed information about SolarCity's financial results, business, operations and practices, *via* access to internal documents, conversations, and contact with other corporate officers and employees, attendance at meetings, and *via* reports and other information provided to them.

26. Each of the Individual Defendants, by virtue of his high-level position, was directly involved in the day-to-day operations of SolarCity at the highest levels and was privy to confidential information concerning the Company and its business, operations, and practices, including the misstatements alleged herein. Their positions of control and authority as officers and directors enabled the Individual Defendants to control the content of the SEC filings, press releases, and other public statements of SolarCity.

27. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of its annual reports, quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be materially false and misleading prior to or shortly after their issuance, and thus the Individual Defendants had the ability and opportunity to prevent their issuance or to correct them.

28. Because of their positions with the Company, and their access to material, non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed and were being fraudulently concealed. The Individual Defendants are liable for the materially false and misleading statements and omissions alleged herein.

29. As officers and controlling persons of a publicly-held company whose shares are registered with the SEC and were traded on NASDAQ, the Individual Defendants had a duty to disseminate prompt, accurate and truthful information with respect to SolarCity, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants each violated these specific requirements and obligations during the Class Period.

30. The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of SolarCity common stock by disseminating materially false and misleading statements that concealed material adverse facts concerning the manipulation of publicly reported information concerning the Company's performance and prospects. The scheme: (a) deceived the investing public regarding SolarCity's business, operations, management and the value of SolarCity's common stock; (b) caused Plaintiff and other members of the Class to purchase SolarCity common stock at artificially inflated prices; and (c) caused Plaintiff and the Class to suffer damages.

## V. SUBSTANTIVE ALLEGATIONS

### A. Background of SolarCity's Business.

31. SolarCity was founded in 2006 by defendant Rive and his brother Peter J. Rive. The Rives are cousins of Elon Musk ("Musk"), the founder of Tesla, who at all relevant times served as Chairman of the Board of Directors of SolarCity.

32. According to its 2014 Form 10-K, dated February 24, 2015, and filed just prior to the beginning of the Class Period (the "2014 Form 10-K"), SolarCity's founding vision was to accelerate mass adoption of solar energy. SolarCity's stated goals are to sell solar energy at prices below traditional utility rates and to reduce the cost of solar energy. According to the 2014 Form 10-K, the Company claims to have provided, or contracted to provide, solar systems or services to more than 190,000 customers as of early 2015.

33. The major components of the Company's solar systems include solar panels that convert sunlight into electrical current, inverters that convert the electrical output from the panels to a usable current compatible with the grid, "racking" that attaches the solar panels to the roof or ground, and electrical hardware that connects the solar system to the grid. SolarCity purports to have developed a "uniquely vertically integrated strategy" to roll out its solar systems which it claims has "disrupted the industry status quo."

34. According to the 2014 Form 10-K, this strategy incorporates: (a) marketing and sales of solar systems through an outside sales force, call centers, door-to-door sales personnel, agreements with "channel" partners such as big-box home improvement stores and homebuilders, and direct marketing campaigns and public events through various forms of media; (b) various methods for customers to finance their acquisition of solar power; (c) customized engineering of each solar system; (d) manufacture of each such solar system; (e) installation, monitoring and maintenance; and (f) energy storage services.

35. According to the 2014 Form 10-K, SolarCity's business model "allows us to offer long-term energy solutions to residential, commercial, government and other customers. We make it possible for our customers to buy renewable energy or solar energy systems from us for less than they currently pay for electricity from utilities with little to no up-front cost or down payment, as applicable. Our long-term contractual arrangements typically generate recurring customer payments, provide our customers with insight into their future electricity costs and minimize their exposure to rising retail electricity rates."

36. The two primary financing mechanisms for solar energy customers to avoid the large up-front capital costs required to install a solar system are the PPA (power purchase agreement) and the solar lease. Under a PPA, the developer (here SolarCity) arranges for the design, permitting and financing of the solar system on the host customer's property. The developer sells the energy created by the system to the host customer at a fixed rate that is typically lower than what is charged by the local utility. The lower price permits the customer to begin saving upon installation, while the developer receives income as well as tax credits such

as the Solar Investment Tax Credit (ITC) which allows certain tax deductions for solar installation costs, and other incentives generated from its continued ownership of the system.

37. A solar lease operates like a PPA, except that while under a PPA the monthly charge is based on the amount of electricity used by the customer, under a solar lease the customer pays a fixed monthly amount. The customer can also prepay certain amounts to produce a lower monthly charge. At the end of the PPA or solar lease, the customer can upgrade the system, extend the agreement, or have the system removed. PPAs and solar lease agreements typically are for 20-year terms and are used by the majority of solar energy customers.

38. According to the 2014 Form 10-K, SolarCity describes its PPA and lease products as follows: "In 2008, we launched the SolarLease, offering customers a fixed monthly fee at rates that typically translated into lower monthly utility bills with an electricity production guarantee from a SolarCity-owned system. This was followed in 2009 by the launch of the SolarPPA, a power purchase agreement charging customers a fee per kilowatt hour, or kWh, based on the amount of electricity produced by our solar energy systems at rates typically lower than their local utility rate." Similarly, according to the 2014 Form 10-K: "Our innovative SolarLease and SolarPPA customer agreements have fueled our growth by allowing our customers to pay little or no upfront costs to switch to distributed, solar energy. Customers can also increase their lifetime energy savings by pre-paying a portion of their future payments. Over the terms of both agreements, we own and operate the system and guarantee its performance. Our current standard SolarLeases and SolarPPAs have 20-year terms, and we typically offer the opportunity to renew our agreements for up to an additional 10 years."

39. Other less prevalent financing mechanisms for solar systems include purchasing them outright for cash, or through a loan. As of 2014, SolarCity provided a loan product called MyPower pursuant to which a subsidiary of the Company would provide qualified residential customers with a 30-year loan to finance the purchase of a solar system. However, most of SolarCity's business is derived from the PPA and solar lease model. According to the 2014 Form

10-K, PPAs and solar leases "create a portfolio of high-quality receivables that we leverage to further reduce the cost of making the switch to solar energy."

40. As SolarCity collects little from customers upfront, the Company must obtain capital elsewhere to pay for the solar systems it installs. According the 2014 Form 10-K, SolarCity has "monetized the assets created by our customer agreements through financing funds we have formed with fund investors. In general, we contribute and sell assets to the financing funds in exchange for upfront cash and a residual interest . . . . We use a portion of the cash received from the financing fund to cover our variable and fixed costs associated with installing the related solar energy systems. We invest the excess cash in the growth of our business. At the end of 2014, we had 40 financing funds with 18 different investors, comprised mostly of large financial institutions and large blue chip corporations."

41. The Company classifies its customers as residential, commercial, or government. According to the 2014 Form 10-K, the "vast majority" of SolarCity's customers are residential, that is, "individual homeowners who want to switch to cleaner, more affordable energy." Commercial customers "represent diverse business sectors, including technology, retail, manufacturing, agriculture and nonprofits." Government customers include "various federal, state and municipal entities" and schools and universities.

42. The Company has incurred substantial net losses as calculated under Generally Accepted Accounting Principles ("GAAP") and debt in recent fiscal years as it pursued an aggressive growth strategy. According to the 2014 Form 10-K, SolarCity has "incurred net losses in the past, and we had an accumulated deficit of $258.4 million as of December 31, 2014. We may incur net losses from operations as we increase our spending to finance the expansion of our operations, expand our installation, engineering, administrative, sales and marketing staffs, and implement internal systems and infrastructure to support our growth."

**B. SolarCity's Key Financial and Operating Metrics.**

43. In the context of it aggressive growth strategy and associated losses, the Company has historically identified in its SEC filings four "key operating metrics" to "evaluate our

business, measure our performance, identify trends affecting our business, formulate financial projections and make strategic decisions." In addition to discussing them in its SEC filings, the Company often highlighted these metrics by leading off with them at the top of its periodic earnings releases. Each metric is highly dependent upon the number of signed contracts the Company has with customers:

> ***Customers***
> We track the number of residential, commercial, government and other customers where we have installed or contracted to install a solar energy system, or performed or contracted to perform an energy-related consultation or other energy efficiency services. We believe that the relationship we establish with building owners, together with the energy-related information we obtain about the buildings, position us to provide the owners with additional solutions to further lower their energy costs. We track the cumulative number of customers as of the end of a given period as an indicator of our historical growth and as an indicator of our rate of growth from period to period.
>
> ***Energy contracts***
> We define an energy contract as a residential, commercial or government lease, power purchase agreement or MyPower contract pursuant to which consumers use or will use energy generated by a solar energy system that we have installed or have been contracted to install. . . . We track the cumulative number of energy contracts as of the end of a given period as an indicator of our historical growth and as an indicator of our rate of growth from period to period.
>
> ***Megawatts Deployed and Cumulative Megawatts Deployed***
> We track the megawatt production capacity of our solar energy systems that have had all required building department inspections completed. This metric includes solar energy systems deployed under energy contracts, as well as solar energy system direct sales. Because the size of our solar energy systems varies greatly, we believe that tracking the megawatt production capacity of the systems is an indicator of the growth rate and cost efficiency of our solar energy system business. We track the megawatts deployed in a given period as an indicator of asset growth and efficiency of the scale of our operations in the period. We track cumulative megawatts deployed as of the end of a given period as an indicator of our historical growth and our future opportunity to provide customers with additional solutions to further lower their energy costs.

> ***Nominal Contracted Payments***
> Our leases, power purchase agreements and MyPower contracts create long-term recurring customer payments. We use a portion of the value created by these contracts, which we refer to as "nominal contracted payments," together with the value attributable to investment tax credits, accelerated depreciation, solar renewable energy credits, performance-based incentives, state tax benefits and rebates to cover the fixed and variable costs associated with installing solar energy systems.
>
> We track the estimated nominal contracted payments of our leases, power purchase agreements and MyPower contracts entered into as of specified dates. Nominal contracted payments represent our estimate of the sum of the cash payments that our customer is obligated to pay under our agreements. When calculating nominal contracted payments, we include only those leases, power purchase agreements and MyPower contracts for solar energy systems already deployed and in backlog over the remaining term of such contracts. Backlog represents the aggregate megawatt capacity of solar energy systems not yet deployed as of the date specified pursuant to energy contracts and contracts for solar energy system direct sales executed as of such date. For a lease, we include the monthly fee and the upfront fee as set forth in the lease. . . .

44. In its public disclosures, the Company also highlights metrics regarding MW (Megawatts) – namely "MW Booked," "MW Installed" and "MW Deployed."

45. MW Booked is generally defined as the aggregate megawatt production capacity of solar energy systems pursuant to customer contracts signed during the applicable period, net of cancellations during the applicable period.

46. MW Installed is generally defined as the megawatt production capacity of solar energy systems for which all hardware has been installed, the system inverter is connected and production capacity has been confirmed, and the system is capable of being grid connected.

47. MW Deployed is generally defined as a completed system that has been inspected.

48. As demand for the Company's products and services waned throughout the Class Period due to various factors, Defendants manipulated the number of active customer contracts to maintain the Company's "key operating metrics" and MW metrics at inflated levels. Specifically, Defendants took steps to ensure that contracts that should have been canceled remained active in the Company's contract management systems. In addition, Defendants

undertook highly aggressive sales practices to bolster new contract volume, signing up customers who it knew would not qualify or did not stand to benefit financially, leading to a predictable (and undisclosed) increase in cancelled contracts as customers reneged on their agreements.

49. At the end of the Class Period, as Defendants' practices became unsustainable and the quality of the Company's backlog deteriorated, Defendants abandoned or redefined the "key operating metrics" to avoid closer scrutiny of the Company's faltering performance.

### C. Defendants Mask Failing Demand with Dubious Sales Practices and Manipulation of Contract Status and Cancellations.

50. As the Class Period began, SolarCity was experiencing declining demand for its solar panels. Demand was declining due to: (a) adverse developments in "net metering" policies of certain states, pursuant to which solar system owners may receive credit from utilities for excess power their systems produce; (b) the expiration of tax credits, rebates, and other financial incentives for solar power; (c) lower cost solar panels and increased access to financing, making ownership more appealing than SolarCity's solar leases, PPAs and MyPower loans; (d) customers' concerns that the need to transfer a solar agreement would impede their ability to sell their homes; and (e) the market becoming saturated, leaving a smaller pool of potential customers.

