UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE SOLARCITY CORPORATION SECURITIES LITIGATION | Case No. 16-CV-04686-LHK **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** Re: Dkt. No. 55 |

Plaintiffs Frank Fish ("lead plaintiff"), Joerg Mueller, George Nuckols, Richard Flynn, Neil Jubitz, and Retail Wholesale Department Store Union Local 338 Retirement Fund (collectively, "Plaintiffs") allege that Defendants SolarCity Corporation ("SolarCity"), Lyndon Rive, Brad Buss, Tanguy Serra, and Hayden Barnard (collectively, "Defendants") violated federal securities laws by misrepresenting SolarCity's business health. Before the Court is Defendants' Motion to Dismiss. ECF No. 55 ("Mot."). Having considered the parties' briefing, the relevant law, and the record in this case, the Court GRANTS Defendants' Motion to Dismiss.

## I. BACKGROUND

### A. Factual Background

#### 1. The Parties

Lead plaintiff Frank Fish "purchased SolarCity common stock" and was allegedly damaged by misrepresentations made by Defendants. ECF No. 50, Consolidated Class Action Complaint ("Compl.") ¶ 18. Lead plaintiff seeks to represent a putative class of "all persons who purchased or otherwise acquired the publicly-traded securities of SolarCity between May 6, 2015 and May 9, 2016 (the "Class Period"). *Id.* ¶ 1. SolarCity is a Delaware corporation that was traded on the NASDAQ stock market under the symbol SCTY during the Class Period. *Id.* ¶ 19. In June 2016, it was announced that SolarCity would be purchased by Tesla, Inc., and the sale closed in November 2016. *Id.*

Defendant Lyndon Rive ("Rive") is one of the founders of SolarCity and served as the Chief Executive Officer ("CEO") for SolarCity during the Class Period. *Id.* ¶ 20. Defendant Brad Buss ("Buss") served as the Chief Financial Officer ("CFO") for SolarCity from before the Class Period until February 10, 2016, when Buss resigned from that position. *Id.* ¶ 21. Buss remained an employee of SolarCity until March 31, 2016, and remained "an advisor to [SolarCity] for the remainder of the Class Period." *Id.* Defendant Hayes Barnard ("Barnard") was the Chief Revenue Officer ("CRO") of SolarCity from August 2013 to June 9, 2016, when he resigned from that position. *Id.* ¶ 22. Defendant Tanguy Serra ("Serra") served as President of SolarCity throughout the Class Period, and became Solarcity's CFO starting in February 2016. *Id.* ¶ 23.

## 2. SolarCity's Business Model

SolarCity "sells solar energy systems for residential and commercial use." Compl. ¶ 4. SolarCity generally "absorbs the upfront capital costs needed to install the solar energy system at the customer's property, and then bills the customers pursuant to long-term contracts lasting 20 years." *Id.* These contracts (called SolarLeases or Solar PPAs) "can be cancelled by the customer prior to construction at no charge." *Id.* Under the Solar PPA, SolarCity "arranges for the design, permitting and financing of the solar system on the host customer's property." *Id.* ¶ 36. SolarCity then "sells the energy created by the system to the host customer at a fixed rate that is typically lower than what is charged by the local utility." *Id.* Under SolarLeases, instead of selling the customer the energy produced by the solar panels at a particular rate, "the customer pays a fixed

monthly amount" to SolarCity. *Id.* ¶ 37. At the end of these 20-year contracts, "the customer can upgrade the system, extend the agreement, or have the system removed." *Id.* Up until the solar system is installed, SolarLeases and Solar PPAs can be cancelled by the customer or SolarCity at any time with no repercussions. *Id.*

SolarCity also offered a loan product called a MyPower loan. *Id.* ¶ 39. Under MyPower loans, a subsidiary of SolarCity "would provide qualified residential customers with a 30-year loan to finance the purchase of a solar system." *Id.* However, Plaintiffs allege that "most of SolarCity's business is derived from the PPA and solar lease model." *Id.* For simplicity, the Court alternatively refers to SolarLeases and Solar PPAs as "contracts" throughout this order.

### 3. SolarCity's Key Metrics

Plaintiffs' suit is premised on allegations that SolarCity made false or misleading statements in SolarCity's quarterly shareholder letters, SolarCity's quarterly reports with the Securities and Exchange Commission ("SEC") on Form 10-Q, and quarterly earnings conference calls with business analysts. *See id.* ¶¶ 96–143. Plaintiffs primarily allege that SolarCity made false or misleading reports about SolarCity's "key operating metrics," which SolarCity used to "evaluate [SolarCity's] business, measure [SolarCity's] performance, identify trends affecting [SolarCity's] business, formulate financial projections and make strategic decisions." *Id.* ¶ 43. These key operating metrics included: (1) Cumulative Customers; (2) Cumulative Energy Contracts; (3) Megawatts ("MW") Booked, MW Installed, and MW Deployed; and (4) Nominal Contracted Payments. *Id.* ¶ 44. The Court briefly describes these key operating metrics below.

First, the Cumulative Customers metric is a count of all customers "where [SolarCity] ha[s] installed or contracted to install a solar energy system, or performed or contracted to perform an energy-related consultation or other energy efficiency services." *Id.* ¶ 43. For example, at the end of quarter 1 of 2015, SolarCity reported that it had 217,595 Cumulative Customers. *Id.* ¶ 96.

Second, the Cumulative Energy Contracts metric is a count of all "residential, commercial or government [contracts] pursuant to which consumers use or will use energy generated by a solar energy system that [SolarCity] ha[s] installed or ha[s] been contracted to install." *Id.* For

3

example, at the end of quarter 1 of 2015, SolarCity reported that it had 207,426 Cumulative Energy Contracts. *Id.* ¶ 96.

Third, MW Booked is defined "as the aggregate megawatt production capacity of solar energy systems pursuant to customer contracts signed during the applicable period" after subtracting the "cancellations during the applicable period." *Id.* ¶ 45. MW Installed is defined as "the megawatt production capacity of solar energy systems for which all hardware has been installed, the system inverter is connected and production capacity has been confirmed, and the system is capable of being grid connected." *Id.* ¶ 46. MW Deployed is defined as "the megawatt production capacity of [SolarCity's] solar energy systems that have had all required building department inspections completed." *Id.* MW Installed is broader than MW Deployed because the former metric includes solar energy systems that both have and have not been inspected. For example, SolarCity reported that in quarter 1 of 2015, SolarCity's MW Booked was 237 MW and its MW Installed was 153 MW for that quarter. *Id.* ¶ 96. Also in quarter 1 of 2015, SolarCity estimated it would reach a MW Deployed of 920–1,000 MW for the 2015 fiscal year. *Id.* ¶ 98.

Fourth, Nominal Contracted Payments is a metric based on the fact that SolarCity's contracts with customers "create long-term recurring customer payments." *Id.* Nominal Contracted Payments are defined as SolarCity's "estimate of the sum of the cash payments that [SolarCity's] customer[s] [are] obligated to pay under our agreements." *Id.* These calculations include estimated future payments on contracts for "deployed" solar energy systems (installed and inspected solar energy systems) and contracts from the "backlog." The term "backlog" refers to all of the contracts for which "solar energy systems [have] not yet [been] deployed." *Id.* ¶ 43. At the end of quarter 1 of 2015, for example, SolarCity reported an estimated $6.1 billion in Nominal Contracted Payments. *Id.* ¶ 96.

### 4. Declining Demand and SolarCity's Business Practices

Plaintiffs allege that "[a]s the Class Period began, SolarCity was experiencing declining demand for its solar panels." *Id.* ¶ 50. Demand was allegedly declining because of changes in regulatory policies towards solar energy systems, the expiration of Federal tax credits for solar

Case No. 16-CV-04686-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

energy systems, increased competition, and customer preference to own rather than lease solar energy systems. *Id.*

Plaintiffs allege that "[i]n order to conceal declining demand, [SolarCity] embarked on a two-fold scheme that would" inflate SolarCity's key operating metrics. *Id.* ¶ 51. "First, [SolarCity] would inflate the number of contracts through the use of overly-aggressive and deceptive sales practices, and, second, [SolarCity] would maintain long-inactive and infeasible contracts on the system as long as possible." *Id.* The Court addresses each of these two aspects of the "scheme" in turn.

First, as to the overly-aggressive and deceptive sales practices, Plaintiffs allege that two questionable sales practices were used that artificially inflated the number of contracts. Plaintiffs allege that "SolarCity management instructed its sales representatives to" (1) engage in deceptive sales practices and (2) enter contracts with customers who would not ultimately receive credit approval." *Id.* ¶ 57. First, with respect to the deceptive sales practices, Plaintiffs allege that SolarCity engaged in sales techniques that involved misrepresentations about the benefits of switching to solar power and about the terms of the SolarLeases and PPAs. Plaintiffs allege that these questionable sales tactics are shown through the testimony of a number of confidential witnesses ("CWs"). The thrust of these allegations is that SolarCity salespersons would make "representations to customers that were incorrect and untrue in order to get a contract." *Id.* ¶ 84. After the contract was obtained through misrepresentations, many SolarLeases and PPAs were allegedly cancelled when those misrepresentations were discovered.

With respect to the customers who would not ultimately receive credit approval, the CWs provide testimony that many of SolarCity's contracts were "not high quality." *Id.* ¶ 72. Specifically, at least one CW states that SolarCity salespeople were encouraged to get a customer to enter a contract regardless of whether the customer would be able to qualify [to have a solar energy system installed]." *Id.* ¶ 93. Plaintiffs allege that because of the misrepresentations and lack of discernment as to which customers were allowed to sign contracts, the number of contracts in SolarCity's system was artificially inflated. *Id.*

United States District Court
Northern District of California

Second, as to "maintain[ing] long-inactive and infeasible contracts on the system," Plaintiffs allege that SolarCity "fail[ed] to cancel and/or improperly refus[ed] to cancel contracts that customers had attempted to terminate, or which should have been cancelled because they were inactive." *Id.* ¶ 56. These contracts were entered in SolarCity's "SolarWorks" and "Zipline" customer database systems. *Id.* ¶ 55. According to Plaintiffs, SolarCity sales representatives intentionally kept many contracts in the database that should have been cancelled by taking no action on those contracts or by entering "notes" in SolarCity's database that prevented the contracts from automatically being cancelled. *Id.* ¶ 56.

Plaintiffs attribute the aggressive sales tactics and retention of contracts that should have been canceled to Individual Defendant Hayes Barnard ("Barnard"). As noted above, Barnard was the CRO of SolarCity from August 2013 to June 9, 2016. *Id.* ¶ 22. Plaintiffs allege that "Barnard . . . had a history of employing similar deceptive practices in the mortgage industry." *Id.* ¶ 52. Before becoming SolarCity's CRO, "Barnard was the Founder, Chairman, and CEO of Paramount Equity Mortgage, a consumer finance company specializing in mortgage, insurance, and residential solar." *Id.* While the complaint does not allege when, Paramount Equity Mortgage "agreed to pay a fine and restitution totaling approximately $400,000 in response to charges brought by the Department of Financial Institutions, Division of Consumer Services for the State of Washington concerning alleged false, deceptive, and misleading mortgage services advertising and collected fees." *Id.* ¶ 54.

### 5. Alleged Misrepresentations

Plaintiffs allege that, over a period of five fiscal quarters from quarter 1 of 2015 to the end of quarter 1 of 2016, SolarCity made a number of false or misleading statements. These false or misleading statements were allegedly made in SolarCity's quarterly shareholder letters, SolarCity's quarterly reports to the SEC on Form 10-Q, and quarterly earnings conference calls with business analysts. *See id.* ¶¶ 96–143.

The quarterly shareholder letters that allegedly contain false or misleading statements were issued by SolarCity after each quarter in 2015 and the first quarter of 2016. Specifically, the

shareholder letter reporting on the first quarter of 2015 was issued on May 5, 2015 ("1Q15 Shareholder Letter"), *id.* ¶ 96; the shareholder letter reporting on the second quarter of 2015 was issued on July 29, 2015 ("2Q15 Shareholder Letter"), *id.* ¶ 107; the shareholder letter reporting on the third quarter of 2015 was issued on October 29, 2015 ("3Q15 Shareholder Letter"), *id.* ¶ 120; the shareholder letter reporting on the fourth quarter of 2015 was issued on February 9, 2016 ("4Q15 Shareholder Letter"), *id.* ¶ 134; and the shareholder letter reporting on the first quarter of 2016 was issued on May 9, 2016 ("1Q16 Shareholder Letter"), *id.* ¶ 140. On the same day that each of the above shareholder letters was issued, Defendants held earnings conference calls with business analysts to discuss the prior quarter and to discuss predictions for the future of the business. *Id.* ¶¶ 102, 116, 126, 138. The day following the issuance of each shareholder letter, Defendants filed Form 10-Q with the SEC, which provided a report on that quarter. *Id.* ¶¶ 100, 115, 124, 125, 142.