51. In order to conceal declining demand, the Company embarked on a two-fold scheme that would play into the Company's growth metrics. First, it would inflate the number of contracts through the use of overly-aggressive and deceptive sales practices, and, second, it would maintain long-inactive and infeasible contracts on the system as long as possible.

52. Defendant Barnard, who had a history of employing similar deceptive practices in the mortgage industry prior to joining the Company, spearheaded the effort and his tactics brought considerable scrutiny to SolarCity.

53. In early 2015, it was reported that members of Congress from eight states asked for an investigation into SolarCity's sales practices, including the use of false and misleading information to obtain lease agreements. According to a January 8, 2015 article posted to

Watchdog.org, the Company went so far as to put out sales brochures that misrepresented states' annual increases in utility rates to deceive consumers as to their anticipated savings. The Company was also accused of deceptive sales practices in class action litigation, as discussed below.

54. Additionally, SolarCity partnered with Paramount Equity Mortgage to sell solar systems—a company that agreed to pay a fine and restitution totaling approximately $400,000 in response to charges brought by the Department of Financial Institutions, Division of Consumer Services for the State of Washington concerning alleged false, deceptive, and misleading mortgage services advertising and collected fees. Paramount Equity Mortgage was owned by Defendant Barnard—who was a named respondent in the State of Washington proceeding—and who became SolarCity's Chief Revenue Officer in 2013. As alleged herein, confidential witness statements confirm that improper practices were likewise employed at SolarCity while Barnard served as CRO.

55. The next step was to keep these contracts active in the system. When a customer signed a solar lease or PPA, the customer was entered into SolarCity's "SolarWorks" and "Zipline" systems which were used to track the customer's relationship with the Company, including progress towards installation. A customer was free to cancel the contract at any time before installation began. In addition, the Company's policy was to cancel contracts for which panel installation had not begun and the account had been "inactive" for 120 days. However, if sales representatives or Concierges entered a note on a customer's Zipline profile, providing an excuse for the inactivity, the contract would not be automatically cancelled.

56. During the Class Period, the Company was failing to cancel and/or improperly refusing to cancel contracts that customers had attempted to terminate, or which should have been cancelled because they were inactive. As reported by confidential witnesses, SolarCity sales representatives were instructed by management not to cancel any contracts by simply neglecting to do so, and/or including fabricated notes (*i.e.*, excuses) on customer profiles as to why the process was not moving forward, so that the contract would not be automatically

cancelled due to inactivity. This allowed contracts that should have been cancelled to remain active, having the effect of inflating the Company's metrics.

57. In addition, confidential witnesses confirm that SolarCity management instructed its sales representatives to contract with customers who would not benefit from switching to solar or who would not ultimately receive credit approval. This also had the effect of inflating the Company's metrics, as these contracts would ultimately be cancelled when the customers figured out they would not benefit or had failed to qualify.

58. As a result of this widespread suppression of cancellations and inclusion of impossible-to-complete contracts, multiple metrics used by the Company to demonstrate growth to investors were inflated because they included, in part, customer contracts that would never generate revenue for the Company. The inflated metrics included, at least, MW Booked, Cumulative Energy Contracts, Cumulative Customers, and NCP.

59. The megawatts associated with each fraudulently-retained contract were inflating MW Booked. Each fraudulently-retained contract and the customer who signed it inflated Cumulative Energy Contracts and Cumulative Customers. In addition, NCPs were inflated because they included projected payments from contracts that should have been cancelled. Because these metrics provided insight into the level of demand for the Company's products, the inflation helped conceal a downward trend that had been negatively impacting the Company's performance and ultimately came to light towards the end of fiscal year 2015 and into fiscal year 2016.

**D. Company Drops and Alters Key Metrics in an Attempt to Further Conceal Impact of Cancellations.**

60. The Company's cancellation suppression continued to inflate these metrics through the third quarter of 2015, when the Company began to gradually shed the improperly retained agreements from its system, while attempting to continue to conceal the cancellation suppression from investors and the public. The Company concealed the cancellation suppression and declining demand by redefining or ceasing to report these inflated performance metrics—

metrics the Company had previously labeled as “”key”—and blaming missed guidance on uncontrollable delays in its commercial sector.

61. For example, on October 29, 2015, the Company issued its third quarter 2015 Shareholder Letter in which SolarCity announced a steep drop in MW Booked, falling 12.4% compared to the prior quarter, which it attributed to a change in the Company’s contract cancellation policy, rather than a drop in demand. However, as admitted by the Company, even if the cancellation policy had not changed it still would have reported a drop. It also reported Cumulative Energy Contracts, Cumulative Customers, and NCP metric results that revealed growth percentages significantly below the Company’s prior trends. This was the result of the Company shedding fraudulently retained agreements from its system, causing the metric drop-off.

62. In its third quarter 2015 Shareholder Letter, the Company further misled investors by claiming that “going forward” the Company would be “focusing our strategy on cost reductions and cash flow” and “not targeting the same growth rates” the Company had always pursued to date. The Company’s purported focus away from its “growth rates” became necessary as the Company’s reporting metrics were falling because it was finally shedding the fraudulently retained contracts and beginning its move away from sales tactics that piled those contracts into the backlog.

63. On February 9, 2016, the Company issued its fourth quarter 2015 Shareholder Letter, which announced that despite having revised downward its 2015 installation guidance on October 29, 2015, just two months before the end of the fiscal year, it had failed to meet this installation guidance. The Company also *declined to report* MW Booked and NCP in an apparent effort to conceal the effect of the elimination of improperly retained customer contracts. In addition, the Company’s Cumulative Energy Contracts and Cumulative Customers reported for the fourth quarter experienced the smallest growth percentages in (at least) two years.

64. The Company’s 2015 Form 10-K, filed on February 10, 2016 announced that the Company would no longer report NCP at all, stating: “Though we have historically reported

nominal contracted payments as a representation of the growth in our operations and the value of our energy contracts, ***we have decided not to report our undeployed backlog of contracts*** as a value in this manner and will no longer be reporting this amount." [emphasis supplied].

65. These statements partially revealed to investors that the Company had a substantial number of inactive customers in its system and/or that weakening demand was rendering these metrics undesirable to report. Then, on May 9, 2016, the Company reported its results for the first quarter of 2016, showing MW Booked had fallen drastically to 160 MW, the smallest figure in nearly two years. The Company lowered its fiscal year 2016 installation guidance from 1.25 GW down to 1.0 – 1.1 GW. In addition, the Company failed to report Cumulative Energy Contracts and Cumulative Customers *at all*, and NCP as previously announced, continuing its pattern of concealing the impact of the elimination of improperly retained agreements.

66. However, while abandoning its traditional metrics, the Company did report "Cumulative Installed Customers" which, by definition, did not include any customers whose contracts were improperly kept active. The Company essentially altered the "Cumulative Customers" metric, and changed its name slightly, to exclude customers who were previously inflating the metric because their contracts were improperly kept active.

67. The decrease in guidance for 2016 in conjunction with the drop in MW Booked revealed a sharp decline in demand for the Company's products, previously concealed by the Company's fraud, and in particular, by the Company's inflation of MW Booked.

### E. Fraud Corroborated by Confidential Witnesses.

***Confidential Witness No. 1***

68. CW1 was employed at the Company's Draper, Utah office from October 2015 until August 2016. From October 2015 to May 2016, CW1's position was "Concierge" for residential contracts in Delaware and Maryland. SolarCity Concierges were responsible for overseeing the various steps after the solar contract was entered into with a customer, such as inspections and permitting, until the solar system was installed. In addition, the Concierge would

monitor contracts following the installation up until the solar system was financed and activated. CW1 indicated that both the Concierge and the "Energy Consultants," who were the salespersons the customers signed the contract with, were able to make notes in the SolarWorks system.

69. CW1 said contracts were supposed to be cancelled if customers were unresponsive after receiving eight voicemail messages from SolarCity after the contract had been signed. At this point, the contract would be transferred to SolarCity's "customer retention" group. CW1 stated that Energy Consultants were under pressure to meet their numbers and fought to prevent their contracts from being cancelled. CW1 had reason to believe that Energy Consultants made false reports and/or notations regarding their interactions with customers which could have resulted in a contract appearing to still be viable when that was not the case.

70. CW1 recalled at least one contract which should have been cancelled because it required too significant of design changes; instead, the Energy Consultant claimed that the contract was viable and even reported that the customer was on vacation as one reason to delay cancellation of the contract.

71. CW1 explained that in addition to their other duties, Concierges handled inquiries from customers not assigned to them. When taking other Concierges' customer calls, CW1 noticed contracts that "should have been cancelled months ago." Further, CW1 would see things noted in the SolarWorks system that had not actually been done. For instance, the SolarWorks system would indicate that SolarCity was waiting to receive a document from the customer, but CW1 would find out that the customer had not been made aware of this. CW1 estimated that 15% of the contracts in the backlog at any given time were in an "overlooked" status – meaning there were actions that needed to occur but had not. CW1 claimed this became "more evident as time went on."

72. CW1 said certain individuals who engaged in problematic conduct "to make their numbers look good" ended up getting promotions and bonuses during CW1's tenure. In CW1's view, these false inputs were "obvious" and the Company could have done better canceling

contracts "when they were supposed to." CW1 believed it was evident from the large backlog of contracts that many would never be installed.

73. CW1 also indicated that the many of the contracts were "not high quality," because Energy Consultants and other personnel were "not doing their jobs right." Customers who did not have the necessary credit quality were allowed to sign contracts. CW1 provided the example of an adult with "sketchy" credit living with an elderly parent signing the contract, which would ultimately necessitate having the parent with qualifying credit execute a new contract to obtain financing.

***Confidential Witness No. 2***

74. CW2 worked at SolarCity from September 2012 until April 2016. CW2's most recent position was Senior Director of Operations, where CW2 was responsible for supporting SolarCity's operations so as to achieve targets, particularly residential solar installations, a process which included (but was not limited to) areas such as site surveys, permitting, and the actual installation itself. CW2 also trained the Operations Managers at SolarCity's 83 field offices. The training included "how to run an operation," "manage crews," "forecast properly," and how to handle matters such as errors in the design of a solar array, and coordinating the permitting for solar installations. CW2 reported to Senior Vice President of Operations Eric Wittenberg, who reported to Defendant Serra.

75. CW2 stated that the Company proactively maintained contact with the customer after signing the contract. CW2 indicated that the Company wanted to ensure a customer was still interested before incurring the cost of permitting, which could exceed $500; however, customers were still free to cancel after this point. CW2 also stated that if no contact had been made with a customer after 60 days from when the contract was signed, it was reclassified as a "HOLD." CW2 noted there would also be "some attempt to save" the contract at that point. Once it was clear a customer was going to cancel, the contract status would be changed in the SolarWorks system, requiring the approval of a manager on the team.

76. CW2 said that the contract cancellation rate for residential solar installations had been "very high" throughout CW2's tenure. CW2 noted that historical cancellation data indicated that upwards of 50% of the residential solar contracts in SolarCity's backlog ended up being cancelled. The "backlog" referred to any residential solar contract that had been signed by a customer, and therefore, had been entered into the SolarWorks system.

77. CW2 indicated that the high cancellation rate was due to the SolarCity sales force not adequately or fully qualifying customers. CW2 attributed this to Defendant Barnard, who had come to SolarCity from the mortgage industry and operated at SolarCity in a similar fashion, selling solar contracts to "anybody who gave the time of day" even though these "quick sales" often had "no value proposition to the customer."[1] As a result, "there was a lot of buyer's remorse" on the part of customers once they actually read their contracts, albeit after they had signed them. CW2 indicated that in the period leading up to his departure, upwards of 40% and closer to 50% of all customers were expressing "buyer's remorse" and were backing out of their contracts.

78. CW2 recalled that December 2015 had been the Company's biggest month ever in terms of megawatts installed; however, "thereafter sales dove" and never recovered. CW2 stated that changes to Nevada's net metering policy were one factor contributing to the decline in sales in 2016. Another factor impacting sales in 2016 was the Solar Investment Tax Credit (ITC), which had been set to expire at the end of 2015 but had been extended to 2018, so it was no longer as urgent as it had been for some customers to get solar systems before the credit expired. CW2 also noted several states that had been "unfriendly" to solar, including Nevada, Colorado and Arizona.