As a general matter, Plaintiffs allege that the outlook for SolarCity's business changed significantly from the beginning of quarter 1 of 2015 to the end of quarter 1 of 2016. *See id.* ¶¶ 4– 13. Plaintiffs allege that, although the first and second quarters of 2015 seemingly indicated a successful growing business, those reports were false or misleading. *Id.* ¶ 7. Plaintiffs allege that the problems with SolarCity's business model began to show in quarter 3 of 2015 when SolarCity announced a new strategy of becoming "cash flow positive" rather than pursuing growth. *Id.* ¶ 62. Plaintiffs allege that these problems became clearer in quarter 4 of 2015 and quarter 1 of 2016, when SolarCity began to show shrinking bookings and installations of solar systems. *Id.* ¶ 11. Plaintiffs allege that statements made throughout this period were false or misleading to investors who invested in SolarCity. *Id.* ¶ 13.

First, Plaintiffs allege that Defendants' reporting of four of the key operating metrics— MW Booked, Cumulative Customers, Cumulative Energy Contracts, and Nominal Contracted Payments—in the quarterly shareholder letters and Forms 10-Q was false or misleading. *Id.* ¶ 6. In the first three quarters of 2015, Defendants reported all four of these key operating metrics. *Id.* ¶¶ 96, 115, 124. However, in quarter 4 of 2015, Defendants stopped reporting Nominal

United States District Court
Northern District of California

Contracted Payments, and in quarter 1 of 2016 Defendants only reported MW Booked. *Id.* ¶¶ 134, 140. Plaintiffs allege that the key operating metrics, when they were reported, were false or misleading because they were artificially inflated by contracts obtained by deception, low quality contracts, and old and inactive contracts that should have been removed from SolarCity's database. *Id.* ¶ 6–7. Plaintiffs also allege that Defendants' decision to stop reporting these key operating metrics in quarter 4 of 2015 and quarter 1 of 2016 shows that the metrics were false or misleading when they were reported. *Id.* ¶¶ 134, 140.

Second, Plaintiffs allege that Defendants' guidance statements for MW Installed in the quarterly shareholder letters, that is, the predictions of the total energy capacity of solar systems SolarCity was going to install in the future, were false or misleading because Plaintiffs based their prediction on artificially inflated metrics. *Id.* ¶¶ 98, 110, 122, 134, 140.

Third, Plaintiffs allege that many of the statements made by Defendants that expressed a positive outlook for SolarCity were false or misleading because demand for SolarCity's products was dropping and the key operating metrics were artificially inflated. *Id.* ¶ 50.

Finally, Plaintiffs allege that the individual Defendants' explanations for why SolarCity's installation and booking numbers no longer showed the same level of growth in quarter 4 of 2015 and quarter 1 of 2016 were false or misleading because these statements did not reveal that demand had been dropping for SolarCity's products throughout the Class Period. *Id.* ¶¶ 137, 143.

The Court reproduces in the table below the specific statements that Plaintiffs allege are false or misleading:

| Quarter | Location | # | Statement |
|---------|----------|---|-----------|
| 1Q15 | May 5, 2015 1Q15 Shareholder Letter and May 6, 2015 Form 10-Q | A1 | The 1Q15 Shareholder Letter disclosed Defendants' "key operating metrics": (a) a record of 237 MW Booked and 153 MW Installed, (b) 217,595 Cumulative Customers; (c) 207,426 Cumulative Energy Contracts; and (d) $6.1 billion of Estimated Nominal Contracted Payments. Compl. ¶ 96–97. On May 6, 2015, Plaintiffs filed Form 10-Q for the first quarter of 2015 with the SEC, which disclosed the same key operating metrics. *Id.* |
| | | A2 | The 1Q15 Shareholder Letter predicts that "[f]or the second quarter of 2015, we expect MW Installed of 180 MW, which would represent year-over-year growth of 69% with residential growing |

United States District Court
Northern District of California

| | | | |
|---|---|---|---|
| | | | north of 80%. While we now offer quarterly guidance on MW Installed, we reaffirm our full year guidance for 920–1,000 MW Deployed." *Id.* ¶ 98. |
| | May 5, 2015 Earnings Call | A3 | Rive stated: "We are actually extremely bullish for the US markets." *Id.* ¶ 102 |
| | | A4 | Rive stated: "I think we'll see a lot more growth in Q3, Q4 based on where the jobs are in progress right now." *Id.* |
| | | A5 | Rive stated: "So we're highly optimistic about the US . . . . In our primary states, we very [sic] optimistic about our growth." *Id.* |
| | | A6 | Buss stated: "[O]ur growth profile is going to be pretty darn big compared to most companies that are out there." *Id.* |
| 2Q15 | July 29, 2015 2Q15 Shareholder Letter and July 30, 2015 Form 10-Q | B1 | The 2Q15 Shareholder Letter reported "MW Installed at 189 MW, up 77% year over year, and MW Booked at 395 MW, up 81% year over year." *Id.* These MW volumes were a "new high." *Id.* The 2Q15 Shareholder Letter further reported: (a) 262,495 Cumulative Customers; (b) 252,591 Cumulative Energy Contracts; and (c) $7.7 billion of Estimated Nominal Contracted Payments. *Id.* On July 30, 2015, SolarCity filed its quarterly report on Form 10-Q for the second quarter of 2015 and reported the same metrics described in the 2Q15 Shareholder Letter. *Id.* ¶ 115. |
| | | B2 | The 2Q15 Shareholder Letter stated that "[d]emand remained as strong as ever in California, continued to gather significant steam in the northeast markets of New York, Massachusetts, and Connecticut, and gained early traction following the launch of sales in Rhode Island and New Hampshire." *Id.* ¶ 108. |
| | | B3 | The 2Q15 Shareholder Letter predicted that "[f]or Q3 2015, we expect to install a record 260 MW, representing growth of 89% year-over year. For the full year 2015, we are updating our guidance to 920–1,000 MW Installed (vs. 920–1,000 MW Deployed previously)." *Id.* ¶ 110. According to the 2Q15 Shareholder Letter, MW Deployed was changed to MW Installed because government inspections of solar systems could no longer keep up with SolarCity's rate of installations. *Id.* |
| | | B4 | The 2Q15 Shareholder Letter stated that "we plan on closing out our first decade with greater strength, momentum and record results as well as set the stage for continued strong growth for 2016 and beyond." *Id.* ¶ 112. |
| | July 29, 2015 Earnings Call | B5 | Rive stated: "Q2 was an amazing quarter for SolarCity. . . . We are well on our way to achieve our 1 million customer goal." *Id.* ¶ 116. Buss stated: "I think we had a great Q2 and I expect an even better Q3 . . . .[SolarCity is] growing extremely well." *Id.*. |
| | | B6 | Rive stated: "We added $1.6 billion of nominal contracted payments [in the second quarter of 2015]." *Id.* |

| | | B7 | Rive stated: "The biggest bottleneck that we face is taking it from booking to getting it ready for installation. And that's with dealing with all the permitting. That's going back to the customers, finalizing the design, back and forth custom design, back and forth customer's [sic] on vacation." *Id.* |
|---|---|---|---|
| | | B8 | Serra stated: "I'm very happy with our continued ability to scale and [unbelievably] incredibly strong sales." *Id.* |
| | | B9 | In response to the question "And then can you tell us anything about FICO scores and where you're headed ultimately here," Rive stated: "Right now if you take the history of the Company we went from 725 FICO down to 700 down to 680 down to 650. And now we have to figure out how we make it possible for everybody in America to get cheaper clean energy." *Id.* ¶ 116. Serra then states that "[o]ur average is still comfortably in the 700. 730, 740. [sic] So you're not going to see that, [sic] mix change too quickly." *Id.* |
| 3Q15 | October 29, 2015 3Q15 Shareholder Letter and October 30, 2015 Form 10-Q | C1 | The 3Q15 Shareholder Letter "reported MW Installed at 256, below the projected 260 . . . [and] MW Booked at 345, below the 395 for the prior quarter, a drop of 12.6%." *Id.* In addition, the 3Q15 Shareholder Letter reported: (a) 298,030 Cumulative Customers; (b) 288,992 Cumulative Energy Contracts; and (c) $8.9 billion of Estimated Nominal Contracted Payments. *Id.* On October 30, 2015, SolarCity filed its quarterly report on Form 10-Q with the SEC for the third quarter of 2015 and reported the same metrics described in the 3Q15 Shareholder Letter. *Id.* ¶ 124. |
| | | C2 | The 3Q15 Shareholder Letter predicted that MW Installed for quarter 4 of 2015 would be 280–300 MW. Based on these numbers, the 3Q15 Shareholder Letter lowered its projected guidance for 2015 from 920–1,000 MW Installed to 878–898 MW Installed. The new range was thus "below the low end of [SolarCity's] prior annual guidance." *Id.* ¶ 121. The 3Q15 Shareholder Letter stated that the lowered guidance occurred because of "'inherent uncertainty' regarding certain commercial installations and 'potential weather related disruptions.'" *Id.* |
| | | C3 | At the same time as lowering the projected guidance for 2015, SolarCity announced a new strategy for the company. *Id.* ¶ 122. The 3Q15 Shareholder Letter stated that "[g]oing forward we are focusing our strategy on cost reductions and cash flow. Though we expect our deployments to grow in 2016 we are not targeting the same growth rates that have gotten us to our current scale going forward. Specifically it is our goal to achieve positive cash flow by 2016 year-end and be in solid shape prior to the planned [income tax credit for solar panel installation] expiration in 2017." *Id.* Based on this strategy, SolarCity gave an initial 2016 guidance of 1.25 Gigawatts ("GW") Installed for 2016. *Id.* |
| | October 29, | C4 | Rive stated that "he was disappointed" in missing the guidance of |

| | | | |
|---|---|---|---|
| | 2015 Earnings Call | | 260 MW Installed (by only installing 256 MW), but that "[a]ll the fundamentals of the business is [sic] looking good . . . [and that] [d]emand for the product is strong. We expect Q4 bookings to be greater than Q3 bookings . . . But the demand is strong. In 2016, we expect demand to be very strong. . . . [I just really want to] highlight one thing, because this is important to me. This is not a demand challenge." *Id.* ¶ 126. |
| | | C5 | Rive stated: "[o]verall, I'm very excited about the business, and the strategy change." *Id.* |
| | | C6 | In response to a question about the large number of contracted solar systems not yet installed and capacity restraints, Rive stated "there's no capacity constraints or anything like that on the east coast. We really, really like the east coast. . . . [and that] whether it's volume or costs, the east coast markets are really good for us." *Id.* Plaintiffs allege that "[w]hile the Defendants' statements that they did not have installation capacity constraints were true, the statements were false and misleading at the time they were made because they omitted the fact that the performance metrics were fraudulently inflated, concealing that the underlying issue was a lack of demand." *Id.* ¶ 129. |
| | | C7 | A business analyst asked whether SolarCity was worried about delays in installations causing "sales to churn off the backlog," that is, cancellations of contracts waiting for installations. Rive responded that "we are ramping up our installations, so that will catch up to [the number of bookings]. . . . so you'll see the bookings and installs getting closer to one another, but there will still be a delta because at a 40% growth rate, you still have to have a delta, but you'll see those two lines getting closer to one another" *Id.* |
| 4Q15 | February 9, 2016 4Q15 Shareholder Letter and February 10, 2016 Form 10-Q | D1 | SolarCity did not report many of its "key operating metrics" such as MW Booked, Cumulative Customers, Cumulative Energy Contracts, or Nominal Contracted Payments. *Id.* ¶ 134. The 4Q15 Shareholder Letter reported that SolarCity missed its 280–300 MW Installed guidance by 8 MW, with 272 MW Installed. *Id.* |
| | | D2 | The 4Q15 Shareholder Letter stated that it was still predicting 1.25 GW Installed by the end of 2016, but that growth had become a "secondary focus." *Id.* |
| | | D3 | The February 10, 2016 Form 10-Q reported (a) 331,256 Cumulative Customers; and (b) 322,897 Cumulative Energy Contracts, "both reflecting the smallest growth percentages in at least two years." *Id.* ¶ 136. SolarCity did not report Nominal Contracted Payments to the SEC because "[t]hough we have historically reported nominal contracted payments as a representation of the growth in our operations and the value of our energy contracts, we have decided not to report our undeployed |

| | | | backlog of contracts as a value in this manner and will no longer be reporting this amount." *Id.* ¶ 137. |
|---|---|---|---|
| | February 9, 2016 Earnings Call | D4 | Rive stated that SolarCity missed the predicted 280–300 MW Installed prediction because of "commercial delays and stopping installations in Nevada. As many of you know, . . . net metering rates [were changed in] Nevada, which forced us to stop installations." *Id.* ¶ 138. Net metering rates represent the credits solar system owners may receive "from utilities for excess power [the solar users'] systems produce." *Id.* ¶ 50. |
| 1Q16 | May 9, 2016 1Q16 Shareholder Letter and May 10, 2016 Form 10-Q | E1 | The 1Q16 Shareholder Letter lowered SolarCity's full year 2016 MW Installed Guidance from 1.25 GW Installed to 1.0–1.1 GW Installed. *Id.* ¶ 140. |
| | | E2 | The 1Q16 Shareholder Letter stated that SolarCity was "recalibrating [SolarCity's] outlook for the year after taking into account the regulatory developments that impacted Q1 2016 MW Booked and the impact of an increase in pricing for [SolarCity's] commercial business." *Id.* Plaintiffs allege that "while the Defendants admit regulatory policies had impacted demand in 1Q16, Defendants failed to disclose that this and other factors had been impacting demand for several quarters resulting in its weaker performance and reduced guidance." *Id.* ¶ 143. |
| | | E3 | The 1Q16 Shareholder Letter reported MW Booked at 160 MW "the smallest figure in nearly two years." *Id.* ¶ 140. However, it omitted "any reference to [SolarCity's other] key operating metrics, including Cumulative Customers, Cumulative Energy Contracts, or [Nominal Contracted Payments]." *Id.* ¶ 141. Instead, SolarCity "reported a new metric called 'Cumulative Installed Customers' which, by definition, did not include customers whose contracts were improperly kept active, but only those whose contracts [that had proceeded to installation]." *Id.* On May 10, 2016, SolarCity filed its quarterly report on Form 10-Q with the SEC for the first quarter of 2016, which also omitted these metrics. *Id.* ¶ 142. Plaintiffs allege that its entire switch from prior Cumulative Customer, Cumulative Energy Contracts, and Nominal Contracted Payments metrics indicates that SolarCity had been "concealing that it had been improperly retaining contracts in its backlog and suppressing contract cancellations." *Id.* ¶ 143. |