***Confidential Witness No. 3***

79. CW3 was also a Concierge from September 2015 until January 2017 at the Company's Las Vegas, Nevada call center and was responsible for residential contracts in New

---

[1] While working in the mortgage industry, Defendant Barnard entered into consent order arising out of deceptive practices in home loan refinancing. *See* http://www.dfi.wa.gov/sites/default/files/consumer-services/enforcement-actions/C-07-405-09-CO01.pdf

Jersey. CW3 stated that both the Concierge and the Energy Consultants had access to the Zipline system and were authorized to enter notes into it. CW3 said the system was "really detailed" and maintained a record of every interaction with a customer. If a customer had not responded after 60 days or eight attempts to contact after signing the contract then the contract would be "put into retention," which meant it was turned over to SolarCity's "customer satisfaction" group and removed from CW's backlog of active contracts.

80. CW3 noted that the contract cancellation rate was "very high," possibly greater than 50%. CW3 noted that the Energy Consultants were under a lot of pressure to keep their jobs, and therefore, would do what they could to retain customers.

***Confidential Witness No. 4***

81. CW4 was also a Concierge from June 2015 until September 2016 at the Company's Las Vegas, Nevada call center and was responsible for residential contracts in Southern and Northern California.

82. CW4 noted that SolarCity's database included older contracts that were highly unlikely ever to be installed, but which Energy Consultants would claim were "moving forward" when, in fact, there was no actual progress towards installation for months at a time.

83. CW4 stated that he was familiar with reports that untrue or false notes were entered into the system that made the status of a contract appear to be more viable or current than was actually the case.

84. CW4 also stated that Energy Consultants would make representations to customers that were incorrect and untrue in order to get a contract. As an example, CW4 reported that an Energy Consultant might represent that the customer would get a free upgrade to the customer's electrical panel or that the customer was eligible for a promotion that was not available. These false representations would be entered into the system and it would be up to the Concierges to call the customers in these instances to explain that whatever the Energy Consulted had represented was not correct.

85. With regard to the backlog of old and inactive contracts that would not be installed but remained on the system, CW4 reported that this diminished near the end of the Class Period (following the departure of Defendant Barnard), when Toby Corey took over.

86. CW4 stated that when Toby Corey took over as VP of Sales in or about August 2016, these contracts were "purged" from the system and Energy Consultants were informed that they needed to "clean out" any contracts that would not be installed.

***Confidential Witness No. 5***

87. CW5 worked as a SolarCity Energy Consultant from January 2014 until the end of May, 2016, in New Jersey, New York, and Connecticut.

88. CW5 noted that Defendant Barnard would lead weekly calls that were intended to "prop up" and encourage the sales force and that he was a major driver of SolarCity's aggressive expansion and emphasis on sales numbers.

89. CW5 had monthly quotas of 10 to 15 sales, with 7 to 10 final contracts. According to CW5, a sale was the initial contract obtained from the customer, and preceded a "walk-through" during which the customer's premises was inspected and the actual solar system was designed. Following the walk-through, the Energy Consultant had to obtain final contract from the potential customer.

90. According to CW5, by the end of 2015 or the beginning of 2016, especially in the Northeast Region, sales and installations were very hard to come by, and Energy Consultants were expected to enter into only 3 final contracts per month, which was very challenging.

91. CW5 explained that the number of installations was significantly less than the number of final contracts entered into by SolarCity.

92. CW5 attributed the challenges SolarCity faced at the end of 2015 and going into 2016 as overly-aggressive sales tactics that were turning people off and SolarCity's poor customer service and reputation, leading those who initially signed up to cancel their contracts.

93. Moreover, CW5 noted that many of the contracts entered into by SolarCity were of dubious quality; Energy Consultants were encouraged to get a customer to enter a contract regardless of whether the customer would be able to qualify.

94. According to CW5, the backlog of contracts was inflated because the objective for the Energy Consultants was to get a certain number of contracts each month, "however you got it didn't matter" and it did not matter if a contract was "good or bad" as long as "you got them signed."

95. CW5 said that by the end of 2015, only 10%-20% of "total sales" were resulting in installations.

## VI. FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A. First Quarter 2015

96. On May 5, 2015, the Company issued a Shareholder Letter reporting results for the first quarter of fiscal year 2015 (1Q15). The Shareholder Letter opened: "Entering 2015 with a strong start, SolarCity continued to drive significant growth in distributed solar energy deployment and create substantial value for shareholders." The Shareholder Letter stated that the Company had "record" bookings of 237 MW and installations of 153 MW that "surpassed our expectations." Defendants further reported: (a) 217,595 Cumulative Customers; (b) 207,426 Cumulative Energy Contracts; and (c) $6.1 billion of Estimated NCP.

97. The 1Q15 Shareholder Letter reported as follows:

> In what tends to be one of our seasonally softer periods, our sales and installation teams delivered strong year-over-year growth in the first quarter of 2015 that exceeded our expectations. We booked a record 237 MW in the first quarter of 2015, up 74% year-over-year, for a total of 891 MW over the last twelve months. We experienced increased demand across all of our product offerings and the majority of our markets in the first quarter, as more new customers embraced the opportunity we provided them to switch to distributed solar and lower their utility bills with no upfront costs.
>
> We added close to 28,000 new customers in the first quarter, and our Estimated Nominal Contracted Payments Remaining—an approximation of the revenue our lease/PPA/loan customers are expected to generate over the remaining life of their Energy Contracts—increased by a net $1.2 billion in the period. We view the increase in Estimated Nominal Contracted Payments Remaining as a better measure of our new sales activity than

> reported revenue, which is recognized over the life of the 20- 30 year terms of our lease, PPA, and loan contracts.
>
> Though we experienced the typical seasonal slowdown, in part due to winter weather on the east coast, our operations team powered ahead and installed 153 MW in the first quarter of 2015, up 87% year-over-year. Even with some of our key growth markets pounded by snow, residential installations grew 108% year-over-year to 139 MW. On many days, our installation crews literally dug their way to doorsteps and shoveled snow off rooftops to ensure many of our new east coast customers were able to go solar this last quarter. We can't express enough gratitude and appreciation for the diligence and dedication of all our operations teams— all across the country.

98. The 1Q15 Shareholder Letter further contained bullish guidance for the quarter ahead:

> **Establishing Q2 2015 Outlook and Reaffirming Guidance for 2015 MW Deployed**
>
> While the first quarter of 2015 was impacted by the typical seasonal slowdown, we expect a resumption in installation volume growth to new records in the second quarter of 2015 as our operations continue to scale and weather improves on the East Coast.
>
> For the second quarter of 2015, we expect MW Installed of 180 MW, which would represent year-over-year growth of 69% with residential growing north of 80%. While we now offer quarterly guidance on MW Installed, we reaffirm our full year guidance for 920 - 1,000 MW Deployed.

99. The 1Q15 Shareholder Letter was signed by Defendants Buss and Rive.

100. On May 6, 2015, SolarCity filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended March 31, 2015. The Company's Form 10-Q reported: (a) 217,595 Cumulative Customers; (b) 207,426 Cumulative Energy Contracts; and (c) $6.1 billion of Estimated NCP. The Form 10-Q was signed by Defendant Rive, reaffirmed the Company's statements regarding its operations, results, and prospects made in the 1Q15 Shareholder Letter issued May 5, 2015.

101. The foregoing statements regarding 1Q15 were false and misleading at the time they were made. As alleged herein, in their statements regarding 1Q15, Defendants failed to disclose that demand for the Company's products was softening, and that the Company's performance metrics including, at least, MW Booked, Cumulative Customers, Cumulative

Energy Contracts, and NCP, as well as its future growth forecast which relied upon those metrics, were materially misleading as they were inflated by poor quality contracts the Company knew would never be installed and other contracts it was improperly retaining in its backlog that should have been canceled.

102. On May 5, 2015, SolarCity conducted a telephone conference call for analysts to discuss its business and its 1Q15 results during which the Company and its executives stated as follows:[2]

> [Rive]: Let's take a closer look at customer growth. As mentioned in previous earnings calls, we have a goal of 1 million customers by mid-2018. We are now 20% of the way of achieving this goal.
>
> To achieve this goal, we need [to] grow at 60% year-over-year. Historically, we have grown at 95%, which ***makes us feel confident in achieving the 1 million customer goal.***
>
> * * * *
>
> [Serra]: Thank you, Lyndon. Our ***residential business*** continues to more than double, with Q1 installs growing from 67 megawatts to 139 megawatts year-over-year. This is a combination of our existing states continu[ing] to grow, and the opening of new states like Nevada, New Hampshire, and New Mexico. We are at 75 permanent warehouses in 16 states, and have new openings, approximately one every 15 days in 2015, ***intensifying and expanding our geographic coverage***.
>
> * * * *
>
> [Buss]: Most of you have probably seen the guidance, and I'll just touch on a couple of things. We are targeting megawatts of installed of 180, which will be a new record. As you can see, our revenue increases significantly since we're exiting winter, and we're adding thousands of new customers. Our OpEx dollars increase as we support the planned growth in a very measured manner, and we're also planning a significant ramp in megawatts deployed in the second half of 2015.
>
> * * * *
>
> [Analyst Brian Lee, Goldman Sachs]: Follow-up just on volumes. I think, you guys, if you could help us on your installation operational capacity and how it's grown since Q4. I think you had mentioned targeting 1 gigawatt for resi by year end. So wondering how close you are in relation to that target, and especially since you installed almost a 180 megawatts, which is the target for Q2 here. But you had seasonal impacts in Q4, so would've

[2] *Q1 2015 SolarCity Corp Earnings Call – Final* transcript, FD (Fair Disclosure) Wire (May 5, 2015).

> thought maybe you could be significantly higher here versus the guidance that you provided. So any thoughts there would be helpful. Thank you.
>
> [Rive]: Let me clear up on thing before Tanguy answers. It's not a gigawatt of residential. If the forecast is 922 gigawatt for residential and commercial. Just to clear the air.
>
> [Serra]: I think ***we're not changing the range. We still see ourselves very much in that range for the full year install. This is commercial and residential.*** On commercial, things are tracking nicely. ***As I said, I think we'll see a lot more growth in Q3, Q4 based on where the jobs are in progress right now. We feel very good about that.***
>
> *        *        *        *
>
> [Serra]: The way we've done it is ***we have really sophisticated forecasting models*** that allow us to look at, based on past patterns, new installs will hit by geographic area.
>
> *        *        *        *
>
> [Serra]: As a point of reference, I'd say sometime in 2014 there's a couple of months where we grew by more than 5 megawatts by month in 2014, and we were much smaller then than we are now, so ***growing north of 5 megawatts month by month is something we've done in the past, and I think we can do it again reasonably comfortably.***
>
> *        *        *        *
>
> [Peter Rive]: ***We are actually extremely bullish for the US markets.*** You look at the policy changes that New York is implementing, the policy changes that California is going to be looking at implementing, we absolutely believe in a future and see a future where the grid is a two-way grid where consumers are actually providing services to the utility. ***So we're highly optimistic about the US***…***In our primary states, we very optimistic about our growth.***
>
> *        *        *        *
>
> [Peter Rive]: ***With the growth rate of expansion right now and the size of the markets that we are in, there is no urgency to expand internationally.***
>
> *        *        *        *
>
> [Buss]: …I think it'd be great to put the metrics out, and then we can talk about forecasting. But I think it's pretty simple to see our growth that we have, the growth and retained value, everything hangs and comes in line. ***So our growth profile is going to be pretty darn big*** compared to most companies that are out there…

103. The foregoing statements regarding 1Q15 were false and misleading at the time they were made. As alleged herein, in their statements regarding 1Q15, Defendants failed to

disclose that demand for the Company's products was softening, and that the Company's performance metrics including, at least, MW Booked, Cumulative Customers, Cumulative Energy Contracts, and NCP, as well as its future growth forecast which relied upon those metrics, were materially misleading as they were inflated by poor quality contracts the Company knew would never be installed and other contracts it was improperly retaining in its backlog that should have been canceled.