### 6. Resulting Losses

Plaintiffs allege that "Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class." *Id.* ¶ 144. Plaintiffs allege that Plaintiffs

12

suffered economic losses because "[d]uring the Class Period, [Plaintiffs] purchased SolarCity's securities at artificially inflated prices," and these prices dropped significantly "when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed." *Id.*

Plaintiffs allege that as a result of the revelations in quarter 3 and quarter 4 of 2015 that SolarCity was not doing as well as previously thought, SolarCity's stock price dropped significantly. On October 30, 2015, the day after the issuance of the 3Q15 Shareholder Letter, SolarCity's "stock price fell $8.42 per share, or 22%, to close at $29.65." *Id.* ¶ 147. On February 10, 2016, the day after the issuance of the 4Q15 Shareholder Letter, SolarCity's "shares fell $7.72 per share, or 29%, to close at $18.63." *Id.* ¶ 152. On May 10, 2016, the day after the issuance of the 1Q16 Shareholder Letter, SolarCity's "stock price fell $4.69, or 20.8%, to close at $17.79." *Id.* ¶ 156.

**B.    Procedural History**

On August 15, 2016, a group of SolarCity's shareholders filed suit against SolarCity in a case captioned *Mueller v. SolarCity Corporation*, N.D. Cal. Case No. 16-CV-04686-LHK. *See* ECF No. 1. A different group of SolarCity's shareholders filed suit on October 7, 2016 in a case captioned *Nuckols v. SolarCity Corporation*, N.D. Cal. Case No. 16-CV-05806–LHK. On November 4, 2016, the Court granted the parties' stipulation to consolidate the two cases as *In re SolarCity Corporation Securities Litigation*, N.D. Cal. Case No. 16-CV-04686-LHK. *See* ECF No. 29. On January 25, 2017, the Court appointed Plaintiff Frank Fish as lead plaintiff in the instant suit. ECF No. 43. In the same order, the Court also appointed lead plaintiff's counsel. *Id.*

On March 20, 2017, Plaintiffs filed a Consolidated Class Action Complaint. *See* Compl. On May 5, 2017, Defendants filed a Motion to Dismiss Consolidated Class Action Complaint. *See* Mot. On June 19, 2017, Plaintiffs filed an opposition, ECF No. 61 ("Opp'n"), and on July 19, 2017, Defendants filed a reply, ECF No. 69 ("Reply").

**C.    Request for Judicial Notice**

Defendants request judicial notice of 24 documents, which include (1) five SolarCity

quarterly shareholder letters for quarter 1, 2, 3, and 4 of 2015 and quarter 1 of 2016, (2) five

SolarCity transcripts from the quarterly earnings calls for the above-mentioned quarters, (3) five

SolarCity slide decks presented with the quarterly earnings call, (4) four SolarCity 10-Q forms

filed with the SEC quarterly in quarters 1, 2, 3, and 4 of 2015, (5) two SolarCity 10-K forms filed

with the SEC for 2014 and 2015; (6) one Form 4 filed with the SEC on June 15, 2015, which

shows Brad Buss's stock purchases; and (7) two SolarCity proxy statements for 2015 and 2016

filed with the SEC. "Although generally the scope of review on a motion to dismiss for failure to

state a claim is limited to the Complaint, a court may consider evidence on which the complaint

necessarily relies if: "(1) the complaint refers to the document; (2) the document is central to the

plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6)

motion." *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation

marks and citations omitted). The court may "treat such a document as 'part of the complaint, and

thus may assume that its contents are true for purposes of a motion to dismiss under Rule

12(b)(6).'" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (quoting *United States v. Ritchie*,

342 F.3d 903, 908 (9th Cir. 2003)).

Defendants contend, and Plaintiffs agree, that all of the items described in items 1, 2, 3, 4,

and 5, above, were cited by Plaintiffs in the complaint, and thus may be considered under the

incorporation by reference doctrine. Plaintiffs do not object to judicial notice being taken of these

documents to the extent they are referenced in the complaint. However, Plaintiffs argue that

because Plaintiffs allege in the complaint that Defendants made false or misleading statements in

these documents, the Court should not consider these documents for the truth of the matter

asserted. Plaintiffs also argue that the Court should not take judicial notice of items 6 and 7

above, Form 4 and the proxy statements filed with the SEC, because those documents are not

referenced in the complaint. The Court addresses each argument in turn.

First, Plaintiffs contend that the Court cannot consider the documents described in 1, 2, 3,

4, and 5 above for the truth of the matter asserted. Defendants argue that under the incorporation

by reference doctrine, once documents are referenced in a complaint the entire document is

14

assumed to be true for the purposes of a motion to dismiss. Although courts generally assume a document's contents to be true on a motion to dismiss when that document is referenced in a complaint, the Court cannot do so when Plaintiffs' complaint alleges that these documents contain false or misleading statements. Therefore, although the Court may consider these documents under the incorporation by reference doctrine, the Court does not assume that the documents contain true statements. *See Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of matters of public record . . . But a court may not take judicial notice of a fact that is subject to reasonable dispute.") (internal quotation marks omitted), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

Second, Plaintiffs argue that the Court cannot consider Form 4 filed with the SEC for Buss's stock transactions or SolarCity's 2015 and 2016 proxy statements because these documents are not referenced in the complaint. However, courts in this district have taken judicial notice of SEC Form 4 and proxy statements, even when those documents were not referenced in the pleadings in order to prove that stock sales were made or were not made. *See, e.g.*, *Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*, 2012 WL 685344, at *5 n.4, *8 n.5 (N.D. Cal. Mar. 2, 2012). These documents, and whether stock sales were made or not made, are relevant for the purpose of evaluating scienter because the sale of stock by an individual defendant may demonstrate a financial motive for that defendant to make false or misleading statements. *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) (holding that the sale or non-sale of stock by the individual Defendants is relevant to whether an inference of scienter is warranted); *Coyler v. Acelrx Pharms., Inc.*, 2015 WL 7566809, at *3, 14 (N.D. Cal. Nov. 25, 2015) (considering defendants' personal financial holdings and transactions, as reflected in proxy statements and Form 4, and noting that the "absence of insider trading by a defendant is highly relevant and undermines any inference of scienter"). Accordingly, the Court may consider the proxy statements and the Form 4 supplied by Defendants.

## II.     LEGAL STANDARD

### A.     Motion to Dismiss

15

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to state a claim upon which relief may be granted. Because Plaintiffs have brought their claims as a federal securities fraud action, Plaintiffs are not subject to the notice pleading standards under Federal Rule of Civil Procedure 8(a)(2), which require litigants to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Instead, Plaintiffs must "meet the higher, [more] exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." *Or. Pub. Emp. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 603–04 (9th Cir. 2014).

Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Plaintiffs must include "an account of the time, place, and specific content of the false representations" at issue. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). Rule 9(b)'s particularity requirement "applies to all elements of a securities fraud action." *Apollo Group*, 774 F.3d at 605. "PSLRA imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." *In re Rigel*, 697 F.3d at 877. In order to properly allege falsity, "a securities fraud complaint must . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Id.* (internal quotation marks and alteration omitted). In addition, in order to "adequately plead scienter under the PSLRA, the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (internal quotation marks omitted).

For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere "conclusory

16

1  allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss."

2  *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). Furthermore, "'a plaintiff may plead

3  [him]self out of court'" if he "plead[s] facts which establish that he cannot prevail on his . . .

4  claim." *Weisbuch v. Cty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quoting *Warzon v. Drew*,

5  60 F.3d 1234, 1239 (7th Cir. 1995)).

6  ### B.  Leave to Amend

7  Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely

8  granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate

9  decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d

10  1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and alterations omitted).

11  Generally, leave to amend shall be denied only if allowing amendment would unduly prejudice the

12  opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith.

13  *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III.  DISCUSSION

15  Plaintiffs allege two causes of action: (1) violation of § 10(b) of the Exchange Act and

16  Rule 10b-5 against all Defendants, and (2) violation of § 20(a) of the Exchange Act against the

17  individual Defendants. The Court addresses each cause of action in turn.

18  ### A.  Violation of § 10(b) of the Exchange Act and Rule 10b-5

19  "To plead a claim under section 10(b) and Rule 10b-5, the Plaintiffs must allege: (1) a

20  material misrepresentation or omission; (2) scienter; (3) a connection between the

21  misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic

22  loss; and (6) loss causation." *Apollo Group*, 774 F.3d at 603. Defendants argue that Plaintiffs

23  have failed to adequately allege (1) material misrepresentations or omissions, (2) scienter, and (3)

24  loss causation. The Court first discusses Defendants' alleged misrepresentations and omissions

25  and finds that Plaintiffs have failed to adequately allege actionable misrepresentations or

26  omissions. Although the Court finds below that Plaintiff fails to adequately allege actionable

27  misrepresentations or omissions, in anticipation of an amended complaint, the Court then

28

Case No. 16-CV-04686-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

addresses a number of other remaining issues, including scienter. However, because the Court finds below that Plaintiffs fail to adequately allege material misrepresentations or omissions and scienter, the Court does not reach the issue of loss causation.

### 1. Material Misrepresentation or Omission

Plaintiffs allege that Defendants made a number of material misrepresentations and omissions in SolarCity's quarterly shareholder letters, in filings with the SEC, and in quarterly earnings conference calls with business analysts. By contrast, Defendants argue that Defendants' statements are nonactionable because they are (1) forward-looking statements that are protected by a safe harbor, (2) nonactionable statements of corporate optimism, or (3) statements that are true and not misleading. The Court addresses each argument in turn and finds that none of the alleged misrepresentations or omissions is actionable because the statements fall into at least one of these three categories.

### a. Forward-Looking Statements Safe Harbor

Under the PSLRA's "Safe Harbor" Provision, "forward-looking statements" are not actionable as a matter of law if they are identified as such and accompanied by "meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward looking statement." *See* 15 U.S.C. § 78u–5(c)(1)(A)(i). A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u5 (i)). When a statement includes both forward-looking and non-forward-looking statements, the challenged statements still fall within the safe harbor as forward-looking if, when "examined as a whole, the challenged statements relate[] to future expectations and performance." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014) (*Police Retirement*) (citing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)).

"[I]f a forward-looking statement is identified as such and accompanied by meaningful

Case No. 16-CV-04686-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera*, 610 F.3d at 1112. Alternatively, if a forward-looking statement is not identified as a forward-looking statement or is unaccompanied by meaningful cautionary statements, then the statement is actionable only if the plaintiff proves that the forward-looking statement "was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B).

Defendants argue that Defendants' guidance statements—statements A2, B3, C2, C3, D2, and E1—in the quarterly shareholder letters and earnings conference calls were forward-looking statements that are protected by the PSLRA's safe harbor. Defendants also argue that statement C4 is a forward-looking statement that is protected by the safe harbor. The Court first addresses whether the guidance statements were forward-looking, then addresses whether statement C4 was forward-looking, and finally looks to whether these statements fall within the PSLRA's safe harbor because they were "accompanied by meaningful cautionary statements." *In re Cutera*, 610 F.3d at 1112.[1]

### i. Guidance Statements Were Forward-Looking

As discussed above, in each quarterly shareholder letter, SolarCity made predictions regarding the key operating metrics MW Installed or MW Deployed for the next quarter, and for the entire year. The guidance statements are statements A2, B3, C2, C3, D2, and E1. Plaintiffs allege in the complaint that the guidance statements that were placed in SolarCity's quarterly shareholder reports were false and misleading because the future growth predictions "relied on" key operating metrics that were artificially inflated by contracts that would never result in installations.

However, Plaintiffs' opposition abandons Plaintiffs' claim based on these guidance

---

[1] Defendants also argue that the key operating metrics were forward-looking. However, the Court finds that Plaintiffs have not adequately alleged falsity as to those statements in section III.A.1.c below. Thus, the Court need not reach whether those statements fall in the forward-looking safe harbor.

19

statements. Plaintiffs' opposition does not argue that *any* guidance statements are actionable. As Defendants point out in their reply brief: "[Plaintiffs'] Opposition omits any reference to the allegations assailing the Company's guidance." Reply at 2. Accordingly, on this ground alone Plaintiffs' claim based on these guidance statements is subject to dismissal with prejudice. *See Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1205 (N.D. Cal. 2014) ("[W]here a plaintiff simply fails to address a particular claim in its opposition to a motion to dismiss that claim, courts generally dismiss it with prejudice.") (internal quotation marks omitted).