104. More specifically, the statements "We are actually extremely bullish for the US markets" and "So we're highly optimistic about the US…In our primary states, we very optimistic about our growth" were false and materially misleading insofar as Defendants omitted to disclose that the Company's forecasted growth was dependent upon installations that Defendants knew would never occur and contracts the Company was improperly retaining in its backlog that should have been canceled.

105. As indicated above by Brian Lee's question, the Company's false and misleading performance metrics indicated a significant backlog of contracts, causing analysts to question whether installation capacity was an issue. While the Defendants' statements that they did not have installation capacity constraints were true, the statements were false and misleading at the time they were made because they omitted the fact that the performance metrics were fraudulently inflated, concealing that the underlying issue was a lack of demand.

106. Analysts and the investing public reacted positively to these misstatements. For instance, the *International Business Times* published an article on May 6, 2015, entitled "SolarCity Corp (SCTY) Shares Jump After Narrower Q1 Loss on Rising Revenue, Higher Solar Panel Installations." The article noted that SolarCity's stock rose 3.5% in early trading following the Company's May 5, 2015 disclosures and conference call. An article posted on *SeekingAlpha* on May 6, 2015, entitled "SolarCity's Growth Continues to Impress" echoed these conclusions, noting that the Company was "clearly on track in terms of its ambitious growth roadmap, and shows no signs of slowing down anytime soon." The article continued, "[T]here are several

reasons why the company should be able to extend its current growth rate for much longer than expected," including "the innovativeness of its marketing team."

**B. Second Quarter 2015**

107. On July 29, 2015, the Company issued a Shareholder Letter reporting results for the second quarter of fiscal year 2015 (2Q15), reporting MW volumes at "new highs." The Company reported MW Installed at 189 MW, up 77% year over year, and MW Booked at 395 MW, up 81% year over year. In the 2Q15 Shareholder Letter, Defendants further reported: (a) 262,495 Cumulative Customers; (b) 252,591 Cumulative Energy Contracts; and (c) $7.7 billion of Estimated NCP.

108. In addition, the 2Q15 Shareholder Letter further reported on the Company's updated sales strategy:

> Laying the groundwork for the step-up in installations we are targeting in the second half of the year, our sales output took it to the next level with a record net 395 MW Booked in the quarter. Our sales strategy to canvas, educate, and penetrate viable solar markets continued to bear fruit. Demand remained as strong as ever in California, continued to gather significant steam in the northeast markets of New York, Massachusetts, and Connecticut, and gained early traction following the launch of sales in Rhode Island and New Hampshire. We also entered the Minneapolis-St. Paul, MN market where we introduced our first community solar offering. For the first time, we are offering our solar service to those who live in rental units, condos, and low income housing, expanding our addressable market to a broader set of new customers who are seeking to lower their energy bills by going solar.

109. The Defendants' statement that sales were strong and gaining traction in the Northeast states was false and misleading at the time it was made given that it was diametrically contrary to the reality of a known (but concealed) 40-50% contract failure rate and was based on metrics the Company knew to be fraudulently inflated and deceptive. Furthermore SolarCity's reported MW Booked, Cumulative Customers, and NCP were materially misleading as they were inflated by poor quality contracts the Company knew would never be installed and other contracts it was improperly retaining in its backlog that should have been canceled.

110. The 2Q15 Shareholder Letter contained more bullish guidance for the quarter ahead:

> **Q3 2015 Outlook and Guidance for 2015 MW Installed**
>
> Following the ramp in bookings and installation capacity in Q2 2015, we exited the quarter at a monthly run rate that provides us with confidence in a significant step-up in our quarterly pace of installations. For Q3 2015, we expect to install a record 260 MW, representing growth of 89% year-over-year. For the full year 2015, we are updating our guidance to 920 – 1,000 MW Installed (vs. 920 – 1,000 MW Deployed previously). We consider a system (a) "installed" essentially when construction is completed by SolarCity and (b) "deployed" after Administrative Housing Judge [AHJ] inspection. Systems are typically inspected by numerous third parties one to several weeks after installation, and thus deployments tend to be lower than installations during periods of high growth. Because we are scaling our operations at a much faster pace than AHJs are scaling their inspection teams, inspection times are growing longer and we are experiencing greater difficulty in forecasting their timing. Nevertheless, our pace of installations is still coming in line with our original forecast at 920 – 1,000 MW, implying year-over-year growth of between 83% and 98%. Going forward, we plan on basing all of our MW forecasts on installations rather than deployments.

111. The Defendants' statement that the change from MW Deployed to MW Installed was in line with its original forecast was false and misleading at the time it was made, given that it was guiding to the same number of MW Installed as it had been previously guided to for MW Deployed, which was a downward revision since MW Installed would have been higher than MW Deployed, because it included those contracts which were waiting for inspection. Furthermore, Defendants' statements regarding the pace of installations and future growth were false and misleading at the time they were made because as indicated by the downward revision to its installation guidance, SolarCity was anticipating less growth due to declining demand.

112. Finally, the 2Q15 Shareholder Letter closed with a highly optimistic statement regarding the Company's purported trajectory:

> **Ramping Up for a Strong Close to 2015 and Solid Growth in 2016**
>
> Earlier this month, we celebrated our ninth anniversary and over that stretch, we have grown from installing less than 1 MW per quarter to our current plans of ~260 MW for Q3 2015. Entering into our 10th year, we plan on closing out our first decade with greater strength, momentum and record results as well as set the stage for continued strong growth for 2016 and

> beyond as we continue to grow significantly in the US and also begin our international expansion.

113. The Defendants' statement concerning future growth was false and misleading at the time it was made given that it was made with actual knowledge that, based on its backlog, low contract retention rate, and current conditions and trends, such growth was not achievable.

114. The 2Q15 Shareholder Letter was signed by Defendants Buss and Rive.

115. On July 30, 2015, SolarCity filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2015. The Company's Form 10-Q reported: (a) 262,495 Cumulative Customers; (b) 252,591 Cumulative Energy Contracts; and (c) $7.7 billion of Estimated NCP. The Form 10-Q was signed by Defendant Rive, and reaffirmed the Company's statements regarding its operations, results, and prospects made in the 2Q15 Shareholder Letter issued July 29, 2015.

116. On July 29, 2015, SolarCity conducted a telephone conference call for analysts to discuss its business and its 2Q15 results during which the Company and its executives stated as follows:[3]

> [Rive]: Q2 was an amazing quarter for SolarCity. We booked two new records, bookings and installs…As we look at our Company, this quarter we booked 395 megawatts. Our previous record was 237 megawatts. We installed 189 megawatts, another record for us, 77% year-over-year growth…We have 262,000 customers, adding over 44,000 customers this quarter, an 86% growth year over year. ***We are well on our way to achieve our 1 million customer goal. We added $1.6 billion of nominal contracted payments***, with a total of $7.7 billion.
>
> * * * *
>
> [Serra]: …we had a really solid quarter of installs. We deployed 168 megawatts of residential systems and 21 megawatts of commercial systems. ***I'm very happy with our continued ability to scale and [unbelievably] incredibly strong sales*** and leadership teams that continue to work hand-in-hand to offer customers an amazing experience. Housing installs grew at 86% year on year.
>
> * * * *
>
> [Buss]: I'll wrap up with some guidance. ***For Q3 we expect to install approximately 260 megawatts, which is a very strong 90% growth rate***

3 *Q2 2015 SolarCity Corp Earnings Call – Final* transcript, FD (Fair Disclosure) Wire (July 29, 2015).

> ***year on year. We entered the quarter with record bookings, and July has continued to be very strong***…For the full year 2015 we are aligning our full year guidance to megawatts installed versus deployed, which is consistent with the way we've been providing our guidance for the last two quarters, and is the way we'll provide guidance going forward. As such, ***we expect to install 920 to 1000 megawatts for 2015.*** Remember, deployments tend to lag this number by several weeks on average due to our large volume and the scheduling of third-party inspections. In summary***, I think we had a great Q2 and I expect an even better Q3.*** As a Company we remain focused on rapid growth, lowering cost and driving higher equity returns to our shareholders.
>
> *   *   *   *
>
> [Rive]: ***For the year we plan install 920 to 1000 megawatts, which should create around $920 million to $1 billion of value growing at 86%. We feel really good about the Company…***
>
> *   *   *   *
>
> [Rive]: ***The Company's growing extremely well*** and it creates tremendous value with every watt we deploy.
>
> *   *   *   *
>
> [Rive]: …***The biggest bottleneck that we face is taking it from booking to getting it ready for installation.*** And that's with dealing with all the permitting. That's going back to the customers, finalizing the design, back and forth custom design, back and forth customer's on vacation. That to us is our biggest bottleneck. And taking it from a booking to actually getting it ready for installation. The installation itself as Tanguy mentioned, be ***a really good process to ramp that up.***
>
> *   *   *   *
>
> [Analyst Paul Coster, JP Morgan]: …And then can you tell us anything about FICO scores and where you're headed ultimately here? And maybe also what kind of default rates you're seeing at the moment, if anything?
>
> [Rive] …Right now if you take the history of the Company we went from 725 FICO down to 700 down to 680 down to 650. And now we have to figure out how we make it possible for everybody in America to get cheaper clean energy. And so that's – we just have to solve that***. In terms of the actual default, it's –***
>
> [Buss]: ***They're miniscule.***
>
> *   *   *   *
>
> [Serra]: …Our average is still comfortably in the 700. 730, 740. So you're not going to see that, mix change too quickly. ***The delinquencies, even just aging, is well below normal. It's sub 1%. Just age stuff. And as far as true write-offs, it's a couple of handfuls. And it's usually due to an unfortunate circumstance.***

117. The statements regarding 2Q15 were false and misleading at the time they were made. As alleged herein, in their statements regarding 2Q15, Defendants failed to disclose that demand for the Company's products was softening, and that the Company's performance metrics including, at least, MW Booked, Cumulative Customers, Cumulative Energy Contracts, and NCP, as well as its future growth forecast which relied upon those metrics, were inflated by poor quality contracts the Company knew would never be installed and other contracts it was improperly retaining in its backlog that should have been canceled.

118. More specifically, the statement "[t]he biggest bottleneck that we face is taking it from booking to getting it ready for installation" was false and materially misleading insofar as Defendants knew at the time, but failed to tell the investing public, that the Company's booking figures were inflated by poor quality contracts the Company knew would never be installed, and other contracts it was improperly retaining in its backlog that should have been canceled. Furthermore, the statements about FICO scores were materially misleading because the Defendants failed to disclose, as indicated by CW1 and CW5, that the Company was signing up customers who would not qualify for financing, thereby fraudulently inflating the Company's performance metrics, yet not impacting its defaults or delinquencies.

119. Analysts and the investing public again reacted positively to these misstatements. For instance, an article posted on *CleanTechnica* on July 30, 2015, entitled "Despite Net Loss, SolarCity Enjoys Record Bookings & Installations," focused upon the Company's record number of new customers. An article posted on *Electrek* entitled "SolarCity added a record 44,000 customers during the last quarter" maintained the same focus, explaining that the Company "impressed the industry" with its MW Installed results, which were "impressive."

**C. Third Quarter 2015**

120. On October 29, 2015, the Company issued a Shareholder Letter reporting results for the third quarter of fiscal year 2015 (3Q15). The Shareholder Letter revealed moderation in the Company's growth and the inability to meet projected results. The Company reported MW Installed at 256, below the projected 260. The Company also reported MW Booked at 345, below

the 395 for the prior quarter, a drop of 12.6%. In addition, the Shareholder Letter reported: (a) 298,030 Cumulative Customers; (b) 288,992 Cumulative Energy Contracts; and (c) $8.9 billion of Estimated NCP.

121. Furthermore, the Company reported that it was reducing MW installation guidance for the fourth quarter of 2015 to 280-300 MW and an annual figure of 878-898 MW, "below the low end of our prior annual guidance," but blaming the decline on "inherent uncertainty" regarding certain commercial installations and "potential weather related disruptions."