Moreover, even if Plaintiffs did not abandon their challenge to Defendants' guidance statements, the Court would still find those statements nonactionable because they fall within the forward-looking safe harbor. In this section, the Court discusses whether the guidance statements were forward-looking. In section III.A.1.a.iii below, the Court discusses whether these guidance statements fall into the safe harbor because they were accompanied by meaningful cautionary language.

The Ninth Circuit has held that "growth and revenue projections" are "forward-looking on their face." *Police Retirement*, 759 F.3d at 1058; *see also In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1046 (N.D. Cal. 2007) ("Here, each of the financial forecast statements identified by defendants as forward-looking falls squarely within 15 U.S.C. § 78u–5(i)(1)(A)-(D) as each is a statement predicting the company's future expected sales or other financial results."). Defendants' guidance for future MW Installed and MW Deployed are a projection of future sales and revenue for SolarCity. *See, e.g.*, Compl. ¶ 98 ("For the second quarter of 2015, we expect MW Installed of 180 MW."). These predictions for MW Installed and MW Deployed are a prediction of the energy capacity of all of the contracts that will actually be transformed into revenue-producing assets. These predictions that certain target sales numbers will be reached are forward-looking under *Police Retirement* and *LeapFrog*.

Plaintiffs' complaint alleges that that these guidance statements were not forward-looking because the statements were based on operating metrics that provided a then-present description of the status of SolarCity. However, as discussed by the Ninth Circuit in *Police Retirement*,

statements that "plainly project expectations for future growth" are still forward-looking even if they are based on "'then-present effects and circumstances[]' of known trends." *Police Retirement*, 759 F.3d at 1058. Accordingly, Defendants' guidance statements are forward-looking.

### ii. Statement C4 Was Forward-Looking

In this section, the Court discusses whether Statement C4 was forward-looking. In the next section, the Court discusses whether statement C4 falls into the safe harbor because it was accompanied by meaningful cautionary language.

In statement C4, which was made during the earnings conference call at the end of quarter 3 of 2015, Rive stated that "[a]ll the fundamentals of the business is [sic] looking good . . . [and that] [d]emand for the product is strong. We expect Q4 bookings to be greater than Q3 bookings . . . But the demand is strong. In 2016, we expect demand to be very strong. . . . [I just really want to] highlight one thing, because this is important to me. This is not a demand challenge." *Id.* ¶ 126. Although this statement refers to demand, it is nonetheless forward-looking. In *Fusion-io*, this Court previously held that statements about demand are included in the safe harbor where the statement was made "in the context of Fusion's guidance for its third-quarter revenues." *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *12 (N.D. Cal. Feb. 12, 2015).

Here, although the statements about demand were not made as part of the "formal guidance" in the 3Q15 Shareholder Letter, the statements about demand were nonetheless being used by Rive to make predictions about future bookings in quarter 4 of 2015 and demand in 2016. Moreover, Rive made these statements in the context of discussions about the strategy change SolarCity made at the end of quarter 3 of 2015 to become "cash flow positive." Previously, SolarCity was growing at a rapid rate: the MW Installed values for quarter 1 and quarter 2 of 2015 had grown 80% to 90% from the previous year. As part of the cash flow positive strategy, SolarCity would drop its growth rate to 40%. Statement C4 clarified that SolarCity's change in strategy was not motivated by an expectation of a drop in demand. Thus, in context, Rive's

United States District Court
Northern District of California

statements about demand were part of a discussion about the expectations for SolarCity's "cash flow positive" strategy.[2]  Therefore, statement C4 is a forward-looking statement.

### iii.  Meaningful Cautionary Language and Safe Harbor

Plaintiffs argue that even if the above statements are forward-looking, Defendants did not identify the statements as such and did not provide meaningful cautionary language, and thus the safe harbor does not apply.  As noted at the beginning of the forward-looking safe harbor section, "if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."  *In re Cutera*, 610 F.3d at 1112.

Here, Defendants' statements were accompanied by language that identified the presence of forward-looking statements and provided a warning using meaningful cautionary language.  In *Police Retirement*, the Ninth Circuit approved the following language as sufficient to satisfy the requirements of the forward-looking safe harbor:

> Before we begin, I would like to inform you that comments mentioned on today's call may be deemed to contain forward-looking statements.  Actual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties.  These risks and uncertainties are described in detail in the company's [SEC] filings.  Prospective investors are cautioned not to place undue reliance on such forward-looking statements.

*Police Retirement*, 759 F.3d at 1058; *see also In re Cutera*, 610 F.3d at 1108 (holding that essentially similar warning language was sufficient to trigger the PSLRA's safe harbor).

Here, the guidance provided in shareholder letters, SEC filings, and earnings conference calls was accompanied by warning language that is substantially similar to the language approved

---

[2] Even if the statements about demand are not forward-looking statements, these statements are non-actionable statements of corporate optimism.  The Court discusses the standard for such statements in the next section.  This Court has previously held that statements such as the "demand metrics were strong" and that a company has "good underlying market fundamentals" are nonactionable statements of corporate optimism.  *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (dismissing statements that we have "strong demand metrics and good momentum" and "our demand indicators are strong").  Statement C4's language similarly is a representation of demand being "strong," and thus is a statement of corporate optimism.

Case No. 16-CV-04686-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

in *Police Retirement*. All of the shareholder letters began with a warning that the document contained forward-looking statements and provided the following warning language about such statements:

> Forward-looking statements are subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in or suggested by the forward-looking statements. As of the date hereof, we have bookings for only a portion of the orders needed to achieve our megawatt projections and therefore expect the megawatts we need to deploy and/or install to meet our projections to be sourced substantially from new deployments of solar systems not currently under contract. In order to meet our projections, we will need to expand our workforce, increase our installation efficiency and exceed our existing bookings rate relative to what we have achieved to date. Additional key risks and uncertainties include the level of demand for our solar energy systems, . . . the effect of electric utility industry regulations, net metering and related policies, the availability and amount of rebates, tax credits and other financial incentives, . . . risks that consumers who have executed energy contracts included in reported nominal contracted payments remaining and backlog may seek to cancel those contracts, . . . changes in strategic planning decisions by management or reallocation of internal resources . . . .

ECF No. 56. The above warning language specifically refers to a potential lack of demand and the potential that signed contracts would be cancelled, the two risk factors that Plaintiffs allege that Defendants failed to disclose.

Further, the earnings conference calls with investors similarly began with the warning:

> As a reminder, today's discussion will contain forward-looking statements that involve our views as of today based on information currently available to us. Forward-looking statements should not be considered a guarantee of future performance or results, and reflect information that may change over time. Please refer to SolarCity's quarterly shareholder letter issued today, as well as the slides accompanying this presentation, and our periodic reports filed with the Securities and Exchange Commission for a discussion of our forward-looking statements and the factors and risks that could cause our results to differ from these forward-looking statements.

*Id.* at 261–62. Again, this language is substantially similar to the language that was approved by the Ninth Circuit in *Police Retirement*, reproduced above. Therefore, the Court finds that adequate warning language accompanied the forward-looking statements made by Defendants.

Accordingly, Plaintiffs' claims fail to the extent they are based on statements A2, B3, C2, C3, D2, and E1—the guidance statements—and statement C4. As set forth above, these

23

statements are forward-looking and they were accompanied by sufficient warning language. Thus, they fall within the PSLRA's safe harbor.

### b. Corporate Optimism

Defendants further argue that many of the allegedly false or misleading statements are not actionable because they are mere statements of corporate optimism. In the Ninth Circuit, "vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws" because no reasonable investor would rely on such statements. *In re Impac Mortg. Holdings, Inc.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003)); *In re Cutera*, 610 F.3d at 1111 ("[P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives."). This is because "[w]hen valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera*, 610 F.3d at 1111; *see also In re iPass, Inc. Sec. Litig.*, 2006 WL 496046, at *4 (N.D. Cal. Feb. 28, 2006) (generalized statements of optimism are not actionable because they are "'not capable of objective verification,'" and "'lack[ ] a standard against which a reasonable investor could expect them to be pegged.'") (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).

Thus, for example, a district court in this district has held the following statements to be nonactionable statements of corporate optimism: "[w]e are very pleased with the learning from our pilot launch," "so far we're getting really great feedback," and "we are very pleased with our progress to date." *Wozniak v. Align Tech., Inc.*, 2012 WL 368366, at *4–5 (N.D. Cal. Feb. 3, 2012). Likewise, "statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years'" have similarly been held not actionable as mere puffery. *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005); *see also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868–89 (N.D. Cal. 2004) ("[R]un-of-the-mill" statements such as "business remained 'strong'" are not actionable under § 10(b)); *In re LeapFrog*, 527 F. Supp. 2d at 1050

24

(vague statements such as "This is going to be a very big second half for us" were not actionable under § 10(b)); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (statements that "[b]oth Verizon and AT&T are strong partners," company has "strong demand metrics and good momentum" and "our demand indicators are strong, our product portfolio is robust" are nonactionable statements of corporate optimism).

Here, the Court finds that statements A3, A4, A5, A6, B2, B4, B5, B8, and C5 are statements of corporate optimism.[3] *See* Statement A3 ("We are actually extremely bullish for the US markets."); Statement A4 ("I think we'll see a lot more growth in Q3, Q4 based on where the jobs are in progress right now"); Statement A5 ("So we're highly optimistic about the US . . . . In our primary states, we very [sic] optimistic about our growth."); Statement A6 ("[O]ur growth profile is going to be pretty darn big compared to most companies that are out there."); Statement B2 ("Demand remained as strong as ever in California, continued to gather significant steam in the northeast markets of New York, Massachusetts, and Connecticut, and gained early traction following the launch of sales in Rhode Island and New Hampshire."); Statement B4 ("we plan on closing out our first decade with greater strength, momentum and record results as well as set the stage for continued strong growth for 2016 and beyond."); Statement B5 ("Q2 was an amazing quarter for SolarCity. . . . We are well on our way to achieve our 1 million customer goal."; "I think we had a great Q2 and I expect an even better Q3 . . . .[SolarCity is] growing extremely well."); Statement B8 ("I'm very happy with our continued ability to scale and [unbelievably] incredibly strong sales."); Statement C5 ("Overall, I'm very excited about the business, and the strategy change.").

All of these statements are "vague statements of optimism" and "feel good monikers" that are not actionable. *Police Retirement*, 759 F.3d at 1060. Indeed, these statements are similar to statements this Court and other courts in this circuit have found to be nonactionable statements of corporate optimism. *See Kelly v. Elec. Arts, Inc.*, 71 F. Supp. 3d 1061, 1071 (N.D. Cal. 2014)

---

[3] As noted in footnote 1, above, the Court also finds that statement C4 was a statement of corporate optimism.

(holding inactionable statement that the defendant "[is] certainly bullish as we come into this platform generation . . ."); *In re Cutera*, 610 F.3d at 1111 (approving "I am optimistic about Syntex's performance during this decade'" as a nonactionable statement of corporate puffery (quoting *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal.1994), aff'd, 95 F.3d 922 (9th Cir. 1996)); *In re LeapFrog*, 527 F. Supp. 2d at 1050 (vague and amorphous statements such as "This is going to be a very big second half for us," "Our underlying sell-through at the retail level remained very strong throughout the third quarter," "consumer demand for our learning products is more vibrant than ever, and "We are pleased with our progress" were not actionable under § 10(b)).

The Court notes that two of the above statements, statements B2 and B5, warrant further discussion. First, statement B2 stated: "Demand remained as strong as ever in California, continued to gather significant steam in the northeast markets of New York, Massachusetts, and Connecticut, and gained early traction following the launch of sales in Rhode Island and New Hampshire." Although this statement referred to particular markets, the description of demand in these various markets is general and vague. Statement B2 stated that demand in California was "as strong as ever"; in the northeast, demand "gained significant steam"; and in Rhode Island and New Hampshire, SolarCity "gained early traction." These statements merely express that SolarCity's business is going well in these markets in a general and vague manner. This Court has previously held that similar statements were nonactionable statements of corporate optimism. *See Juniper*, 880 F. Supp. 2d at 1064 (statements that "[b]oth Verizon and AT&T are strong partners," company has "strong demand metrics and good momentum" and "our demand indicators are strong, our product portfolio is robust" are nonactionable statements of corporate optimism). As this Court has previously held, general statements about demand "merely express confidence in [a company's] business and outlook, [and that] such statements are simply vague assertions of corporate optimism and therefore are not actionable under the federal securities laws." *Id.* Therefore, the Court finds statement B2 to be a nonactionable statement of corporate optimism.