122. The 3Q15 Shareholder Letter revealed that the Company was no longer targeting the "same growth rates" due to a purported new focus on "positive cash flow." According to the Shareholder Letter:

> Going forward we are focusing our strategy on cost reductions and cash flow. Though we expect our deployments to grow in 2016 we are not targeting the same growth rates that have gotten us to our current scale going forward. Specifically it is our goal to achieve positive cash flow by 2016 year-end and be in solid shape prior to the planned ITC expiration in 2017. We expect to continue to lead the industry in MW Installed with the lowest costs and strong returns, and we expect GAAP operating lease revenues to grow in excess of 70% year-over-year in 2016. In turn, we will be even more selective in the markets and projects we enter into. As such, we are introducing preliminary 2016 guidance of 1.25 GW Installed, representing a healthy year-over-year growth of approximately 41% as compared to the midpoint of our 2015 guidance. We also expect to announce meaningful reductions to our 2017 cost targets by our next earnings call. By continuing to increase our already industry-leading cost advantage, we expect to generate greater cash flow and position ourselves for continued growth that is less susceptible to competitive or regulatory developments than that of any other provider in the category.

123. The 3Q15 Shareholder Letter was signed by Defendants Buss and Rive.

124. On October 30, 2015, SolarCity filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended September 30, 2015. The Company's Form 10-Q reported: (a) 298,030 Cumulative Customers; (b) 288,992 Cumulative Energy Contracts; and (c) $8.9 billion of Estimated NCP.

125. The Form 10-Q was signed by Defendant Rive, and reaffirmed the Company's statements regarding its operations, results, and prospects made in the 3Q15 Shareholder Letter issued on August 29, 2015.

126. On October 29, 2015, SolarCity conducted a telephone conference call for analysts to discuss its business and its 3Q15 results during which the Company and its executives stated as follows:[4]

> [Rive]: Quick recap for Q3. ***We installed 256 megawatts, which is a new record, but slightly lower than our 260 megawatt forecast. I'm disappointed with this number,*** but just to put it in perspective, at our current rate of installation, we install roughly 2.5 to 3 megawatts a day, so we missed it by 1.5 days or so.
>
> ***All the fundamentals of the business is looking good.*** Cost reduction is coming down nicely. ***Demand for the product is strong,*** and the economic value we created this quarter was $239 million. That's quite an amazing number***. Looking at the last nine years, the strategy of the Company has all been about growth.***
>
> …The last nine years, we have been growing roughly 80% to 90%...
>
> Now that we've achieved scale, we as an executive team and the Board have ***decided to focus on cost reduction and being cash-flow positive by the end of 2016. With this new focus, we are going to reduce our growth rate to roughly 40% in 2016.***
>
> * * * *
>
> [Rive]: ***One thing I want to make clear, that is change in focus is not a lack of demand. We expect Q4 bookings to be greater than Q3 bookings.*** Normally, Q4 is lower than Q3 because of the seasonality. We have less selling days. ***But the demand is strong. In 2016, we expect demand to be very strong.***
>
> When you have an expiring tax credit, or tax credit gone from 30% down to 10%, ***the customer is going to rush to get in to not miss the opportunity, so we expect the demand to be strong in 2016***…
>
> ***Overall, I'm very excited about the business, and the strategy change.***
>
> * * * *
>
> [Rive]: ***So it is not our standard 80% growth, but not that 40% is a low growth number,*** just wanted to emphasize that.

---

[4] *Q3 2015 SolarCity Corp Earnings Call – Final* transcript, FD (Fair Disclosure) Wire (October 29, 2015).

* * * *

[Analyst Brian Lee, Goldman Sachs]: On the 2015 outlook, in the shareholder letter, you're mentioning some uncertainty around commercial installs in December. So are you actually expecting things to slip into 2016? Because I would have figured if all goes according to plan, your original outlook, even it's the low end, would have remained intact. ***Is there anything that might be falling out here or is growth simply just slower than you might have thought?***

[Rive]: ***We just don't want to push too hard on the growth,*** as once again, that's a higher cost. So maintaining this 80% growth, in terms of installation, had extra costs. We just want to reduce that…

* * * *

[Rive]: [I just want to really] to highlight one thing because this is important to me. ***This is not a demand challenge.*** Q4 bookings is going to be higher than Q3 bookings and that normally does not happen in Q4 because you just have less selling days, so that's normally harder to do that.

* * * *

[Rive]: Yes, our focus is going to be on cost reduction and cash flow positive. If we have the opportunity to grow more, but still meet those two primary goals, we will, but ***the primary focus is cost reduction and being cash flow positive.***

* * * *

[Analyst Julien Dumoulin-Smith, UBS]: Yes, but in terms of the backlog, the time to get these things done, is there any differentiation, is one lagging more than the other in terms of getting them off the ground?

[Rive]: Okay. Sorry. The average time to install across the portfolio is about 60 days. It's a little bit less in California, a little bit longer on the east coast, but ***there's no capacity constraints or anything like that on the east coast. We really, really like the east coast.*** Maryland is one of our best markets. ***If you look at, whether it's volume or costs, the east coast markets are really good for us.***

[Analyst Julien Dumoulin-Smith, UBS]: And just a little bit cutting back to the 2017 number...But you still got this 1 million customer target, how do you think about the, how back-end weighted is that, to hit that number at this point?

[Rive]: ***Yes, the 1 million customer goal is definitely something that we considered when we were looking at this new focus of absolute cost reduction, and being cash flow positive. I'd say cash reduction and cash flow positive is a higher priority than the 1 million customer goal.***

[Rive]: ***Not giving up on the million customer goal,*** but that's the priority. Then we'll see how things go in 2017 and 2018 to what we have to do to

> accelerate to meet the 1 million customer goal, but the focus is cost reduction and cash flow positive.

127. The foregoing statements regarding 3Q15 were false and misleading at the time they were made. As alleged herein, in their statements regarding 3Q15, Defendants failed to disclose that demand for the Company's products was softening, and that the Company's performance metrics including, at least, MW Booked, Cumulative Customers, Cumulative Energy Contracts, and NCP, as well as its future growth forecast which relied upon those metrics, were materially misleading as they were inflated by poor quality contracts the Company knew would never be installed and other contracts it was improperly retaining in its backlog that should have been canceled.

128. Specifically, the statements "One thing I want to make clear, that is change in focus is not a lack of demand. We expect Q4 bookings to be greater than Q3 bookings" and "[t]his is not a demand challenge" were false and materially misleading insofar as Defendants knew, but failed to disclose to the investing public, that the Company's reported "demand" was overstated, inflated by poor quality contracts the Company knew would never be installed and other contracts it was improperly retaining in its backlog that should have been canceled.

129. Further, as indicated by Dumoulin-Smith's question, the Company's false and misleading performance metrics indicated a significant backlog of contracts, causing analysts to question whether installation capacity was an issue, never knowing the metrics had been fraudulently inflated. While the Defendants' statements that they did not have installation capacity constraints were true, the statements were false and misleading at the time they were made because they omitted the fact that the performance metrics were fraudulently inflated, concealing that the underlying issue was a lack of demand.

130. The October 29, 2015, conference call for analysts continued:

> [Analyst Stephen Byrd, Morgan Stanley]: ***Any trends in terms of, as your business grows larger, in terms of credit quality, credit strength of customers, default rates, et cetera?*** Any commentary on that?
>
> [Buss]: ***No, the trends have been extremely consistent over the eight years,*** and obviously, we have done more and more business in the last few years.

> [Rive]: Yes, the underlying principle of our deployment is that we charge the customer less than they are currently paying for energy, so default rates, since they lower them, they have the choice of paying us or paying the utility more or don't have electricity. ***Given those three choices, our customers pay their bills.***
>
> * * * *
>
> [Analyst Gordon Johnson, Axiom Capital Management]: Then there's been some recent discussion around some of the lending practices. I'm sure you guys have heard this, with respect to the leasing programs with respect to solar rooftop. ***Have you guys seen any push back with respect to some of these conclusions around it affecting home values, being more expensive versus outright owning, have you guys seen any pushback from customers or are you not seeing that?***
>
> [Rive]: No, right now, at the size we are right now, we have probably about 20 to 30 customers move every single day. We haven't seen – not one has failed in transferring the lease of the PPA, and ***often there has been an additional value to it, to the house, and the new homeowner likes it. So we haven't seen that.***
>
> * * * *
>
> [Analyst Michael Morosi, Avondale Partners]: At 350 to 400 megawatt quarter run rate, your sales team in bookings are running pretty solidly ahead of your ability to deploy the systems. ***Are you at all concerned that some of those sales could churn off the backlog, and is there anything that you can do in the near term to clear what appears to be a building backlog?***
>
> [Rive]: Yes, so this is the – one, ***we are ramping up our installations, so that will catch up to them.*** This is the part I mentioned earlier, is we're going to focus now on the lower acquisition costs. ***We're going to focus on the profitable customers and so you'll see the bookings and installs getting closer to one another, but there will still be a delta because at a 40% growth rate, you still have to have a delta, but you'll see those two lines getting closer to one another.***

131. The statements regarding 3Q15 were false and misleading at the time they were made. Contrary to Defendants' assertions, market conditions had in fact changed and were having a negative impact on demand. The declining cost of solar panels and increased access to financing meant more customers were opting for ownership, rather than purchase a SolarLease or SolarPPA through SolarCity, and its MyPower loans were failing to capture this demand. In addition, the changing and increasingly uncertain regulatory environment, particularly with respect to net metering, negatively impacted the economics of transitioning to solar, thereby

causing a decline in demand. Furthermore, SolarCity's costs to acquire new customers were increasing, as the solar market became more saturated.

132. Specifically, the statement, "We're going to focus on the profitable customers and so you'll see the bookings and installs getting closer to one another, but there will still be a delta because at a 40% growth rate, you still have to have a delta, but you'll see those two lines getting closer to one another," was false and materially misleading insofar as Defendants recognized that reported "bookings and installs" figures were predicated upon poor quality contracts the Company knew would never be installed and other contracts it was improperly retaining in its backlog that should have been canceled. In addition, the statements about customer credit quality were materially misleading because the Defendants failed to disclose, as indicated by CW1 and CW5, that the Company was signing up customers who would not qualify for financing, thereby fraudulently inflating the Company's performance metrics, yet not impacting its defaults or delinquencies.

133. The Company's claim that its reduced guidance was due to its focus on costs in anticipation of the expiration of the Federal ITC was false and misleading because the Company was in fact experiencing declining demand, as evidenced by its weak performance in 3Q15, despite the fact that demand was expected to be greater during this period from customers looking to take advantage of the ITC before it expired. In fact, many customers were taking advantage of the ITC, but had opted to claim the benefit for themselves through ownership rather than sign it over to SolarCity as required by its SolarLease, SolarPPA, and MyPower programs. Ownership also increased home values by approximately $15,000; whereas leasing provided no increase in value and there were reports that leases could be a drag on the sale of a home. As alleged herein, in their statements regarding 3Q15, Defendants failed to disclose that demand for the Company's products was softening, and that the Company was improperly retaining contracts in its backlog and suppressing contract cancellations, which had the effect of causing inflation of its key operating and guidance metrics, including, at least, MW Booked, Cumulative Customers, Cumulative Energy Contracts, and NCP. In addition, Defendants undertook highly

aggressive sales practices to bolster new contract volume, signing up customers who it knew would not qualify or did not stand to benefit financially, leading to an increase in cancelled contracts as customers predictably reneged on their agreements.

**D. Fourth Quarter and Year End 2015**

134. On February 9, 2016, the Company issued a Shareholder Letter reporting results for the fourth quarter of fiscal year 2015 (4Q15). In the 4Q15 Shareholder Letter, the Company declined to report MW Booked and disclosed that it failed to meet its MW installation guidance by 8 MW. Furthermore, the 4Q15 Shareholder Letter failed to reference the Company's key operating metrics, including Cumulative Customers, Cumulative Energy Contracts, or NCP. The 4Q15 Shareholder Letter repeated that growth had become a "secondary focus":

> Looking ahead to 2016, we continue to target 1.25 GW Installed. Though the ITC extension certainly provides us with more tailwinds to growth, the primary focus of our company in 2016 is our goal of generating positive cash by year-end. As we highlighted in last quarter's shareholder Letter, the primary focus of the company is on cash generation, with growth our secondary focus. Though we are projecting a lower rate of growth in 2016 than in years past, our guidance still implies over 40% annual growth in 2016, a rate of growth that would be the envy of most industries and companies in this country.
>
> In conclusion, we closed out 2015 with the strongest quarter of installations and value creation in our history. Moreover, we entered into 2016 in our best position yet to continue creating meaningful value for equity shareholders.
>
> Though last year certainly did not lack its share of challenges, we entered into 2016 with a bright outlook bolstered by strong demand, best-in-class operations, an extension of the federal tax credit, and continued access to capital to fund our growth.