Second, statement B5 stated: "Q2 was an amazing quarter for SolarCity. . . . We are well

Case No. 16-CV-04686-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

on our way to achieve our 1 million customer goal."; "I think we had a great Q2 and I expect an even better Q3 . . . .[SolarCity is] growing extremely well." The Court acknowledges that a "1 million customer goal" is not vague or general. However, in this statement, Defendant Rive is not setting the goal but asserting that SolarCity was "well on its way" towards such a goal. In section III.A.1.c.i below, the Court addresses the "key operating metric" of Cumulative Customers, which indicated precisely how close to the 1 million customer goal SolarCity had come. The statement "well on our way," in contrast, is a nonactionable "feel good moniker." *Police Retirement*, 759 F.3d at 1060. Moreover, the statement "I think we had a great Q2 and I expect an even better Q3" is a statement of corporate optimism because statements like "great" and "better" are vague and general "feel good monikers." *Id.* The fact that the statement is using Q2 as a benchmark for Q3 does not cause this statement to not be general and vague. *See In re Cutera*, 610 F.3d at 1111 (approving as nonactionable puffery statement that "we expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first" (quoting *In re Syntex*, 855 F. Supp. at 1095)).[4]

Plaintiffs argue that the above statements are not mere statements of corporate optimism because (1) these statements were based on the "key operating metrics," and (2) were false. However, a similar argument was made in *Police Retirement*, where the plaintiff argued that statements of optimism were "objectively verifiable and thus qualif[ied] as material misstatements." *Police Retirement*, 759 F.3d at 1060. The Ninth Circuit rejected this argument because the statements involved "'feel good' speak that characterizes 'non-actionable-puffing.'" *Id.* Those feel good monikers included statements "(i) that the opportunity for system placement at hospitals 'is still very, very large'; (ii) that there is potential for growth in the dVP market; (iii) that the company is 'reservedly optimistic' about sales; and (iv) wishing it had 'a crystal ball,' that

---

[4] To the extent that this statement about Q2 and Q3 is tied to specific key operating metrics, this statement is still not actionable because, as discussed below, Plaintiffs have failed to adequately allege the falsity of the key operating metrics. Moreover, as a prediction about Q3, this statement would fall within the PSLRA's forward-looking safe harbor in the same manner as the guidance statements discussed above.

Intuitive 'will come out stronger' and [is] 'in a pretty good position' despite the economic crisis." *Id.* *Police Retirement* also referred to feel good speak from the Ninth Circuit's *Cutera* decision: "'[N]one of our employees is represented by a labor union, and we believe our employee relations are good' and 'everything is clicking [for the 1990s] . . . new products are coming in a wave, not in a trickle . . . old products are doing very well.'" *Id.* (quoting *In re Cutera*, 610 F.3d at 1112). Similarly here, the above statements involve "feel-good" speak of the type discussed in *Police Retirement* and *Cutera*. Accordingly, the Court finds that statements A3, A4, A5, A6, B2, B4, B5, B8, C4, and C5 are nonactionable statements of corporate optimism.

### c. Adequacy of Allegations of Falsity

To assert a claim under the PSLRA, the plaintiff must plead with particularity, *inter alia*, the element of falsity. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) "The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler*, 540 F.3d at 1070. To satisfy these "exacting requirements," a plaintiff must plead "specific facts indicating why" the statements at issue were false. *Id.*; *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Plaintiffs' complaint was required to allege specific facts that show" how statements were false); *see also In re Stratosphere Corp. Sec. Litig.*, 1997 WL 581032, at *13 (D. Nev. May 20, 1997) (to plead falsity, plaintiff must provide "evidentiary facts contemporary to the alleged false or misleading statements from which this court can make inferences permissible under Rule 9(b)"). Moreover, to be actionable, a statement must be false "at [the] time by the people who made them." *Larkin*, 253 F.3d at 430. "The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re VeriFone Sec. Litig.*, 11 F.3d at 871.

The Court addresses all of the statements in this section that the Court has not already found nonactionable as forward-looking statements in the PSLRA's safe harbor and as statements of corporate optimism. Specifically, the Court addresses (1) the key operating metrics in statements A1, B1, B6, C1, and D3, and statements omitting those key operating metrics from statements D1 and E3, (2) Defendants' explanations for missing their installation targets in quarter 4 of 2015 and quarter 1 of 2016, and Defendants' explanation for lowering predictions for future

28

installations, which are discussed in statements D4 and E2, (3) Defendants' statements about SolarCity's "capacity constraints" on installing the contracts that had not yet been installed, which are discussed in statements B7, C6, and C7, and (4) Defendants' statements about FICO scores, which are discussed in statement B9. The Court addresses each of these categories of statements in turn.

### i. Operating Metrics

Plaintiffs challenge SolarCity's "key operating metrics," which are reproduced as statements A1, B1, B6, C1, and D3 in the instant order. Moreover, Plaintiffs challenge the omission of some of these metrics from the quarter 4 of 2015 and quarter 1 of 2016 reports, as described in statements D1 and E3. Plaintiffs argue that the "key operating metrics" were a "sham" involving "smoke and mirrors." Opp'n at 11. Specifically, Plaintiffs argue that the values for MW Booked, Cumulative Customers, Cumulative Energy Contracts, and Nominal Contracted Payments were artificially inflated because SolarCity included contracts that were likely to be canceled because the contracts were obtained by deception, were of "low quality", or were improperly retained in SolarCity's database. Plaintiffs allege that these four operating metrics depended on the number of executed contracts SolarCity had with customers. According to Plaintiffs, certain contracts in SolarCity's database should not have been counted in these metrics because the contracts were extremely unlikely to result in the actual installation of a solar system.

Plaintiffs' theory is similar to the theory of the plaintiffs in *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008). In *Berson*, the defendant had signed a number of contracts to perform work for the U.S. government which accounted for approximately 30% of the defendant's revenue for that fiscal year. *Id.* at 985. During the work, the U.S. government issued a "stop work" order on those contracts, which stopped all work on the contracts. *Id.* Even though "stop work" orders essentially always meant that the contract would not be completed, the defendant reported the contract as part of its "backlog," that is, the "anticipated revenues from the

uncompleted portions of existing contracts."[5]  *Id.* at 985–86.  The plaintiffs alleged that this report

of the backlog was false or misleading, and the Ninth Circuit agreed.[6]  *Id.*

Here, Plaintiffs attempt to rely on a similar theory of relief.  Plaintiffs assert that "many" of

the contracts in SolarCity's database would never result in installations because (1) they were low

quality contracts, (2) they were contracts obtained by deceiving customers, or (3) they were

contracts that were improperly retained in SolarCity's database.  Thus, Plaintiffs allege that these

excess contracts caused the reporting of the key operating metrics to be false or misleading.

However, Plaintiffs fail to "allege specific facts that show" how the key operating metrics

were false.  The Court first addresses a point of ambiguity about the difference between "initial"

and "final" contracts in Plaintiffs' allegations.  The Court then discusses the three alleged means

of artificial inflation—entering low quality contracts, entering contracts obtained by deceptions,

and retaining old and inactive contracts—in turn.  Finally, the Court addresses whether

Defendants' decision to stop reporting certain key operating metrics in quarter 4 of 2015 and

quarter 1 of 2016 shows the falsity of those key operating metrics.

### *(1)* *Initial vs. Final Contracts*

The Court notes that one of the confidential witnesses ("CWs"), CW5, refers to the

existence of two types of contracts: (1) initial contracts that contemplate a site visit and an

evaluation of the customer's house for a solar system installation and (2) final contracts to actually

install the systems.  *See* Compl. ¶ 89 (CW5 discussing the initial and final contracts).  However,

throughout Plaintiffs' complaint, Plaintiffs refer to SolarCity contracts generally, and does not

identify whether Plaintiffs are speaking about initial or final contracts.  Indeed, Plaintiffs fail to

[5] The Court notes that although the term "backlog" is defined in *Berson* as "anticipated revenues" in the SEC filings in that case, Defendants define the term backlog in the instant case to more generally refer to all of the contracts for which "solar energy systems [have] not yet [been] deployed." Compl. ¶ 43.

[6] The Court notes that *Berson* found that the report of the "backlog" did not fall into the PSLRA's forward-looking safe harbor. At least one district court has distinguished *Berson*, and found that the use of a backlog metric in the circumstances of that district court case involved a forward-looking statement. *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 948 (N.D. Cal. 2010). The Court need not reach whether the key operating metrics in this case are forward-looking or not because the Court finds that Plaintiffs have not adequately alleged falsity.

30

provide essential information on initial and final contracts such as (1) whether the initial contracts are included in the key operating metrics, and if so, whether they affect those key operating metrics in the same manner as final contracts, and (2) whether the initial contracts, final contracts, or both were artificially inflated by Defendants' alleged practices. Without such information, Plaintiff has failed to allege falsity of the key operating metrics with particularity.

### (2)    Low Quality Contracts

With respect to the low quality contracts in the system, Plaintiffs do not allege (1) how many of the contracts in the system were "low quality," and thus unlikely to lead to any installation, (2) what constitutes a "low quality" contract that is unlikely to be installed, (3) how these low quality contracts affected the allegedly false metrics, or (4) whether the inflation in the number of contracts occurred contemporaneously with Defendants' reporting of the key operating metrics. Although Plaintiffs rely on statements from a number of CWs, these statements do not provide sufficient specificity. For example, CW1 states that "many of the contracts were 'not high quality'" and that contracts were entered with "[c]ustomers who did not have the necessary credit quality." *Id.* ¶ 73. CW5 states that "[m]any of the contracts entered into by SolarCity were of dubious quality" and would be signed "regardless of whether the customer would be able to qualify." *Id.* ¶ 93. Moreover, CW2 states that "historical cancellation data indicated that upwards of 50% of the residential solar contracts in SolarCity's backlog ended up being cancelled." *Id.* ¶ 76; *see also id.* ¶ 80 (CW3 noting that cancellation rate was "possibly greater than 50%"). As noted above, "backlog" refers to all of the contracts for which "solar energy systems [have] not yet [been] deployed." *Id.* ¶ 43

These CW statements do not cure the lack of particularity in Plaintiffs' complaint. Although CW1 and CW5 state that "many" contracts were of low credit quality, there is no allegation as to what "many" means or whether the number of low quality contracts was sufficiently high to meaningfully alter the key operating metrics. Moreover, neither CW1 nor CW5 provide any allegations as to what "low quality" means. CW5 refers to not being able to "qualify," but provides no information on what it means for a customer "to qualify," and fails to

31

describe which proportion of "low quality" contracts do not "qualify." Unlike *Berson*, where a stop work order was a clear indicator that contracts representing 30% of that company's revenue would be cancelled, Plaintiffs provide no basis from which to conclude that the "low quality" contracts would not result in a successful installation.

Indeed, Plaintiffs only provide two examples, through CW1, of "low quality" contracts. CW1's first example was a contract where, after a site inspection, SolarCity staff decided to cancel the contract because it would require "significant [] design changes." Compl. ¶ 70. However, until SolarCity realized that such design changes were necessary, it would not have been clear that it was unlikely that an installation would occur. CW1's second example was a contract with an adult who lived with his parents and had "sketchy" credit, and who would eventually need his parent to cosign the contract for the installation to occur. Compl. ¶ 70, 73. CW1 does not provide any allegation or statement that the contract with that person never resulted in an installation. Thus, unlike the stop work order in *Berson*, which clearly indicated that the contract at issue would not provide future revenue, Plaintiffs have not adequately alleged that these contracts were similarly unlikely to result in installations when the alleged false or misleading statements were made.

The Court acknowledges that CW2 and CW3 estimate that contracts in the backlog were cancelled at a rate of 50%. *Id.* ¶¶ 76 (CW2), 80 (CW3 noting that cancellation rate was "possibly greater than 50%"). However, CW2's estimate of a 50% cancellation rate was "historical" and thus may or may not have been the cancellation rate during the Class Period. Indeed, CW3 does not place the "possibly greater than 50%" cancellation rate at a specific time at all.[7] Moreover,

_____

[7] CW5 does state that "by the end of 2015, only 10%–20% of 'total sales' were resulting in installations." Compl. ¶ 95. However, this allegation is vague. First, CW5 refers to "total sales," which seemingly refers to "initial contracts," not final contracts. *See id.* ¶ 89 (CW5 noting that "a sale was the initial contract"). As noted above, it is unclear what effect, if any, initial contracts have on the key operating metrics. Second, CW5 was a salesperson in New Jersey, New York, and Connecticut and it is unclear whether he or she is referring to the percentage of his or her own sales, the percentage of sales for all salespersons in the New Jersey, New York, and Connecticut areas, or a nationwide percentage. If CW5 is attempting to generalize to SolarCity's business nationwide, CW5 does not establish any facts that would show personal knowledge, and thus these allegations are inadequate. *See Brodsky v. Yahoo!, Inc.*, 630 F. Supp. 2d 1104, 1115 (N.D. Cal.

32

even if the cancellation rate was high, that does not necessarily mean that the key operating metrics were artificially inflated as Plaintiffs contend. As noted above, Plaintiffs do not distinguish between initial and final contracts; Plaintiffs have not supplied enough information to determine whether initial contracts are even counted in the key operating metrics. Additionally, Plaintiffs acknowledge that, up until installation, the SolarCity contracts could be cancelled at any time without a penalty. Compl. ¶ 4. Plaintiffs do not allege that this fact was unknown to investors. Thus, Plaintiffs have not alleged what percentage of the cancellations occurred because of "artificial inflation" versus normal and expected cancellation rates for a business of this kind.