135. The 4Q 2015 Shareholder Letter was signed by Defendant Rive.

136. On February 10, 2016, SolarCity filed its Form 10-K for the fiscal year ended December 31, 2015. In the Form 10-K, the Company reported: (a) 331,256 Cumulative Customers; and (b) 322,897 Cumulative Energy Contracts, both reflecting the smallest growth percentages in at least two years.

137. The 2015 Form 10-K further reported that "Though we have historically reported nominal contracted payments as a representation of the growth in our operations and the value

of our energy contracts, ***we have decided not to report our undeployed backlog of contracts as a value in this manner and will no longer be reporting this amount***." [emphasis supplied]. The 2015 Form 10-K was signed by Defendants Rive and Buss.

138. On February 9, 2016, SolarCity conducted a telephone conference call for analysts to discuss its business and its 4Q15 results during which the Company and its executives stated as follows:[5]

> [Rive]: ***For guidance, we came in 8 megawatts short for Q4 at 272 megawatts. I'm disappointed in missing the guidance. This is primarily due to commercial delays and stopping installations in Nevada.*** As many of you know, the PC decided to change net metering rates in Nevada, which forced us to stop installations.

* * * *

> [Analyst Patrick Jobin, Credit Suisse]: …***just thinking about the volume miss in Q4 and more in the Q1 guide being about 18% year-over-year growth for Q1. That includes the 15 megawatts in CNI slipping into Q1? It seems a little weaker that what we and the Street was expecting. What gives you confidence of a rebound in demand at that 40% for next year?***
>
> [Rive]: Yes, a few things went into Q1…Nevada had an impact. It was a little over 20 megawatts. We have the standard seasonality which is about 17%, if you look at our historic performance. We are also changing what we are doing with commercial. So this is a really key thing.
>
> [Rive]: As you install commercial, specifically ground mounts, ***once we're done with the installation there's a lag from installation complete to when the utility may do they interconnection upgrade.*** So, it is not a normal interconnection. There may be some electrical component that they have to upgrade. That electrical component can take six to nine months. And so ***what we are doing is we're shortening the time schedule, so we are delaying the installations,*** pushing it in closer to when their electric upgrade will be done, so that working capital of holding these assets will be reduced.
>
> [Rive]: When we look at our portfolio, leads that come in, they're expensive leads and we have less expensive leads. And ***essentially we stopped buying expensive leads*** in anticipation that there was no extension of the ITC. Now of course with the ITC extension happening, we are now going to invest in to sales and marketing to make up that delta. But those are all the reasons why it is going from 272 to 180 in Q1.

* * * *

[5] *Q4 2015 SolarCity Corp Earnings Call – Final* transcript, FD (Fair Disclosure) Wire (February 9, 2016).

> [Rive]: In terms of ***the loss in Nevada***, yes, we will have to make it up and primarily be on the East Coast and in California. ***Yes, it is a gap*** that we have to make up, but we feel ***confident that we can make it up.***

139. The statements regarding 4Q15 and full year 2015 were false and misleading at the time they were made. As alleged herein, in their statements regarding 4Q15 and full year 2015, while the Defendants admit Nevada's regulatory policies had impacted demand in 4Q15, Defendants failed to disclose that this and other factors had been impacting demand for several quarters resulting in the Company's weaker performance and reduced guidance. Furthermore, through the Defendants' omission of performance metrics and their decision to cease reporting NCPs, the Company was concealing that it had been improperly retaining contracts in its backlog and suppressing contract cancellations, which inflated its key operating and guidance metrics, including, at least, MW Booked, Cumulative Customers, and Cumulative Energy Contracts.

**E. First Quarter 2016**

140. The dire state of the Company's business was finally revealed when the Company announced the results for its first quarter of fiscal year 2016 (1Q16). On May 9, 2016, the Company issued a Shareholder Letter reporting that MW Booked had fallen drastically to 160 MW, the smallest figure in nearly two years. In the 1Q16 Shareholder Letter, the Company lowered expectations once more:

> Looking ahead, we are recalibrating our outlook for the year after taking into account the regulatory developments that impacted Q1 2016 MW Booked and the impact of an increase in pricing for our commercial business. While the regulatory clarity provided by California, Massachusetts, New Hampshire and New York put many of last quarter's headwinds behind us, we do not expect to be able to make up for the decline in MW Booked in Q1 2016. In conjunction with the lower MW expected from higher pricing instituted in Q2 2016, we now expect to install 1.0 - 1.1 GW in 2016 as compared to 1.25 GW previously. For Q2 2016 we expect to install 185 MW, representing a decline of 2% year-over-year, largely due to the 14 MW project that was completed ahead of time in Q1 2016.

141. Again, the Company omitted from its 1Q16 Shareholder Letter any reference the Company's key operating metrics, including Cumulative Customers, Cumulative Energy Contracts, or NCP.

142. On May 10, 2016, SolarCity filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended March 31, 2016. The Form 10-Q was signed by Defendant Rive. The Form 10-Q for the first time omitted any mention of Cumulative Customers or Cumulative Energy Contracts, and, as previously noted, omitted NCP data. Instead, the Form 10-Q reported a new metric called "Cumulative Installed Customers" which, by definition, did not include customers whose contracts were improperly kept active, but only those whose contracts had proceeded.

143. The statements regarding 1Q16 and full year 2016 were false and misleading at the time they were made. As alleged herein, in their statements regarding 1Q16 and full year 2016, while the Defendants admit regulatory policies had impacted demand in 1Q16, Defendants failed to disclose that this and other factors had been impacting demand for several quarters resulting in its weaker performance and reduced guidance. Furthermore, through the Defendants' omission of performance metrics and decision to cease to report NCPs, it was concealing that it had been improperly retaining contracts in its backlog and suppressing contract cancellations, which inflated its key operating and guidance metrics, including, at least, MW Booked, Cumulative Customers, and Cumulative Energy Contracts, thereby misleading investors as to the true state of demand. SolarCity's new "Cumulatively Installed Customers" metric was false and misleading because it failed to reveal that its previously reported metrics were fraudulently inflated.

## VII. LOSS CAUSATION

144. Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class. During the Class Period, Plaintiff and the Class purchased SolarCity's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

145. On October 29, 2015, the Company announced its 3Q15 results, revealing the following facts: (a) the Company was revising its Q415 MW Installation guidance downward to 280 - 300 MW; (b) the Company was cutting its MW Installation growth goal for FY 2016 from 70% to 41%; (c) MW Booked for the quarter was only 345, a drop of 12.6% compared to the prior quarter (395 MW Booked); and (d) Cumulative Energy Contracts, Cumulative Customers, and NCP grew at a rate significantly below the Company's prior trends.

146. The Company's decline in MW Booked and the downward revisions to MW Booked guidance, as well as the decrease in the MW installation guidance partially revealed to investors that demand for the Company's products was declining—the very risk concealed by the Company's inflation of performance metrics purportedly designed to provide insight into the Company's future prospects. The weak growth in Cumulative Energy Contracts, Cumulative Customers, and NCP likewise partially revealed a decrease in demand for the Company's products at a rate significantly below the Company's prior trends.

147. On this news, the Company's stock price fell $8.42 per share, or 22%, to close at $29.65 on October 30, 2015.

148. Analysts and investors were surprised by these disclosures. For instance, an article published by *The Motley Fool* on November 2, 2015 entitled "SolarCity is a Different Company After Abandoning 1 Million Customer Goal" noted that the Company's business strategy reversal (to focus on cost reductions instead of growth) was "not what investors were looking for" and "the stock is being pummeled as a result." *The Motley Fool* surmised that, "[i]n short, the company isn't what investors thought it was." The article also took a dim view of the Company's rising sales costs, explaining that "SolarCity has long passed this off as investing in growth, but it's becoming clear that the investment isn't paying off as efficiently as expected."

149. An article published by *Bloomberg* on October 30, 2015 entitled "Cost Control Costs SolarCity Dearly" was similarly pessimistic, noting that "[r]oughly a quarter of the solar-power leasing company's value was wiped out Friday on the back of results released the previous

afternoon." The surprise disclosures led *Bloomberg* to explain: "A unicorn turning into a horse sounds like a twisted fairy tale. Instead, it's what just happened to SolarCity."

150. On February 9, 2016, the Company announced 4Q15 results which revealed: (a) SolarCity failed to meet its Q415 installation guidance, achieving only 272 MW Installed; (b) SolarCity was maintaining its lowered fiscal year 2016 41% annual MW Installation growth target even though Congress extended the Solar Investment Tax Credit (ITC) by five additional years (which should theoretically have improved the Company's prospects); (c) SolarCity declined to report MW Booked; and (d) SolarCity would cease reporting NCP in an apparent effort to conceal the effect of the elimination of improperly retained customer contracts.

151. The Company's installation guidance miss, and failure to increase its guidance on news that Congress extended the ITC partially revealed to investors that demand for the Company's products was declining—the very risk concealed by the Company's inflation of performance metrics purportedly designed to provide insight into the Company's future prospects. Moreover, the Company's failure to report MW Booked and refusal to publish NCP partially revealed to investors that prior reports of these metrics did not provide a reliable and/or accurate depiction of the Company's prospects, and/or that the metrics were possibly corrupted by inaccurate data.

152. On this news, the Company's shares fell $7.72 per share, or 29%, to close at $18.63 on February 10, 2016.

153. Analysts and investors were further surprised by this news. For instance, in an article published by *Fortune.com* on February 9, 2016 entitled "SolarCity's Stock Craters on Missed Guidance, Slower Growth," it was noted that the Company's stock "plunge[d] over 30% on Tuesday afternoon after the company reported a disappointing number of installations and a weak financial forecast." Analyst J.P. Morgan's February 10, 2016 report stated: "The stock is marked down 30% in the after-market, perhaps reflecting disappointment that the guidance was not raised in view of the surprise ITC extension. . . ."

154. On May 9, 2016, the Company published a letter to shareholders announcing 1Q16 results, which revealed: (a) MW Booked for the quarter was only 160, the smallest figure in nearly two years; (b) the Company was revising its FY16 installation guidance downward, again, from 1.25 GW down to 1.0 - 1.1 GW; and (c) SolarCity declined to report Cumulative Energy Contracts, Cumulative Customers, and NCP for the quarter.

155. The drastic MW Booked decline and downward revision to installation guidance partially revealed to investors that demand for the Company's products was declining—the very risk concealed by the Company's inflation of performance metrics purportedly designed to provide insight into the Company's future prospects. Moreover, the Company's decision not to report cumulative energy contracts and cumulative customers in addition to NCP partially revealed to investors that prior reports of these metrics did not provide a reliable and/or accurate depiction of the Company's prospects, and/or that the metrics were possibly corrupted by inaccurate data.

156. On this news, the Company's stock price fell $4.69, or 20.8%, to close at $17.79 on May 10, 2016.

157. Again, analysts and investors were surprised by these disclosures. For instance, an article published on *The Motley Fool* on May 10, 2016 entitled "SolarCity Corp Fails to Live Up to Expectations (Again)" remarked that the Company's disappointing results were "becoming a trend." More troubling, *The Motley Fool* explained that the "problem with the first-quarter numbers is that they show every flaw in SolarCity's business model." *MarketWatch* noted in its May 10, 2016 article entitled "SolarCity's identity crisis pushes stock lower" that the stock had tumbled more than 25% by May 10, 2016 following these revelations and that, after "three-quarters of foiled expectations," analysts were left to conclude that the Company's "credibility is likely at an all-time low." J.P. Morgan's May 10, 2016 report stated that "guidance was reduced for the third consecutive year which may impact investors' confidence in the company's future forecasting."

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

158. Individual Defendants' Scienter: Each of the Individual Defendants: (a) directly participated in the management of the Company; (b) was directly involved in the day-to-day operations of the Company at the highest levels; (c) was privy to confidential proprietary information concerning the Company and its business and operations; (d) was involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (e) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued; and (f) approved or ratified these statements in violation of the federal securities laws.