Additionally, at least as to the MW Booked and Nominal Contracted Payments key operating metrics, a high cancellation rate may actually prevent artificial inflation of these metrics. As noted above, MW Booked is the estimated MW capacity of the contracts booked over a period of time minus the MW capacity of cancelled contracts during that time period. Similarly, the Nominal Contracted Payments metric would decrease as contracts are cancelled. Therefore, if the contract cancellation rate was consistently high, these key operating metric values might remain low, depending on the relative rates of cancellations and new contract signatures. At the very least, given these considerations, Plaintiffs do not allege sufficient details to determine whether the key operating metrics were actually "artificially inflated" in the manner that Plaintiffs contend.

### (3) Contracts Obtained by Deception

Plaintiffs assert that many contracts in SolarCity's system were obtained by bad or deceptive sales practices. However, once again, Plaintiffs do not provide information on how many contracts in SolarCity's database were obtained by deception, at what rate these "deceptive" contracts resulted in installations (as opposed to the other contracts), or how the presence of these contracts affected the key operating metrics, if at all. Plaintiffs rely on the testimony of CW4 with respect to the deceptive sales practices. CW4 states that SolarCity salespeople "would make representations to customers that were incorrect and untrue in order to get a contract." Compl.

2009) ("Plaintiffs must describe with particularity the CW's personal knowledge of Yahoo!'s revenue recognition process.").

¶ 84. For example, CW4 states that a salesperson "might represent that the customer would get a free upgrade to the customer's electrical panel or that the customer was eligible for a promotion that was not available." *Id.* CW4 states that these issues would then need to be fixed by SolarCity "concierges," individuals who "oversee the various steps after the solar contract was entered into with a customer, such as inspections and permitting, until the solar system was installed." *Id.* ¶ 68. However, CW4's own statement that the issues with the salespeople's deceptive practices were fixed by the concierges undermines Plaintiffs' contention that these practices show any sort of "artificial inflation." Indeed, CW4, like the other CWs in this case, does not state that any of these issues led to inflated key operating metrics.

Plaintiffs also rely on CW5, who was a salesperson during the Class Period. However, CW5 solely establishes that SolarCity's salespeople were given monthly quotas and encouraged to sell SolarCity's products. *Id.* ¶¶ 89–93. CW5 makes no statement that he or she was told to engage in deceptive sales practices or that he or she ever engaged in such practices. *Id.* The encouragement to meet sales quotas without specific allegations does not amount to securities fraud.

### (4)    *Improperly Retained Contracts*

With respect to contracts allegedly improperly retained in SolarCity's database, Plaintiffs' allegations as to these contracts are also too vague to conclude that the key operating metrics were artificially inflated. Plaintiffs rely on CW testimony to allege that SolarCity improperly retained old and inactive contracts. First, CW4 states that "SolarCity's database included older contracts that were highly unlikely ever to be installed, but which [salespeople] would claim were 'moving forward' when, in fact, there was no actual progress towards installation for months at a time." *Id.* ¶ 82. CW4 is also "familiar with *reports* that untrue or false notes were entered into the system that made the status of a contract appear to be more viable or current than was actually the case." *Id.* ¶ 83 (emphasis added). These statements by CW4 provide no information as to whether these retained contracts were initial or final contracts and how these contracts affected the key operating metrics. Moreover, CW4 provides no allegation as to the number of contracts that salespeople

falsely stated were "moving forward." *Id.* Indeed, it is unclear from these allegations whether these contracts were simply slow-moving or whether these contracts all eventually ended in cancellation. Additionally, as to CW4's statement about "untrue or false notes" that kept contracts active, the Court notes that CW4's statement does not come from personal knowledge, but from "reports" about such notes. *See Brodsky*, 630 F. Supp. 2d at 1115 ("Plaintiffs must describe with particularity the CW's personal knowledge of Yahoo!'s revenue recognition process."). Plaintiffs provide no details about the nature of these "reports."

Second, CW1 "estimates that 15% of the contracts in the backlog at any given time were in an 'overlooked' status—meaning there were actions that needed to occur but had not." Compl. ¶ 71. However, it is not clear why the need for an action to occur on a contract means that the contract was unlikely to result in an installation. Indeed, there is no allegation that such "overlooked" contracts were less viable than any other contract.

Third, CW4 also states that the backlog contained "old and inactive contracts," but that these contracts were "diminished" at the end of the Class Period, when Defendant Barnard left the company. *Id.* ¶ 85. The contracts were then finally "purged" two months after the end of the Class Period. *Id.* ¶ 86. Once again, it is unclear how many contracts were among these "old and inactive contracts," and to what extent, if at all, these contracts affected the key operating metrics. Moreover, "[i]t is difficult to prove falsity by questioning whether certain deals should have been included in backlog based on the later removal of contracts from backlog. Hindsight and the former opinions of former employees do not generally rise to the level of falsity. Plaintiffs cannot simply rely on a 'fraud by hindsight' theory to demonstrate falsity." *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 945 (N.D. Cal. 2010) (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084–85 (9th Cir. 2002) ("The purpose of [the PSLRA's] heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'")). At bottom, Plaintiffs are alleging that SolarCity committed fraud by retaining contracts in SolarCity's database, but do not provide details as to why these contracts were unlikely to result in installations and to what extent these contracts

Case No. 16-CV-04686-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

actually affected the key operating metrics.

### (5) Ceasing to Report Metrics

As a final point, Plaintiffs argue that the falsity of the key operating metrics can be inferred

from the fact that Defendants stopped reporting Nominal Contracted Payments in quarter 4 of

2015, and stopped reporting Cumulative Customers and Cumulative Energy Contracts as well in

quarter 1 of 2016, as described in statements D1 and E3.  However, SolarCity's decision to stop

reporting metrics such as Nominal Contracted Payments does not show that the previous reporting

of that metric was false or misleading.  There are many potential reasons why a company might

cease to report a metric and those reasons may have no relation to the prior falsity of that metric.

For example, a change in strategy for the company may make older metrics less relevant.

Similarly, the older metric may have not provided precise information that was useful to investors.

Thus, the Court cannot infer from Defendants' decision to cease reporting some of its key

operating metrics that Defendants previously committed securities fraud by reporting those

metrics.  Multiple district courts in the Southern District of New York agree with this conclusion.

*See Cortina v. Anafex Life Scis. Corp.*, 2016 WL 7480415, at *8 (S.D.N.Y. Dec. 29, 2016)

(holding that the fact that "Anavex changed the way it reported its investor relations expenses and

then stopped reporting them altogether" does not amount to an "accounting irregularit[y]");

*Ironworkers Local 580–Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426 (S.D.N.Y.

2014) ("Plaintiff's effort to transform that business decision [to change the way it calculated

certain metrics] into some sort of admission that statements made in prior reporting periods were

false and materially misleading is entirely misguided.").  Thus, SolarCity's decision to stop

reporting some of the key operating metrics does not render the prior reporting of those metrics

false or misleading.

Accordingly, the Court finds that Plaintiffs have not adequately alleged with particularity

the falsity of the key operating metrics.  The Court next turns to the remaining statements that

Defendants argue were not false or misleading.

### ii.	Explanations For Missed Targets and Lowered Guidance

Case No. 16-CV-04686-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

**in Quarter 4 of 2015 and Quarter 1 of 2016**

Statement D4 and E2 provided explanations for why Plaintiffs' key operating metrics, such as MW Installed, decreased in quarter 4 of 2015 and quarter 1 of 2016. Defendants explained in Statement D4 at the end of quarter 4 of 2015 that sales targets were missed because of "commercial delays" and "[a]s many of you know, . . . net metering rates [were changed in] Nevada, which forced us to stop installations." *Id.* ¶ 138. Net metering rates represent the credits solar system owners may receive "from utilities for excess power [the solar users'] systems produce." *Id.* ¶ 50. In statement E2 at the end of quarter 1 of 2016, Defendants stated that "we are recalibrating our outlook for the year after taking into account the regulatory developments that impacted Q1 2016 MW Booked and the impact of an increase in pricing for our commercial business." *Id.* ¶ 141.

Plaintiffs allege that these statements were false or misleading because "while the Defendants admit regulatory policies had impacted demand in quarter 1 of 2016, Defendants failed to disclose that this and other factors had been impacting demand for several quarters resulting in its weaker performance and reduced guidance." *Id.* ¶ 143. Thus, Plaintiffs do not contest that these statements were technically true, but instead argue that they were incomplete because Defendants did not admit that demand had been declining all along.

However, as the Supreme Court has held, "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011) (citing 17 C.F.R. § 240.10b-5(b)). Indeed, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988). Rather, "[t]o be actionable under the securities laws, an omission must be misleading." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). That is to say the omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made

37

available.'" *Basic*, 485 U.S. at 231–32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Here, Plaintiffs have not adequately alleged that "disclosure of the omitted fact" would have altered the total mix of information. First, Plaintiffs allege that Defendants should have disclosed that regulatory issues "had been impacting demand for several quarters" already. However, Plaintiffs do not allege the existence of regulatory issues before quarter 4 of 2015 and quarter 1 of 2016 or how those regulatory issues decreased demand. Second, although Plaintiffs refer to "other factors" that had been affecting demand, Plaintiffs do not allege with particularity what those factors are or which "other factors" should have been disclosed. Third, in statement D4 and E2, Defendants disclosed that regulatory issues had been decreasing SolarCity's installations and bookings, and required lower guidance for the future. Plaintiffs fail to allege why disclosing that these demand problems had existed "all along" would alter the "total mix" of information when Defendants were already disclosing that regulatory issues were negatively affecting SolarCity's business.

Therefore, the Court finds that Plaintiffs have not adequately alleged that statements D4 and E2 were false or misleading.

### iii. Statement About Capacity Constraints

Statements B7, C6, and C7 were statements in quarter 2 of 2015 and quarter 3 of 2015 discussing the issue of capacity constraints for installations. The Court addresses each statement in turn.

Statement B7 stated that "[t]he biggest bottleneck that we face is taking it from booking to getting it ready for installation. And that's with dealing with all the permitting. That's going back to the customers, finalizing the design, back and forth custom design, back and forth customer's on vacation." Compl. ¶ 116. Plaintiffs allege that this statement was false or misleading because SolarCity's bookings were "inflated by poor quality contracts" and SolarCity was "improperly retaining in its backlog" other contracts that "should have been canceled." *Id.* ¶ 118. However, as discussed in the key operating metrics discussion above, Plaintiffs have not adequately alleged

38

that SolarCity entered poor quality contracts or had a backlog of contracts that "should have been canceled." Accordingly, for the same reasons that the Court found that Plaintiffs have failed to adequately allege falsity as to the key operating metrics, Plaintiffs also fail to adequately allege the falsity of statement B7.

Statement C6 stated that "there's no capacity constraints or anything like that on the east coast. We really, really like the east coast. . . . [and that] whether it's volume or costs, the east coast markets are really good for us." *Id.*¶ 126. Plaintiffs allege that "[w]hile the Defendants' statements that they did not have installation capacity constraints were true, the statements were false and misleading at the time they were made because they omitted the fact that the performance metrics were fraudulently inflated, concealing that the underlying issue was a lack of demand." *Id.* ¶ 129. However, this statement is not false or misleading. A statement that a company does not have *capacity constraints* to install solar systems does not have anything to do with whether or not *demand* is low or whether performance metrics were artificially inflated. Thus, this statement would not mislead an investor in the manner that Plaintiffs contend. Moreover, to the extent Plaintiffs are challenging the statement that "the east coast markets are really good for us," that is a nonactionable statement of corporate optimism. *See In re Cutera*, 610 F.3d at 1111 ("[P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives."). Accordingly, Plaintiffs do not adequately allege the falsity of statement C6.

In statement C7, in response to a business analyst question as to whether SolarCity was worried about delays in installations causing "sales to churn off the backlog," Rive responded that "we are ramping up our installations, so that will catch up to [the number of bookings]. . . . so you'll see the bookings and installs getting closer to one another, but there will still be a delta because at a 40% growth rate, you still have to have a delta, but you'll see those two lines getting closer to one another" *Id.* Plaintiffs allege that this statement is false or misleading because the "bookings" "were predicated on poor quality contracts they knew would never be installed and other contracts improperly retained in the Company's backlog." Compl. ¶ 132. However, as

United States District Court
Northern District of California

discussed in the key operating metrics section, Plaintiffs have not adequately alleged that

SolarCity entered poor quality contracts or had a backlog of contracts that "should have been

canceled." Accordingly, for the same reasons that the Court found that Plaintiffs failed to

adequately allege falsity as to the key operating metrics, Plaintiffs also fail to adequately allege the

falsity of statement C7.

As to statements B7, C6, and C7, the Court finds that Plaintiffs have not adequately

alleged that they were false or misleading.

### iv.    Statement About FICO Scores

Defendants argue that Plaintiffs have failed to adequately allege that statement B9 is false

or misleading. As noted above, in statement B9, Rive stated: "Right now if you take the history of

the Company we went from 725 FICO down to 700 down to 680 down to 650. And now we have

to figure out how we make it possible for everybody in America to get cheaper clean energy." *Id.*

¶ 116. Serra then stated that "[o]ur average is still comfortably in the 700. 730. 740. So you're

not going to see that, mix change too quickly." *Id.* Plaintiffs allege that this statement was false

or misleading because it falsely implied that there were credit standards for signing SolarCity

contracts. *Id.* ¶ 118. Plaintiffs point to the statements of CW1 and CW5 to substantiate the

allegations of falsity on this point. Specifically, CW1 states that "many of the contracts were 'not

high quality'" and that "[c]ustomers who did not have the necessary credit quality were allowed to

sign contracts." *Id.* ¶ 73. CW5 states that "many of the contracts entered into by SolarCity were

of dubious quality" and would be signed "regardless of whether the customer would be able to

qualify." *Id.* ¶ 93.