159. As officers, directors, and controlling persons of a publicly-held company whose securities are and were registered with the SEC pursuant to the Exchange Act, and traded on NASDAQ and governed by the provisions of the federal securities laws, Defendants Rive, Buss, Serra, and Barnard each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

160. In violation of this duty, Defendants Rive, Buss, Serra, and Barnard knew and/or recklessly disregarded that their statements concerning the accuracy of the Company's reporting of its business condition and future prospects was materially false and misleading.

161. The key operating metrics reported by the Company in SEC filings signed by some or all of the Individual Defendants depended almost entirely on the number of customer contracts generated by sales, evidencing: (a) the materiality of information regarding the amount and quality of such contracts; and (b) that each of the Individual Defendants knew about the amount and quality of such contracts and related backlog. Furthermore, during the Class Period, each Individual Defendant participated in earnings calls in which they discussed the Company's metrics at length and in detail. These metrics concern core operations of the Company.

162. In addition, the Company is a self-proclaimed "data-driven" company and maintains a sophisticated database described as "SolarWorks Customer Management Software, our proprietary software platform used to track and manage every project." According to the Company's SEC filings, "SolarWorks' embedded database and custom architecture offers reduced costs, improved quality and improved customer experience by supporting scheduling, budgeting and other project management functions as well as customer communications, inventory management and detailed project data." The existence of this database containing detailed information regarding the Company's core operations supports an inference of direct knowledge of the Individual Defendants.

163. As alleged herein, according to CW2, Defendant Barnard, the Company's Chief Revenue Officer during the Class Period, was known for selling solar contracts to "anybody who gave the time of day" even though these "quick sales" often had "no value proposition to the customer." CW2 attributed high contract cancellation rates to Defendant Barnard. CW3 stated that cancellation rates could run as high as 50%. On information and belief, Defendant Barnard reported to one or more of the Individual Defendants. As executives running the Company with Defendant Barnard, and given the significance to the Company of customer and contract growth and volume, the Individual Defendants knew that Defendant Barnard's sales strategy was unreliable and unsustainable, as confirmed by him suddenly "retiring" from SolarCity shortly after the Class Period.

164. Indeed, as confirmed by CW4, upon the departure of Barnard, his replacement, Toby Corey, set about "purging" the backlog of languishing, never-to-materialize contracts and instructed the Company's Energy Consultants to cancel any contracts that were not going to be installed. Armed with the identical information, Barnard was content to perpetuate the illusion of strong sales and growth by amassing and then maintaining these worthless contracts on the system.

165. The Company's brazen sales practices were institutionalized and core to the business plan as executed across the Company's sales territories. In early 2015, it was reported

that members of Congress from eight states asked for an investigation into SolarCity's sales practices. A January 8, 2015 article posted to Watchdog.org entitled "Congressional Leaders Charge 'Potentially Deceptive Sales Tactics' by SolarCity, Others" stated:

> Spurred by consumer complaints that the massive savings they were promised never materialized, 12 Republicans and four Democrats have asked two federal regulatory agencies to investigate concerns that "these leases are not offered in good faith or with accurate disclosures."
>
> Recent letters by the GOP to the U.S. Federal Trade Commission and by Democrats to the Consumer Financial Protection Bureau come on the heels of a year-long Watchdog.org investigation into SolarCity, one of the nation's largest solar contractors. Owned largely by billionaire Elon Musk, SolarCity pioneered the leasing business model in order to take advantage of state and federal tax breaks paid to solar-energy owners.
>
> "I do not want the future of solar energy harmed if there are consumer scams going on that will cause thousands of people to question the entire solar industry based on their own bad experience," U.S. Rep. Paul A. Gosar, R-Arizona, told Watchdog.org. "A free market depends on fairness, openness and honesty."
>
> Gosar, an advocate of solar, initiated the GOP probe after receiving complaints from constituents.
>
> "Someone brought in an actual brochure SolarCity uses in a sales pitch and the savings were based on utility rates increasing by 4 percent annually," said Jeff Small, Gosar's legislative director. "At least in Arizona, this has never happened. The highest it has ever been was 3 percent. Usually it's 1 percent.
>
> "Every little thing we looked into raised the hairs on the back of (Gosar's) neck, so he asked us to dive into it more and wasn't pleased with what we found," Small said.
>
> In California, SolarCity customer Jeffrey Leeds encountered a similar situation. He says he was lured into a lease with scare tactics of rising electricity rates. But instead of reaping savings, his electric bill rose by $350 a month. Leeds and other customers recounted their frustrations to Watchdog.org last year in an investigation titled, "Customers tell horror stories of solar company that gets $422M in tax dollars."

166. The same article reported that SolarCity had partnered with a company named Paramount Equity Mortgage to sell solar systems. Paramount Equity Mortgage is a mortgage services company owned by Defendant Barnard, SolarCity's Chief Revenue Officer, which previously agreed to pay a fine and restitution totaling approximately $400,000 in response to

charges brought by the Department of Financial Institutions, Division of Consumer Services for the State of Washington concerning alleged false, deceptive, and misleading mortgage services advertising and collected fees. Defendant Barnard was a named respondent in the State of Washington proceeding. SolarCity's relationship with Paramount Equity Mortgage supports a strong inference of the Individual Defendants' knowledge and endorsement of Barnard's sales practices, as described by CW2.

167. Further information confirms that SolarCity's sales practices were top-down and dictated by management. For example, an August 26, 2015 blog post entitled "Does SolarCity Use Deceptive Sales Tactics? John Simeone Thinks So" described sales practices that are totally consistent with CW2's statements contained herein.

> SolarCity knocked on John Simeone's door in Stoneham, Massachusetts on May 14, 2014.
>
> **Before the day was done, he had signed a lease agreement with the corporate solar company and didn't even know it.** [emphasis supplied].
>
> "After signing the sales person's ipad, I found out in an email that I had signed a lease agreement," Simeone said.
>
> According to Simeone, Andrew Rossetti, a SolarCity sales representative, was going door to door in his neighborhood trying to sell solar systems to residents.
>
> The sales pitch, according to Simeone, started off with promises of lower energy bills, free maintenance and zero money down to have the system installed. Simeone had more questions than Rossetti could answer.
>
> "I was worried that if I was going to ever sell my house, I would have to sell these solar panels too and what if they didn't want to buy them?" Simeone said.
>
> Solar leasing agreements are rife with contractual restrictions. SolarCity leases solar panels to clients—they own the panels and dictate what you can and can't do with your roof and your property.
>
> Selling a home that is still under contract can be difficult and expensive as buyers first need to take over the lease agreement which requires a credit check and approval by SolarCity. If the buyer doesn't want the solar, the seller must buy out the contract, a purchase that could carry a hefty price tag.
>
> After talking with Rossetti, who stood in the doorway for thirty minutes, Simeone agreed to let SolarCity conduct what was described as a free, no

> commitment energy audit—all Rossetti needed was a signature to gain access to the house.
>
> "I was asked for my signature on a computer tablet to authorize the energy audit only," Simeone said.
>
> That's when things got complicated.
>
> ***"That signature turned out to authorize much more than a free energy audit, it was also a 20 year lease agreement. I found that out through the attachment included in an email," Simeone said.*** [emphasis supplied, italics in original].
>
> Simeone received an email from SolarCity later that night. Documents provided by Simeon show that SolarCity had locked Simeone into a 20 year lease contract. He only had three days to cancel the contract.
>
> "Per state law, I had three business days to cancel. I could have cancelled after the audit as well. I choose to cancel immediately because I can't do business with any firm that lies. I mailed out all of the cancelation forms on the 15th by priority mail," Simeon said.
>
> **The contract was cancelled and Simeone was free from SolarCity—or so he thought.** [emphasis supplied].
>
> **A few days later, Rossetti called Simeone asking why he cancelled the agreement.** [emphasis supplied].
>
> **Simeone said, "I told him, 'you lied to me' and he said, 'that's the way they make us do it."** [emphasis supplied].
>
> SolarCity is currently under federal investigation for deceptive sales practices and for inflating rates to receive larger federal tax credits.

168. Moreover, in a putative class action complaint filed in the State of Nevada, the Company was accused of similar, widespread aggressive and misleading sales practices. There, Nevada homeowners alleged that SolarCity engaged in a campaign of deceptive conduct aimed at maximizing the number of SolarCity customers by promising significant electricity cost savings, while failing to disclose that changes in the Public Utilities Commission of Nevada's net-metering rates could substantially affect (or eliminate) any such savings.

169. The CW allegations corroborated by information in the public domain regarding SolarCity's pressure sales tactics demonstrate the pervasiveness of the Company's contract cancellation percentages and the efforts of personnel to generate contract volume and keep contracts active. In particular, in CW1's view, false inputs to keep contracts active were

"obvious" and the Company could have done better canceling contracts "when they were supposed to." In addition, CW1 believed it was evident from the large backlog of contracts that many would never be installed. The "obvious" nature of the misconduct was known to or recklessly disregarded by the Individual Defendants.

170. In addition, CW1 stated that individuals who could "make their numbers look good" ended up getting promotions and bonuses during CW1's tenure, raising an inference of approval by management, including the Individual Defendants, of the alleged misconduct.

171. The Individual Defendants' changes to the Company's reporting metrics as the Class Period continued, and their eventual abandonment thereof in 1Q16 financial reports, are highly probative of their specific knowledge that the Company's contract and customer figures were materially deteriorating, which they failed to timely disclose.

172. Corporate Scienter: SolarCity is liable for the acts of Defendants Rive, Buss Serra, and Barnard and the acts of its employees, under the doctrine of respondeat superior and common law principles of agency, as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

## IX. POST-CLASS PERIOD EVENTS

173. On June 9, 2016, it was announced that Defendant Barnard, the Company's CRO during the Class Period, was "retiring" from SolarCity.

174. On June 21, 2016, Tesla announced an offer to acquire SolarCity in a stock transaction then valued at $2.8 billion, or approximately $28 per SolarCity share.

175. Oppenheimer & Co. analyst Colin Rusch called the transaction a "bailout" for SolarCity. A *Financial Times* article dated June 28, 2016 entitled "Elon Musk's grip on SolarCity fans corporate governance fears" also described market concerns regarding whether the SolarCity transaction was a "bailout." The article described corporate governance issues in more detail, stating that "the connections between the [Tesla and SolarCity] boards reflect the family, investor and management ties Mr. Musk has fostered between his companies. He and his brother, Kimbal, who is also a Tesla director, are cousins to Lyndon and Peter Rive, who are on

the solar company's board." The article noted further overlaps between the two companies, including that Defendant Buss was a Tesla director.

176. On August 9, 2016, the Company issued a Shareholder Letter for the second quarter of fiscal year 2016 (2Q16), again omitting historical metrics Cumulative Energy Contracts, Cumulative Customers, and NCP data, from the Shareholder Letter, and from the Form 10-Q, filed on August 10, 2016. In addition, the Company reported MW Booked of just 227, its lowest figure since 2014.

177. The market took note of SolarCity's continuing poor performance for 2Q2016. An August 18, 2016 article *SeekingAlpha* article entitled "Musk Fiddles as SolarCity Burns, Take 2" stated as follows regarding the 2Q2016 results:

> -**SolarCity's Q2 results indicate a shrinking, not growing, company in the core residential market**. [emphasis supplied].
>
> -Musk and management commentary indicate the company is on a new and completely different business plan for SolarCity that essentially makes it a startup.
>
> -There is very little chance that even this new business plan will succeed, and Tesla investors have absolutely no reason to support the acquisition of a failing company.
>
> SolarCity's (SCTY) Q2 2016 earnings call, in a very curious manner, featured Elon Musk. We cannot remember when was the last time that Musk actively participated, or even attended, a SolarCity quarterly earnings call. On reflection, the attendance was justified, considering the scope of the business reset that was announced at the call. **This half-sunk SolarCity ship couldn't stay afloat without the marketing muscle that is Musk.** [emphasis supplied]
>
> **The numbers, as we discussed in context of the pre-earnings announcement, were abysmal**. A key additional revelation that came from the earnings call was the anemic Q3 guidance of 170MW. Considering the Company installed 214MW in Q1 and 201MW in Q2, this guidance implies that it needs to install 315MW in Q4 to meet the low end of the 900-1000 MW annual guidance. [emphasis supplied].
>
> In other words, SolarCity needs to grow from 170MW to 315MW, or about 85%, in Q4 to meet the low end of its guidance. This for a Company that has been shrinking as measured by bookings and billings. As we have suggested in our earlier article, 700-900 MW would appear to be a better yearly guidance given the current state of affairs. But giving such a guidance would be a major embarrassment to Mr. Musk, who has been desperately

> trying to push through the merger of this failing company with Tesla Motors (NASDAQ:TSLA).