However, Plaintiffs' allegations are too vague to determine whether statement B9 was false

or misleading. It is not clear that Rive's and Serra's statements even imply that SolarCity had

credit standards, or whether they were simply talking about the general make up of their customer

populace. Moreover, Plaintiffs argue that statement B9 was a representation that "SolarCity's

average customer had a FICO credit score above 700." Opp'n at 8. However, statement B9

clearly stated that the FICO scores of customers had been dropping over time. Moreover, Serra's

40

statement about the average FICO score of customers is not made false or misleading if it is accurately reported. Indeed, an average is not false or misleading just because low values are incorporated into the average. Finally, as discussed in the key operating metrics section above, Plaintiffs have not adequately alleged that SolarCity had entered into poor quality contracts or had a backlog of contracts that "should have been canceled." Accordingly, for the same reasons that the Court found that Plaintiffs fail to adequately allege falsity as to the key operating metrics, Plaintiffs also fail to adequately allege the falsity of statement B9.

For the foregoing reasons, the Court finds that Plaintiffs fail to adequately allege the falsity of the following statements: (1) the key operating metrics described in A1, B1, B6, C1, and D3, and statements omitting those key operating metrics, found in statements D1 and E3, (2) Defendants' explanations for missing their installation targets in quarter 4 of 2015 and quarter 1 of 2016, and Defendants' explanation for lowering predictions for future installations, which are discussed in statements D4 and E2, (3) Defendants' statements about SolarCity's "capacity constraints" on installing the contracts that had not yet been installed, which are discussed in statements B7, C6, and C7, and (4) Defendants' statements about FICO scores, which are discussed in statement B9.

### d. Summary

In summary, the Court finds that none of the false or misleading statements in Plaintiffs' complaint survives the instant motion to dismiss. Above, the Court found that all of the statements were subject to the PSLRA's forward-looking safe harbor, were statements of corporate optimism, or were not accompanied by adequate allegations of falsity. Accordingly, the Court GRANTS Defendants' Motion to Dismiss Plaintiffs' § 10(b) and Rule 10b-5 cause of action. The Court provides leave to amend because Plaintiffs may be able to adequately allege that Defendants made actionable false or misleading statements.

### 2. Remaining Issues

Although the Court grants Defendants' motion to dismiss above because none of the allegedly false or misleading statements are actionable, in anticipation of an amended complaint,

41

the Court addresses three additional topics raised in the instant motion: (1) whether Barnard made any of the statements at issue in the instant suit, (2) whether lead plaintiff Fish has standing to challenge statements made after February 10, 2016, and (3) scienter. The Court addresses each topic in turn.

### a. Whether Barnard Made Any of the Alleged Statements

Defendants argue that even if Plaintiffs adequately allege actionable false or misleading statements, Barnard, SolarCity's CRO and the alleged mastermind behind SolarCity's sales strategies, cannot be held liable because he did not make any of the allegedly false or misleading statements. The United States Supreme Court has held that a person can only be held liable under § 10(b) for false or misleading statements if he or she is the "maker of a statement." *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142–43 (2011); *see also ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016) (following *Janus*). "[T]he maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it." *Janus*, 564 U.S. at 144. "Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker." *Id.* ("Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.").

Although the language in *Janus* is broad, Plaintiffs argue that *Janus* only applies in cases with factual circumstances similar to *Janus*. In *Janus*, the question was whether Janus Capital Management LLC ("JCM"), a mutual fund investment advisor, had "made" the statements in prospectuses that JCM had helped prepare for Janus Capital Group ("Janus"). *Janus*, 564 U.S. at 138–39. JCM and Janus were separate legal entities. *Id.* The *Janus* court held that although JCM had helped to prepare the prospectuses, JCM did not have ultimate authority over those prospectuses, and thus did not "make" the statements for purposes of § 10(b) and Rule 10b-5. *Id.* at 142–43.

Plaintiffs now argue that *Janus* does not apply to corporate officers or insiders. Plaintiffs

42

rely on a single out-of-circuit district court case that held that, because *Janus* involved two distinct legal entities, *Janus*'s holding does not apply to officers of a corporation. *See City of Pontiac General Employees' Retirement System v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359 (S.D.N.Y 2012) (holding that *Janus* involved a "third party" and thus is inapplicable to corporate officers).

The Court disagrees with Plaintiffs and *City of Pontiac*. Although JCM and Janus were separate legal entities, the United States Supreme Court's interpretation of the word "make" in Rule 10b-5 was based on the text of the regulation and not the circumstances of the parties. *See Janus*, 564 U.S. at 142 (relying on the Oxford English Dictionary to hold that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it"). This plain-meaning interpretation does not change just because the defendant at issue was a corporate officer of the entity that allegedly made the false or misleading statements. Indeed, district courts in this circuit regularly apply *Janus* to corporate officers. *See Curry v. Hansen Med., Inc.*, 2012 WL 3242447, at *4 (N.D. Cal. Aug. 10, 2012) (holding that statements in SEC filings not attributable to Senior Vice President of Commercial Operations under *Janus*); *S.E.C. v. Mercury Interactive, LLC*, 2011 WL 5871020, at *2 (N.D. Cal. Nov. 22, 2011) (holding that officer's failure to sign statement meant that statements in those filings were not attributable to her under *Janus*); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 3058563, at *8 (N.D. Cal. July 19, 2017) (applying *Janus* and finding CEOs of two Volkswagen subsidiaries to be "makers" of statements because the complaint alleged facts that the two CEOs "actually participated in and had authority over" the filings containing the false statements); *see also Red River Res., Inc. v. Mariner Sys., Inc.*, 2012 WL 2507517, at *6 (D. Ariz. June 29, 2012) ("Although [*Janus*] involved two distinct legal entities, courts have applied *Janus* to corporate insiders."). The Court agrees with these decisions and finds that the *Janus* court's interpretation of the word "make" applies whether or not the case involves a third party or corporate officers.

Under *Janus*, Plaintiffs fail to adequately allege that Barnard was the "entity with authority" over any statement that Plaintiffs allege was false or misleading. *Janus*, 564 U.S. at

43

144.  Plaintiffs do not allege that Barnard signed any of the shareholder letters or 10-Q forms sent to the SEC.  Plaintiffs do not challenge any statement made by Barnard in the earnings conference calls, and Defendants dispute that Barnard even took part in those calls.

Although Plaintiffs argue that Barnard was in charge of "assembling, reviewing, and approving [SolarCity's] 'key operating metrics' relating to SolarCity's sales," Compl. ¶ 22, Plaintiffs make no allegations that Barnard actually had authority over whether those metrics were or were not included in the quarterly shareholder letters or Forms 10-Q.  Multiple district courts in this circuit have held that merely acting as the "source" of allegedly false or misleading information does not mean that such a person had "ultimate authority" over the statements that were then communicated to the public.  *See Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1060 (N.D. Cal. 2013) (holding director and officer defendants not liable because they did not "make" the statements even though they were "'the source' of the information communicated in the alleged false statements"); *Curry*, 2012 WL 3242447 at *4 (finding Senior Vice President to not be a maker under *Janus* even though he allegedly "manipulate[ed] Hansen's financial results, [and thus] made it necessary and inevitable that false and misleading statements regarding Hansen's financial condition would be communicated to investors"); *In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *6 (C.D. Cal. July 13, 2015) ("Courts since *Janus* have applied [*Janus*] to disallow Rule 10b-5(b) claims against defendants who merely requested, influenced, helped create, or supplied information for the relevant false or misleading statements.").  These cases comport with *Janus*, which held that even though the defendant "was significantly involved in preparing the prospectuses," the final statements were "subject to the ultimate control" of someone else.  *Janus*, 564 U.S. at 143.  Similarly here, although Barnard may have provided the key operating metrics, Plaintiffs make no allegations that Barnard had any actual authority over what was and was not included in the shareholder letters and Forms 10-Q that Plaintiffs challenge in the instant suit.

Accordingly, the Court finds that Plaintiffs have not adequately alleged that Barnard was the maker of any of the statements in the instant suit, and thus Barnard cannot be held liable for any such statements.

44

Defendants argue that lead plaintiff Frank Fish lacks standing to challenge any statements made after February 10, 2016, the day after the quarter 4 of 2015 shareholder letter, when Fish sold his stock in SolarCity. However, the Court need not reach the issue of standing to find these statements nonactionable. The only statements made after February 10, 2016 were statements E1, E2, and E3, which were made on May 9, 2016, the last day of the class period. "As a matter of law, 'conduct actionable under Rule 10b-5 must occur *before* investors purchase the securities.'" *Id.* (quoting *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1487 (9th Cir. 1991)) (emphasis added). Plaintiffs do not allege that any class member purchased SolarCity securities after statements E1, E2, or E3 were made. Indeed, Plaintiffs' theory of the case is that these statements in quarter 1 of 2016 were "corrective disclosures" that revealed that SolarCity had been misleading investors, not false or misleading statements that induced investor reliance. This is especially true for Fish, who sold his securities two months before these statements were made. Therefore, under *Binder*, these statements do not constitute conduct that occurred "before investors purchase[d] the securities." *Binder*, 184 F.3d at 1066. Thus, as a matter of law, these statements are nonactionable under § 10(b) and Rule 10b-5. *See Kelly v. Elec. Arts, Inc.*, 71 F. Supp. 3d 1061, 1069 (N.D. Cal. 2014) ("Because lead plaintiffs cannot plead Section 10(b) reliance as to the five purported misstatements that post-date their EA stock purchase, those statement are inactionable as a matter of law.").

c.    **Scienter**

Even if the Court were to assume that Defendants' statements were misleading, Plaintiffs have failed to adequately allege scienter. In order to survive a motion to dismiss, Plaintiffs' complaint must also create a strong inference of scienter. *See* 15 U.S.C. § 78u–4(b)(2) ("[The complaint must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). With respect to the strong inference requirement, the Ninth Circuit has stated that "[a] strong inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F. 3d 605 (9th Cir. 2017).  As to the meaning of "scienter," the Ninth Circuit has held that a plaintiff's complaint must show that "the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 990–91 (internal quotation marks omitted). "[F]acts showing mere recklessness or a motive to commit fraud and [the] opportunity to do so" are insufficient.  *Id.*  "To meet this pleading requirement, the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (internal quotation marks and citation omitted).  When an omission is at issue, "the plaintiff must plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco*, 552 F.3d at 991 (internal quotation marks omitted).

In the Ninth Circuit, courts must determine first "whether any of the plaintiff's allegations, standing alone, [are] sufficient to create a strong inference of scienter." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014).  If none is sufficient alone, the court must "then consider the allegations holistically to determine whether they create a strong inference of scienter taken together." *Id.*  Under this holistic determination, scienter is adequately pled if "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Police Retirement*, 759 F.3d at 1061–62.

Here, Plaintiffs argue that they have adequately pled scienter through (1) various CW statements when viewed holistically, and (2) the "core operations" theory.  In response, Defendants argue that Plaintiffs have failed to adequately allege scienter because (1) Plaintiffs fail to adequately allege the prerequisites of the core operations theory, (2) the CW statements, even when viewed together, do not create a strong inference of scienter, and (3) the individual

46

Defendants did not have a financial motive to falsify statements.

The Court first addresses the CW statements and engages in a holistic evaluation of the evidence. The court then addresses the core operations theory.

### a. CW Statements and Holistic Evaluation of the Evidence

As noted above, Plaintiffs contend that Defendants' statements were false because (1) demand was decreasing for Defendants' products, and (2) the key operating metrics were artificially inflated with contracts obtained by deception, low quality contracts, and old and inactive contracts. Plaintiffs must allege "specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made" in light of the above-stated reasons that Defendants' statements were allegedly false. *Ronconi*, 253 F.3d at 432.

One way in which scienter can be shown is through contemporaneous statements that show knowledge on the part of the individual defendants. *See id.* (holding that "specific contemporaneous statements" can show scienter). Here, however, Plaintiffs have failed to allege or identify any statement or document that directly shows that any of the individual Defendants were aware that their statements were false or misleading. That is, Plaintiffs do not point to any direct evidence that Defendants knew that demand for SolarCity's products was declining or that the backlog contained contracts that should have been cancelled. Plaintiffs attempt to rely on a number of CW statements to establish scienter. However, none of the CWs state that any of the individual Defendants knew about the alleged declining demand and artificial inflation of the number of contracts in the backlog. Moreover, the Ninth Circuit has held that CW statements cannot create a strong inference of scienter unless the reporting witness "has reliable personal knowledge of the defendants' mental state." *Zucco*, 552 F.3d at 998. Here, there is no allegation that any CW had personal knowledge of the individual Defendants or their states of mind.

Regardless, Defendants argue that the CWs need not provide a "smoking gun" to adequately allege scienter, but that they must merely allege circumstances that create "strong inference" of scienter when viewed holistically.

Although the Court agrees that circumstances can create a strong inference of scienter, *see Ronconi*, 253 F.3d at 432 ("[T]he complaint must contain allegations of specific contemporaneous . . . *conditions* that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."), those circumstances are not present here.