178. On November 4, 2016, it was reported that a leading proxy advisory firm recommended against shareholder approval of the SolarCity transaction, calling it a "thinly veiled bailout" and citing the "uncomfortable relationship between SolarCity's near-crippled financial position and Mr. Musk's personal interest — both direct and indirect — in preventing the rather pronounced, public collapse of an affiliate enterprise."

179. On November 17, 2016, the acquisition by Tesla of SolarCity was completed.

## X. PRESUMPTION OF RELIANCE

180. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. Unites States*, 406 U.S. 128 (1972) because the claims asserted herein are predicated in whole or in part upon omissions of material fact for which there was a duty to disclose.

181. Plaintiff is also entitled to a presumption of reliance under the fraud on the market doctrine on Defendants' material misrepresentations and omissions for the following reasons: (a) SolarCity's common stock was actively traded in an efficient market on NASDAQ during the Class Period; (b) as a regulated issuer, SolarCity filed periodic public reports with the SEC; (c) SolarCity regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (d) the market reacted promptly to public information disseminated by SolarCity; (e) SolarCity was covered by numerous securities analysts employed by major brokerage firms who wrote reports which entered the marketplace by distribution to the sales force and certain customers of their respective firms; and (f) without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiff and other members of the Class purchased SolarCity stock between the time Defendants failed to disclose material facts and the time the true facts were disclosed.

182. In addition to the foregoing, Plaintiff is entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding the Company's faltering performance throughout the Class Period.

## XI. NO SAFE HARBOR

183. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pled in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of SolarCity who knew that those statements were false and misleading when made.

## XII. CLASS ACTION ALLEGATIONS

184. Plaintiff brings this action on behalf of himself and as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), consisting of all persons and entities who purchased or acquired the publicly traded common stock of SolarCity during the Class Period, and who were damaged thereby. Excluded from the Class are (a) the Individual Defendants; (b) members of the immediate families of the Individual Defendants; (c) any subsidiaries and affiliates of any Defendant; (d) any person who is or was an officer or director of SolarCity or any of SolarCity's subsidiaries or affiliates; (e) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; (f) any SolarCity employee

retirement and benefit plan(s); and (g) the legal representatives, heirs, successors and assigns of any such excluded person or entity.

185. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SolarCity stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SolarCity or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

186. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

187. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that are adverse or antagonistic to the Class.

188. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether the SEC filings, press releases, reports and other public statements disseminated to SolarCity's investors during the Class Period contained materially false and misleading statements or omissions;

(c) whether and to what extent the market price of the Company's common stock was artificially inflated during the Class Period due to the non-disclosures and/or false and misleading statements complained of herein;

(d) whether Defendants acted with scienter;

(e) whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

(f) whether the members of the Class have sustained damages as a result of the misconduct complained of herein, and, if so, the proper measure thereof.

189. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this case as a class action.

## XIII. CAUSES OF ACTION

**COUNT I**
**Violations of Section 10(b) of the Exchange Act**
**And Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

190. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

191. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members; (b) artificially inflate and maintain inflated the market price of SolarCity common stock; and (c) cause Plaintiff and other Class members to purchase SolarCity common stock at artificially inflated prices.

192. In furtherance of this unlawful scheme, plan and course of conduct, Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company’s common stock in an effort to maintain artificially high market

prices for SolarCity's common stock in violation of §10(b) of the Exchange Act and SEC Rule 10b-5.

193. Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's deteriorating business condition.

194. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to falsely and misleadingly assure investors of SolarCity's continued growth, which included the making of, or the participation in making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the Company's business, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of SolarCity common stock during the Class Period.

195. In addition to the duties of full disclosure imposed on Defendants as a result of making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors, including truthful, complete and accurate information with respect to the Company's operations and performance so that the market prices of the common stock would be based on truthful, complete and accurate information.

196. Defendants had actual knowledge of the false and misleading statements and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Defendants' materially false and misleading statements and omissions were done knowingly or recklessly and for the purpose and effect of concealing SolarCity's true condition from investors and supporting the artificially inflated price of its common stock.

197. As a result of the materially false and misleading statements and omissions, as set forth above, the market price of SolarCity's common stock was artificially inflated during the Class Period. Unaware that the market price of SolarCity common stock was artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock traded, and/or on the absence of material adverse information that was known to, or recklessly disregarded by, Defendants but not disclosed publicly during the Class Period, Plaintiff and the other members of the Class purchased or otherwise acquired SolarCity common stock during the Class Period at artificially inflated prices and were damaged thereby.

198. At the time of said omissions, Plaintiff and other members of the Class were unaware of the concealed information. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding SolarCity's business condition and prospects, Plaintiff and other members of the Class would not have purchased or otherwise acquired SolarCity common stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

199. Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II
## Violations of Section 20(a) of the Exchange Act
## (Against the Individual Defendants)

200. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

201. Defendants Rive, Buss, Serra, and Barnard acted as controlling persons of SolarCity within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, substantial participation in and/or awareness of the Company's operations and/or intimate knowledge of the materially false

and misleading financial statements filed by the Company with the SEC and disseminated to the investing public, these Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including its omissions, which Plaintiff contends were materially false and misleading.

202. These Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

203. In particular, Individual Defendants Rive, Buss, Serra, and Barnard each had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

204. SolarCity violated §10(b) and Rule 10b-5 by the acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of SolarCity's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Plaintiff as the Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of their wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

Dated: March 20, 2017 By: /s/ *Willem F. Jonckheer*

Robert C. Schubert (S.B.N. 62684)
Willem F. Jonckheer (S.B.N. 178748)
Dustin L. Schubert (S.B.N. 254876)
**Schubert Jonckheer & Kolbe LLP**
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
rschubert@schubertlawfirm.com
wjonckheer@schubertlawfirm.com
dschubert@schubertlawfirm.com

Jeffrey M. Norton (admitted *pro hac vice*)
**Newman Ferrara LLP**
1250 Broadway, 27th Floor
New York, NY 10001
Telephone: (212) 619-5400
Facsimile: (212) 619-3090
jnorton@nfllp.com

*Co-Lead Counsel for the Class*

**LEAD PLAINTIFF CERTIFICATION**

***SolarCity Corporation***

I, Frank J. Fish, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1. I am Lead Plaintiff in the matter *In re SolarCity Corporation Securities Litigation*, Master File No. 5:16-cv-04686 LHK (the "Litigation").

2. I have reviewed the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") prepared for filing in the Litigation, accept the substantive allegations therein, and authorize its filing.

3. I did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any private action arising under the securities laws of the United States.

4. I remain willing to serve as Lead Plaintiff on behalf of the class in this Litigation, including providing testimony at deposition and trial, if necessary. I fully understand the duties and responsibilities of the Lead Plaintiff under the Private Securities Litigation Reform Act, including those regarding the selection and retention of counsel and the overseeing of the prosecution of the action for the class.

5. I authorize Co-Lead Counsel Schubert Jonckheer & Kolbe LLP and Newman Ferrara LLP and to file the Complaint prepared in this Litigation.

6. My transactions in the securities that are the subject of this action are set forth in the chart attached hereto as Exhibit A. Other than those transactions set forth in Exhibit A, I have engaged in no transactions during the Class Period in the equity securities that are the subject of this Litigation (as used herein, "equity security" has the

same meaning as that term has for purposes of Section 16(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(a)).

7. During the three-year period preceding the date of this Certification, I have not sought to serve, served, and I am currently not serving as a lead plaintiff or as a representative party on behalf of a class in any private action arising under the federal securities laws.

8. I will not accept any payment for serving as a representative party on behalf of the class beyond its pro rata share of any possible recovery, except for an award, as ordered or approved by the Court, for reasonable costs and expenses directly relating to its representation of the class in compliance with section 27(a)(4) of the Securities Act, 15 U.S.C. § 77z-1(a)(4), or section 21D(a)(4) of the Securities Exchange Act, 15 U.S.C. § 78u-4(a)(4).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of March 2017.

FRANK J. FISH

# EXHIBIT A

## SOLARCITY CORP. (SCTY) COMMON STOCK TRANSACTIONS

| Trade Date | Transaction | No. of Shares | Base Unit Price | Tot. Amount | FIFO Loss |
|---|---|---|---|---|---|
| 01/29/2016 | BUY | 16,500 | 36.5000 | (602,250.00) | |
| 01/29/2016 | BUY | 16,500 | 35.5500 | (586,575.00) | |
| 02/01/2016 | BUY | 5,100 | 34.1600 | (174,216.00) | |
| 02/02/2016 | BUY | 5,500 | 33.2700 | (182,985.00) | |
| 02/02/2016 | BUY | 6,900 | 30.7500 | (212,175.00) | |
| 02/02/2016 | BUY | 5,000 | 31.9000 | (159,500.00) | |
| 02/03/2016 | BUY | 7,100 | 32.8500 | (233,235.00) | |
| 02/03/2016 | BUY | 5,000 | 30.6500 | (153,250.00) | |
| 02/04/2016 | BUY | 6,000 | 30.5600 | (183,360.00) | |
| 02/04/2016 | BUY | 5,400 | 28.8800 | (155,952.00) | |
| 02/04/2016 | BUY | 6,000 | 28.8800 | (173,280.00) | |
| 02/04/2016 | BUY | 7,000 | 30.0000 | (210,000.00) | |
| 02/04/2016 | BUY | 9,000 | 29.3700 | (264,330.00) | |
| 02/04/2016 | BUY | 11,000 | 28.5700 | (314,270.00) | |
| 02/04/2016 | BUY | 10,000 | 29.2800 | (292,800.00) | |
| 02/04/2016 | BUY | 8,000 | 31.5900 | (252,720.00) | |
| 02/04/2016 | BUY | 9,000 | 29.6800 | (267,120.00) | |
| 02/04/2016 | BUY | 6,000 | 29.3000 | (175,800.00) | |
| **TOTAL SHARES BOUGHT** | | **145,000** | **TOTAL COST** | **($4,593,818.00)** | |
| 02/10/2016 | SELL | (16,500) | 18.3900 | 303,435.00 | (298,815.00) |
| 02/10/2016 | SELL | (16,500) | 19.8020 | 326,733.00 | (259,842.00) |
| 02/10/2016 | SELL | (5,100) | 19.8000 | 100,980.00 | (73,236.00) |
| 02/10/2016 | SELL | (5,500) | 19.8060 | 108,933.00 | (74,052.00) |
| 02/10/2016 | SELL | (6,900) | 19.8000 | 136,620.00 | (75,555.00) |
| 02/10/2016 | SELL | (5,000) | 19.8020 | 99,010.00 | (60,490.00) |
| 02/10/2016 | SELL | (7,100) | 19.8060 | 140,622.60 | (92,612.40) |
| 02/10/2016 | SELL | (5,000) | 19.8000 | 99,000.00 | (54,250.00) |
| 02/10/2016 | SELL | (6,000) | 19.8000 | 118,800.00 | (64,560.00) |
| 02/10/2016 | SELL | (5,400) | 19.8000 | 106,920.00 | (49,032.00) |
| 02/10/2016 | SELL | (6,000) | 18.3200 | 109,920.00 | (63,360.00) |
| 02/10/2016 | SELL | (7,000) | 19.5000 | 136,500.00 | (73,500.00) |
| 02/10/2016 | SELL | (9,000) | 19.6200 | 176,580.00 | (87,750.00) |
| 02/10/2016 | SELL | (11,000) | 19.8000 | 217,800.00 | (96,470.00) |
| 02/10/2016 | SELL | (10,000) | 19.8060 | 198,060.00 | (94,740.00) |
| 02/10/2016 | SELL | (8,000) | 19.8020 | 158,416.00 | (94,304.00) |
| 02/10/2016 | SELL | (9,000) | 18.3901 | 165,510.90 | (101,609.10) |
| 02/10/2016 | SELL | (6,000) | 18.3900 | 110,340.00 | (65,460.00) |
| **TOTAL SHARES SOLD** | | **(145,000)** | **TOTAL REV** | **$2,814,180.50** | **($1,779,637.50)** |