As discussed above in the section addressing the falsity of the key operating metrics, the CW statements on which Plaintiffs rely in the instant case are general and vague. Above, the Court held that these CW statements fail to even show that Defendants' key operating metrics were false, let alone that they show "specific contemporaneous . . . *conditions* that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Id.* Regardless, the Court first summarizes the CW evidence and then addresses whether it shows scienter.

CW1 was a "concierge," a SolarCity employee who "oversee[s] the various steps after the solar contract was entered into with a customer, such as inspections and permitting, until the solar system was installed." Compl. ¶ 68. CW1 states that many contracts in SolarCity's system "should have been cancelled months ago" and that sales personnel engaged in conduct "to make their numbers look good," which created a backlog so large that it was "obvious" that the database inputs were incorrect. *Id.* ¶ 68–73.

CW2 was Senior Director of Operations and stated that the cancellation rate was "very high" at 50% of the backlog. *Id.* CW2 also stated that the "high cancellation rate was due to the SolarCity sales force not adequately or fully qualifying customers. *Id.* ¶ 77. The complaint states that CW2 "attributed this [sales strategy] to Defendant Barnard, who had come to SolarCity from the mortgage industry and operated at SolarCity in a similar fashion." *Id.*

CW3, like CW1, was a concierge who stated that the SolarCity database was "really detailed" and tracked every contract and interaction with a customer. *Id.* ¶¶ 79–80. CW3 stated that the cancellation rate was "very high" and possibly 50%, but that salespeople would "do what they could to retain customers." *Id.*

CW4 was also a concierge. *Id.* ¶ 81–86. CW4 stated that the database contained old

48

contracts that were "unlikely ever to be installed, but which [salespeople] would claim were 'moving forward.'" *Id.* CW4 stated that the "backlog of old and inactive contracts that would not be installed . . . diminished near the end of the Class Period (following the departure of Defendant Barnard)." *Id.* CW4 stated that these contracts were then "purged" in August 2016, approximately 3 to 4 months after the May 9, 2016 end of the Class Period. *Id.*

CW5 was a salesperson for SolarCity. *Id.* ¶¶ 87–95. CW5 states that Barnard would lead weekly calls that were "intended to 'prop up' and encourage the sales force and that he was a major driver of SolarCity's aggressive expansion and emphasis on sales numbers." *Id.* CW5 stated that many sales contracts were of "dubious quality," and that they were hard to come by "as of late 2015." *Id.* CW5 stated that "by the end of 2015, only 10%–20% of 'total sales' were resulting in installations." *Id.*

Plaintiffs argue that these CW statements together show the individual Defendants' scienter. The Court disagrees. Even when read together, these statements do not provide any information about the individual Defendants' knowledge of the falsity of their statements when those statements were made. The above CWs discuss the "low quality contracts" and backlog with old and inactive contracts in the SolarCity database, but provide no allegations about why any of the individual Defendants would know that these contracts were extremely unlikely to result in installations. Moreover, most of these statements are not tied to any specific time frame, and thus are not necessarily contemporaneous with any of the allegedly false or misleading misstatements.

The only mention of any of the individual Defendants at all are CW2's and CW5's statements about Barnard. CW2 stated that he or she "attributed" the sales tactics that resulted in low quality contracts to Barnard, but provides no detail about how CW2 knew that Barnard was the source of these sales tactics. *Id.* ¶ 77 ("CW2 attributed [the sales tactics] to defendant Barnard, who had come to SolarCity from the mortgage industry and operated at SolarCity in a similar fashion, selling solar contracts to 'anybody who gave the time of day' even though these 'quick sales' often had 'no value proposition to the customer.'"). This allegation regarding Barnard is a

49

supposition that Barnard was to blame for the sales tactics because he had previously worked for a mortgage company. The complaint does not allege specific facts showing that he promulgated any particular sales strategy. Similarly, CW5 states that Barnard would lead weekly calls to encourage the sales force, but provides no specific allegations about the contents of those calls and whether Barnard was encouraging the use of dubious practices to obtain low quality contracts.

On the whole, these CW statements are general, vague, and do not satisfy Plaintiffs' burden of showing "specific contemporaneous . . . conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi*, 253 F.3d at 432. The CW statements fail to "identify[] what each Defendant purportedly knew about the challenged backlog figures and revenue forecasts." *In re Accuray*, 757 F. Supp. 2d at 949. Instead, Plaintiffs' allegations about "[i]ndividual Defendants' contemporaneous knowledge is . . . merely speculative." *Bao v. SolarCity Corp.*, 2016 WL 4192177, at *10–11 (N.D. Cal. Aug. 9, 2016).

Moreover, the Court notes that none of the individual Defendants sold SolarCity stock during the Class Period and one of the individual Defendants, Buss, actually purchased stock. ECF No. 56. The lack of any stock sale by individual Defendants during the Class Period does not conclusively establish a lack of scienter, but supports an inference of no scienter. *In re Rigel*, 697 F.3d at 884 ("[B]ecause none of the defendants sold stock during the period between the allegedly fraudulent statements and the subsequent public disclosure . . . , the value of the stock and stock options does not support an inference of scienter. . . . In fact, it supports the opposite inference.").[8]

Accordingly, the Court finds that even when viewed holistically, the CW evidence and the facts alleged in the complaint do not create a strong inference of scienter.

### b.    Core Operations Theory

---

[8] The Court notes that Plaintiffs allude to the existence of an SEC investigation into SolarCity's business practices. Although such an investigation may be relevant as part of the holistic scienter determination, Plaintiffs provide little information about what exactly the SEC was or is investigating and the results of that investigation. Without such information, these vague allegations are insufficient to establish scienter.

50

Even though there is no direct evidence of scienter, Plaintiffs argue that they have adequately pled scienter through a "core operations" theory. The core operations theory may be used to impute to a company's key officers knowledge of "facts critical to a business's 'core operations' or an important transaction." *South Ferry*, 542 F.3d at 783. This theory may be used where the allegations in the complaint (1) "when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations"; (2) "are particular and suggest that defendants had actual access to the disputed information"; or (3) "in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Police Retirement*, 759 F.3d at 1062 (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785–86 (9th Cir. 2008)). The Court addresses each of the core operations theories in turn.

As to the first core operation theory, the Court already held above that the facts alleged in the complaint do not give rise to a "strong inference of scienter." Thus, for the same reasons, the Court does not find that the allegations in the complaint create a "cogent and compelling" inference of scienter. *Police Retirement*, 759 F.3d at 1062 (citation omitted).

As to the second core operation theory, "[a] plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring . . . or witness accounts demonstrating that executives had actual involvement in creating false reports" and "specific allegations about management's exposure to factual information within the company." *Id.* "[P]laintiffs might include in their complaint 'specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database,' a specific admission from a top executive that '[w]e know exactly how much we have sold in the last hour around the world,' or other particular 'details about the defendants' access to information within the company.'" *Zucco*, 552 F.3d at 1000 (internal quotation marks and citations omitted).

The complaint contains no allegation of "specific admissions" by any of the individual Defendants about detailed involvement in the minutia of SolarCity's operations. Instead,

Plaintiffs point to the following allegations to contend that the individual Defendants had "actual involvement in creating false reports" and "exposure to factual information within the company." *Id.* Plaintiffs point to the fact that (1) the individual defendants were in senior positions at SolarCity (Rive was CEO; Buss and Serra were CFOs, and Barnard was the CRO), Compl. ¶ 20–23; (2) SolarCity makes statements that it is a "data driven" company and its management software is "used to track and manage every project," *id.* ¶ 162; (3) in the earnings conference calls with business analysts, Serra stated that SolarCity had "really sophisticated forecasting models" and Rive discussed the "1 million customer[]" goal, *id.* ¶ 102, 116, 126; (4) Barnard allegedly was a "major driver" of SolarCity's growth strategy, *id.* ¶ 52–54; and (5) the individual Defendants made use of the "key operating metrics," which relied on the number of contracts in the backlog. *Id.*

Plaintiffs have failed to adequately allege facts that "are particular and suggest that defendants had actual access to the disputed information." *Police Retirement*, 759 F.3d at 1062 (citation omitted). At most, these allegations show that the individual Defendants had access to the key operating metrics that were reported in the quarterly shareholder letters and the Forms 10-Q. There is no allegation that the individual Defendants ever accessed the database that is "used to track and manage every project" or were involved in working with the data inputs for SolarCity's "sophisticated forecasting models." *Id.* ¶ 162.

In *Police Retirement*, the Ninth Circuit addressed circumstances where confidential witnesses stated that "the [individual defendants] were involved with [the company's] day-to-day operations and were familiar with the contents of the software-generated reports because the substance of the reports was discussed in meetings." *Police Retirement*, 759 F.3d at 1062. However, the Ninth Circuit noted that the allegations were missing references to "specific reports and their contents [that were seen by] the executives." *Id.* Similarly, in *Zucco*, the Ninth Circuit held that "allegations that senior management . . . closely reviewed the accounting numbers generated . . . each quarter" were insufficient to establish scienter because "[n]othing in the complaint suggests that [the individual defendant] had access to the underlying information from

52

which the accounting numbers were derived." *Zucco*, 552 F.3d at 998–1000. Here, although Defendants had access to the "key operating metrics" that were in the shareholder reports and Forms 10-Q and potentially the predictions from SolarCity's "sophisticated forecasting models," there is no allegation that any individual Defendants ever accessed the database containing the customer information or any of the data inputs for SolarCity's "sophisticated forecasting models." There is no allegation that the individual Defendants ever saw "specific reports and their contents" that could have revealed the falsity of the individual Defendants' statements. *Police Retirement*, 759 F.3d at 1062. Accordingly, the Court finds that Defendants have not alleged sufficient information to satisfy the second core operations theory.

As to the third core operations theory, this is not the "rare circumstance" in which it would be "absurd" to suggest that the individual defendants had no knowledge of the allegedly low quality and old and inactive contracts in the SolarCity backlog. *See S. Ferry LP*, 542 F.3d at 786. This case is unlike *Berson*, where the Ninth Circuit held "that these high-level managers must have known about the orders [to stop work on contracts that constituted 30% of the company's revenue] because of their devastating effect on the corporation's revenue. *Berson*, 527 F.3d at 989. In *Berson*, the stop work orders "respectively 'halted between $10 and $15 million of work on the company's largest contract with one of its most important customers,' 'halted $8 million of work,' 'caused the company to reassign 50–75 employees,' and 'required [Defendant] to complete massive volumes of paperwork.'" *Zucco*, 552 F.3d at 1001 (quoting *Berson*, 527 F.3d at 988 n.5).

Here, in contrast, similar circumstances do not exist. Plaintiffs' theory is that Defendants' statements were false because Defendants' database was artificially inflated with contracts obtained by deception, low quality contracts, and improperly retained contracts. However, as noted above, Plaintiffs do not allege that any individual Defendants had any knowledge that any contracts were obtained by deception, were of low quality, or were improperly retained.

Plaintiffs point to the alleged 50% cancellation rate of contracts to argue that Defendants clearly should have known that the number of contracts was artificially inflated by contracts obtained by deception, low quality contracts, or improperly retained contracts. However,

Plaintiffs also allege that SolarCity contracts allowed customers to cancel with no penalties up until solar system installation and the start of the customer's 20 year commitment to SolarCity. Plaintiffs have failed to adequately allege that the cancellation rate would have been unexpected under such a business model or that the cancellation rate was higher during the class period. Indeed, CW2 states that the "historical" cancellation rates had been 50% even before the class period and before the allegedly false or misleading statements. Compl. ¶¶ 76–77. Thus, given SolarCity's lenient cancellation policy before installation and the start of a customer's 20 year commitment, it is not "absurd to suggest" that the individual Defendants did not know that the cancellation rate during the class period meant that the contracts in the backlog were (as Plaintiffs allege) obtained by deception, were of low quality, or were improperly retained in SolarCity's database. Therefore, Plaintiffs' arguments concerning the third core operations theory fail.

Accordingly, whether looked at holistically or with the core operations theory, Plaintiffs fail to adequately allege scienter.

### B. Section 20(a) of the Exchange Act

Congress has established liability in § 20(a) for "[e]very person who, directly or indirectly, controls any person liable" for violations of the securities laws. 15 U.S.C. § 78t(a). To prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law;" and (2) "that the defendant exercised actual power or control over the primary violator." *See Howard*, 228 F.3d at 1065. Because Plaintiffs have failed to plead a primary securities law violation, Plaintiffs have also failed to plead a violation of Section 20(a). *See In re Cutera*, 610 F.3d at 1113 n. 6. Accordingly, Defendants' motion to dismiss Plaintiffs' claim under Sections 20(a) is also GRANTED with leave to amend.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss with leave to amend. Should Plaintiffs elect to file an amended complaint curing the deficiencies identified herein, Plaintiffs shall do so within thirty (30) days of this Order. Failure to meet the thirty-day deadline to file an amended complaint or failure to cure the deficiencies identified in this Order

54

will result in a dismissal with prejudice of Plaintiffs' claim.  Plaintiffs may not add new causes of action or parties without leave of the Court or stipulation of the parties pursuant to Rule 15 of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED.**

Dated: August 11, 2017

*Lucy H. Koh*
LUCY H. KOH
United States District Judge

Case No. 16-CV-04686-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS